# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services*, and ROGER SEVERINO, *in his official capacity as Director of the Office for Civil Rights at the United States Department of Health and Human Services*,<br><br>                    Defendants. | Civil Action No. 1:20-cv-5583<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Congress enacted the Patient Protection and Affordable Care Act ("ACA"), Pub.

L. No. 111-148, 124 Stat. 119 (codified at 42 U.S.C. §§ 18001-18122 (2010)), to expand access

to health care, ensure that health services are broadly available in the United States, and address

significant barriers to health care access caused by inadequate and discriminatory health insurance coverage.

2.      The ACA contained a landmark civil rights provision, 42 U.S.C. § 18116 (commonly known as Section 1557), intended to strike at these barriers by prohibiting discrimination in health care and health insurance.  Section 1557 prohibits all health programs and activities receiving federal financial assistance, including medical providers, health systems, and health insurers, from discriminating against individuals on the basis of race, color, national origin, sex, age, or disability.  Section 1557 was the first federal civil rights law to comprehensively prohibit discrimination in health care, complementing existing protections under other laws, and the first to expressly extend prohibitions on sex discrimination to health care providers and insurers.

3.      After the ACA went into effect in 2010, Defendant U.S. Department of Health and Human Services ("HHS" or the "Department"), confirmed that Section 1557's statutory prohibition on discrimination "on the basis of sex" barred, among other things, discrimination based on gender identity, nonconformity to sex stereotypes, and pregnancy-related conditions. In 2012, the Director of HHS's Office for Civil Rights ("OCR") advised that "Section 1557's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity" and that OCR "will accept such complaints for investigation."[1]  In 2014, OCR settled a complaint against Brooklyn Hospital after the hospital put the complainant, a transgender woman, in a room with a man.

4.      In 2013, HHS, under its authority to promulgate Section 1557 implementing regulations, commenced a three-year-long process to codify the statute's civil rights protections

---

[1] Letter from HHS OCR Director Leon Rodriguez to Maya Rupert (July 12, 2012), *available at* https://hrc.org/files/assets/resources/HHSResponse8612.pdf.

into HHS's regulations by issuing a Request for Information Regarding Nondiscrimination in

Certain Health Programs or Activities, 78 Fed. Reg. 46,588 (Aug. 1, 2013) ("2013 RFI") to

inform the agency's anticipated rulemaking.  That process concluded on May 18, 2016 with the

publication of a Final Rule, Nondiscrimination in Health Programs and Activities, 81 Fed. Reg.

31,376 (codified at 45 C.F.R. § 92) (the "2016 Rule").

5.     In the 2016 Rule, HHS recognized "that a fundamental purpose of the ACA is to

ensure that health services are available broadly on a nondiscriminatory basis to individuals

throughout the country," and that "[e]qual access for all individuals without discrimination is

essential to achieving this goal."  81 Fed. Reg. 31,444.  The rule found that discrimination in the

health care context "can often lead to poor and inadequate health care or health insurance or

other coverage for individuals and exacerbate existing health disparities in underserved

communities," including causing individuals facing discrimination to avoid seeking care,

resulting in adverse public health outcomes and higher medical costs associated with that

delayed or denied care.  *Id*.  HHS also cited substantial evidence of ongoing health care

discrimination—and the related harms to individuals and the public—experienced by transgender

people, women and other individuals seeking reproductive health care or with pregnancy-related

conditions, individuals with limited English proficiency ("LEP") ("LEP individuals"), and

people with disabilities, and detailed the pervasive, discriminatory barriers to adequate health

care faced by these groups.  *Id.* at 31,459-61.

6.     To address these barriers and fulfill Section 1557's antidiscrimination mandate,

the 2016 Rule detailed the obligations of health care providers and insurers with respect to

transgender people, women and individuals seeking reproductive health care, LEP individuals,

and people with disabilities.  The 2016 Rule's key provisions included: (a) clarifying that Section

1557 broadly applies to all health providers and insurers that receive federal financial assistance, *id.* at 31,467 (codified at 45 C.F.R. § 92.4); (b) clarifying that the statute's prohibition on discrimination on the basis of sex included discrimination based on gender identity, sex stereotypes, and pregnancy-related conditions, *id.*; (c) specifying covered entities' obligations to transgender individuals, *id.* at 31,471-72 (codified at 45 C.F.R. §§ 92.206, 92.207); (d) establishing detailed language access requirements to ensure nondiscriminatory access to health services for LEP individuals, *id.* at 31,410-11 (codified at 45 C.F.R. § 92.201); and (e) establishing a uniform enforcement scheme for all forms of discrimination prohibited by the statute, *id.* at 31,439-40.

7.      A mere three years later, Defendants promulgated a proposed rule, Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846 (June 14, 2019) ("2019 NPRM"), that would eviscerate the 2016 Rule and eliminate many of its core protections.  HHS received nearly 200,000 comments to the proposed rule, many opposing the stark retreat from the 2016 Rule's protections.

8.      On June 19, 2020, Defendants published a Final Rule, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (to amend and be codified at 45 C.F.R. pt. 92) ("2020 Rule" or "Rule"). The 2020 Rule, by Defendants' own admission, made only "minor and primarily technical corrections" to the 2019 NPRM, notwithstanding the substantial number of public comments.  85 Fed. Reg. 37,161.  The 2020 Rule arbitrarily and unlawfully strips health care rights statutorily guaranteed by Section 1557 from transgender people, women and other individuals seeking reproductive health care or with pregnancy-related conditions, LEP individuals, individuals with disabilities, and other individuals experiencing discrimination.  The Rule, published in the midst

of the global COVID-19 pandemic, will impose unjustifiable barriers to health care on vulnerable populations at a time when access to care is as crucial as ever.

9. Remarkably, Defendants published the 2020 Rule mere days *after* the Supreme Court confirmed, in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that the prohibition on sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* prohibits discrimination based on sexual orientation or transgender status.[2]  The Rule ignores *Bostock*, redefining discrimination "on the basis of sex" to *exclude* express regulatory protections against gender identity discrimination, removing the specific protections for transgender people contained in the 2016 Rule, and striking the express prohibitions on sexual orientation and gender identity discrimination from other HHS regulations.

10. These changes—coupled with Defendants' well-established animus towards transgender people and their health care needs—makes clear that HHS will not abide by its statutory obligation to enforce Section 1557's protections for lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people.  This is one of many actions taken by HHS and other agencies during the Trump Administration to roll back protections for LGBTQ people.

11. The 2020 Rule, without sufficient justification, purports to redefine covered "health program or activity" to newly exclude many health insurers not "principally engaged in the business of providing healthcare."  85 Fed. Reg. 37,244.  This redefinition, in conflict with the statute, arbitrarily and narrowly defines "healthcare" to exclude health insurance, thus removing many private employer-based plans, Medicare Part B plans, and the Federal Employee Health Benefits ("FEHB") program from the Rule's scope.  The Rule also unlawfully excludes many programs administered by HHS and other federal agencies from the scope of the

---

[2] This Complaint interchangeably uses the phrases "transgender status" and "gender identity" in referring to the prohibited forms of discrimination against transgender people for being transgender.

regulation's coverage.  This redefinition—which is at odds with the plain language of Section 1557 and the statute's core purpose of eliminating discrimination by health care providers and health insurance companies—will reduce express federal protections for all victims of health care discrimination.  By adopting this unduly narrow definition of "health program or activity," HHS has unlawfully abdicated its responsibility to enforce the full and proper scope of Section 1557's statutory protections.

12.     The 2020 Rule also guts the robust language access provisions of the 2016 Rule, including eliminating requirements that covered entities notify LEP individuals of their rights and reducing entities' obligations to ensure that LEP individuals are afforded appropriate language access services while seeking and obtaining health care.

13.     Contrary to its stated purpose of "reduc[ing] confusion," 85 Fed. Reg. 37,202, the 2020 Rule unnecessarily sows confusion.  The Rule deletes the uniform Section 1557 enforcement standards contained in the 2016 Rule, resorting instead to cross-referencing a complicated and inconsistent hodge-podge of standards in other civil rights statutes.

14.     The Rule also runs afoul of Section 1557 by creating a broad religious exemption that has no basis in that statute and that attempts to give religiously-affiliated providers and insurers license to deny care and coverage for discriminatory reasons, jeopardizing the health and well-being of individuals for whom a religiously-affiliated health plan or provider may be the only option.

15.     Defendants' unlawful and arbitrary rollback of health care protections will harm Plaintiffs and their residents.  Plaintiffs the State of New York, State of California, Commonwealth of Massachusetts, State of Colorado, State of Connecticut, State of Delaware, the District of Columbia, State of Hawaii, State of Illinois, State of Maine, State of Maryland,

State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New

Mexico, State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of

Rhode Island, State of Vermont, Commonwealth of Virginia, and State of Wisconsin, bring this

action to vacate the 2020 Rule and enjoin its implementation because it is arbitrary, capricious,

an abuse of discretion, and contrary to law, in violation of the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2)(A); exceeds Defendants' statutory jurisdiction, authority, and

limitations in violation of the APA, 5 U.S.C. § 706(2)(C); and violates the equal protection

guarantee of the Fifth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346,

and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the

Administrative Procedure Act, 5 U.S.C. § 702.

17.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and

706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are United States agencies or officers sued in their official capacities.  Plaintiff the

State of New York is a resident of this judicial district, and a substantial part of the events or

omissions giving rise to this Complaint occurred and are continuing to occur within this district.

## PARTIES

19.     Plaintiff the State of New York, represented by and through its Attorney General,

is a sovereign state of the United States of America.  The Attorney General is New York State's

chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive

Law § 63.

20.     Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action.  The Attorney General is the chief law officer of the State of California and has the authority to file civil actions in order to protect public rights and interests.  Cal. Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

21.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3,10.

22.     Plaintiff the State of Colorado, represented by and through its Attorney General, Phil Weiser, brings this action.  The Attorney General is Colorado's chief legal representative and is authorized to pursue this action on behalf of the State under Colo. Rev. Stat. § 24-31-101.

23.     Plaintiff State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America.  The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq*.

24.     Plaintiff the State of Delaware is a sovereign state of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State."  *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  Del. Code Ann. tit. 29, § 2504.

25.     Plaintiff District of Columbia is a sovereign municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.

The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

26.     Plaintiff the State of Hawaii, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Clare E. Connors is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts and in all cases, criminal or civil, in which the State may be a party or be interested. Haw. Rev. Stat. § 28-1. The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party. Haw. Rev. Stat. § 26-7. This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority. *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

27.     Plaintiff the State of Illinois, by and through Attorney General Kwame Raoul, is a sovereign state of the United States of America. The Attorney General brings this action as the state's chief legal officer pursuant to 15 ILCS 205/4.

28.     Plaintiff, the State of Maine, represented by and through its Attorney General Aaron M. Frey, is a sovereign state of the United State of America. The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business. Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq*. The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest. The Attorney General has the authority to file suit to

challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

29.     Plaintiff the State of Maryland, by and through its Attorney General, Brian E. Frosh, brings this action. The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

30.     Plaintiff State of Michigan, represented by and through Attorney General Dana Nessel, is a sovereign state of the United States of America.  The Attorney General is the State of Michigan's chief law enforcement officer and is authorized to pursue this action under Mich. Comp. Laws § 14.28.

31.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Keith Ellison is the chief legal officer of the State of Minnesota and his powers and duties include filing lawsuits in federal court on behalf of the State of Minnesota. Minn. Stat. § 8.01.

32.     Plaintiff the State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of Nevada.  Nev. Rev. Stat. § 228.170.  Governor Stephen F. Sisolak is the

chief executive officer of the State of Nevada.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  Nev. Const., art. 5, § 1.

33.     Plaintiff State of New Jersey is a sovereign state of the United States of America.  This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer.  N.J. Stat. Ann. § 52:17A-4(e), (g).

34.     Plaintiff the State of New Mexico, by and through Attorney General Hector Balderas, brings this action. The Attorney General is the head of New Mexico's Department of Justice, N.M. Stat. Ann, § 8-5-1, and is authorized to prosecute and defend on behalf of the state when, in his judgment, the interest of the state requires such action. *Id.* at § 8-5-2.

35.     Plaintiff the State of North Carolina, represented by and through Attorney General Joshua H. Stein, is a sovereign state of the United States of America.  The Attorney General is the State of North Carolina's chief law enforcement officer and brings this challenge pursuant to his independent constitutional, statutory, and common-law authority.

36.     Plaintiff the State of Oregon, acting by and through the Attorney General of Oregon, Ellen F. Rosenblum, is a sovereign state of the United States of America.  The Attorney General is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210, and 180.220.

37.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1. Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204.

38.     Plaintiff the State of Rhode Island, represented by and through its Attorney General, is a sovereign state of the United States.  Attorney General Peter F. Neronha is the chief legal advisor to the State of Rhode Island and is authorized to pursue this action pursuant to his constitutional, statutory, and common law authority.  R.I. Const. art. IX § 12, R.I. Gen. Laws §§ 42-9-1 et. seq.

39.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

40.     Plaintiff the Commonwealth of Virginia, by and through Attorney General Mark R. Herring, brings this action.  The Attorney General is the chief executive officer of the Department of Law and performs all legal services in civil matters for the Commonwealth.  Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507.

41.     Plaintiff State of Wisconsin is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests.  *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested."  *Id.*

42.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the 2020 Rule harms their sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the 2020 Rule is vacated.

43.     Defendant HHS is a cabinet agency within the executive branch of the United States government, and is an agency within the meaning of 5 U.S.C. § 552(f).  HHS promulgated the 2020 Rule and is responsible for its enforcement.

44.     Defendant Alex M. Azar II is the Secretary of HHS and is sued in his official capacity.

45.     Defendant Roger Severino is the Director of HHS's Office for Civil Rights and is sued in his official capacity.

## ALLEGATIONS

### I.     STATUTORY BACKGROUND

46.     The 2020 Rule amends the Department's regulations implementing two federal civil rights statutes: Section 1557 of the ACA and Title IX of the Education Amendments of 1972.

### A.     The Affordable Care Act

47.     The ACA, enacted to expand access to affordable, quality health care and coverage across the United States, instituted significant changes to the American health care system.  Recognizing that inadequate health insurance coverage was a significant barrier to health care access, Title I of the ACA ("Title I") made significant reforms to the private health insurance market and public insurance programs, including establishing detailed requirements for qualified health plans and essential health benefits under health insurance plans, as well as expanding consumer choice through health insurance exchanges, tax credit programs, and other provisions intended to expand choice and reduce discrimination in health care.

48.     The ACA's landmark civil rights provision, Section 1557, was the first federal law to expressly and comprehensively prohibit discrimination in the American health care

system on the basis of race, color, national origin, sex, age, and disability.  42 U.S.C. § 18116.

The law incorporates the protected classifications and enforcement mechanisms from Title VI of

the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI") (race, color, and national

origin); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX")

(sex); the Age Discrimination Act of 1975, 42 U.S.C. § 6101 *et seq.* ("Age Act") (age); and

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") (disability).

> 49.     Under Section 1557,

> an individual shall not, on the ground prohibited under [Title VI, Title IX, the Age
> Act, or Section 504], be excluded from participation in, be denied the benefits of,
> or be subjected to discrimination under, any health program or activity, any part of
> which is receiving Federal financial assistance, including credits, subsidies, or
> contracts of insurance, or under any program or activity that is administered by an
> Executive Agency or any entity established under [Title I] (or amendments)," and
> "[t]he enforcement mechanisms provided for and available under such [Title VI,
> Title IX, Section 504] or such [Age Act] shall apply for purposes of violation of
> this subsection.

42 U.S.C. § 18116(a).  Section 1557 expressly applies to "any health program or activity, any

part of which is receiving Federal financial assistance" or is administered by the federal

government.  *Id.*

> 50.     The statute authorizes the Secretary of HHS to "promulgate regulations to

implement this section."  *Id.* § 18116(c).

> 51.     A companion provision, Section 1554 of the ACA, 42 U.S.C. § 18114, prohibits

the Secretary of HHS from:

> promulgat[ing] any regulation that—(1) creates unreasonable barriers to the ability
> of individuals to obtain appropriate medical care; (2) impedes timely access to
> health care services; (3) interferes with communications regarding a full range of
> treatment options between the patient and provider; (4) restricts the ability of health
> care providers to provide full disclosure of all relevant information to patients
> making health care decisions; (5) violates the principles of informed consent and
> the ethical standards of health care professionals; or (6) limits the availability of
> health care treatments for the full duration of a patient's medical needs.

14

### B.    Title IX

52.    Title IX of the Education Amendments of 1972 provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

53.    Title IX "authorize[s] and direct[s]" each federal department and agency that provides federal financial assistance to education programs and activities, including HHS, to promulgate implementing regulations.  *Id.* § 1682.

54.    Title IX contains several exceptions applicable to educational institutions, including one exempting educational institutions controlled by religious organizations from complying with Title IX provisions that are inconsistent with the organization's religious tenets. *Id.* § 1681(a)(1)-(9).

## II.    REGULATORY HISTORY

### A.    Following the ACA's enactment, HHS enforced Section 1557 to protect transgender and gender nonconforming people from discrimination by health providers and insurers.

55.    HHS's OCR has primary administrative enforcement authority over Section 1557. After Section 1557 went into effect in 2010, OCR began accepting and investigating complaints of discrimination prohibited by Section 1557 against covered health programs and activities, including by transgender and gender nonconforming people alleging discrimination based on sex.

56.    Even before promulgating the 2016 Rule, HHS interpreted Section 1557's sex discrimination prohibition to cover discrimination based on gender identity, gender nonconformity, and sex stereotypes.

15

57.     HHS's post-ACA enforcement efforts were consistent with the Department's

finding that "[i]ndividuals, families and communities that have systematically experienced social

and economic disadvantage face greater obstacles to optimal health, and that "[c]haracteristics

such as race or ethnicity, religion, [socioeconomic status], gender, age, mental health, disability,

sexual orientation or gender identity, geographic location, or other characteristics historically

linked to exclusion or discrimination are known to influence health status."[3]  Indeed, in the 2013

RFI, HHS expressly observed that "Section 1557 is consistent with and promotes several of the

Administration's and Department's key initiatives that promote health and equal access to health

care."  78 Fed. Reg. 46,558-59.

> **B.**     **During initial rulemaking, HHS learned of widespread, harmful discrimination against LGBTQ people, women and other individuals seeking reproductive health services and with pregnancy-related conditions, and LEP individuals.**

58.     HHS first commenced Section 1557 rulemaking with the 2013 RFI, which

requested information on: (1) examples and experiences of discrimination in the health care

context on the bases prohibited under Section 1557, including based on gender identity, sex

stereotypes, and pregnancy; (2) the impacts of such discrimination; and (3) other information

relevant to formulating a Section 1557 implementing regulation.  78 Fed. Reg. 46,559-60.

59.     The 2013 RFI yielded 402 responses, more than half of which were from

transgender individuals sharing their experiences with health care discrimination, as well as

many comments from civil rights organizations, advocacy groups, and medical organizations

providing information and data on the experiences with health care discrimination faced by

transgender people, women, LEP individuals, and others.  *See* Nondiscrimination in Health

---

[3] *HHS Action Plan to Reduce Racial and Ethnic Health Disparities*, U.S. Dep't of Health and Human Servs., 2 (2011) ("Action Plan"), https://minorityhealth hhs.gov/assets/pdf/hhs/HHS_Plan_complete.pdf.

Programs and Activities: Notice of Proposed Rulemaking, 80 Fed. Reg. 54,172 (Sept. 8, 2015)

("2015 NPRM").

60.     With respect to the LGBTQ community, the Department obtained information

through the 2013 RFI documenting the widespread discrimination against LGBTQ people by

health care providers, including physical and verbal abuse, outright refusals of care, denials of

insurance coverage for medically necessary services, and other hostile or disparate treatment, as

well as the poorer health outcomes and serious or catastrophic health consequences resulting

from this discrimination.

61.     Individual LGBTQ commenters shared experiences, including being subjected to

categorical coverage exclusions for gender-confirming health treatments, being subject to

inappropriate and humiliating comments from providers relating to sexual orientation, and being

denied essential medical care simply for being gay, transgender, or intersex.  Examples of these

comments, among many like them, included:

- A transgender man had a biopsy indicating that he had breast cancer.  Because the

    attending physician objected to his gender identity, the physician did not inform

    him of the test results.  The patient later learned from a lab technician of his

    cancer diagnosis, after the cancer had progressed past the point where

    chemotherapy could effectively treat it.

- A gay man reported: "My doctor knew or thought I was gay.  I had to have a

    proctological exam of my rectum.  There was an insurance problem so I went to

    the insurance office, and was faced with the fact that the doctor said the exam was

necessary because of sexual orientation and because he thought that I liked large

items inserted in my rectum. This was totally embarrassing and humiliating."[4]

- A person with XXY chromosomes, who is female, shared that she was required to

  use a "male" gender marker for treatment and insurance purposes, leading to

  problems obtaining appropriate care from her doctor.  The commenter stated that

  "trying to use the medical system to effect my personal medical treatment is a

  nightmare.  I should not be required to declare that I am male because I share a

  genetic signature with a number of identified people who are mostly male, but

  also include some whom are not male like me.  The stigma attached to attaining

  medical services rendered from these types of regulations show that as they stand

  now simply asking to be treated in my native gender is in itself a minefield.  The

  only diagnosis the hospitals can use requires me to be male, and has no exceptions

  for if I am not male."[5]

62.     Commenters responding to the 2013 RFI also documented the rampant

discrimination faced by women and others seeking reproductive health services and with

pregnancy-related conditions (including insurance coverage exclusions and discriminatory

treatment by providers), barriers to effective care faced by LEP individuals denied access to

adequate language assistance services, and widespread discrimination against people with

disabilities.  The comments also provided data showing that this pervasive discrimination deters

people from seeking care, including preventative care, due to a fear of experiencing

discrimination, resulting in serious, adverse health consequences.

---

[4] Available at https://www.regulations.gov/document?D=HHS-OCR-2013-0007-0040.
[5] Available at https://www.regulations.gov/document?D=HHS-OCR-2013-0007-0016.

63.     On September 8, 2015, HHS promulgated its proposed Section 1557 implementing regulations.  80 Fed. Reg. 54,172.

64.     During the notice and comment period on the 2015 NPRM, HHS received nearly 25,000 comments in response to the proposed rule from individuals, civil rights organizations, health providers, insurers, and state and local governmental agencies, among others.  81 Fed. Reg. 31,376.  These comments further substantiated the significant, widespread discrimination faced by LGBTQ people, women and individuals seeking pregnancy-related care, LEP individuals, and people with disabilities, and the critical need for HHS's robust enforcement of Section 1557's protections on behalf of these groups.

**C.     The 2016 Rule implemented Section 1557 consistent with HHS's statutory mandate to eradicate discriminatory barriers to health care access.**

65.     On May 18, 2016, HHS published the 2016 Rule to implement Section 1557's protections.  81 Fed. Reg. 31,376.  The rule went into effect on July 18, 2016, with provisions applicable to health insurance and group benefit design becoming applicable on January 1, 2017, the first day of the plan year following the rule's publication.  *Id.*

66.     The Department stressed that the 2016 Rule was intended to effectuate Section 1557's broad antidiscrimination mandate and to serve the ACA's central purpose of "expand[ing] access to care and coverage and eliminat[ing] barriers to access."  *Id.* at 31,377.  The 2016 Rule made express factual findings that discrimination within the health care system contributes to inadequate insurance coverage and poor health outcomes, exacerbates health disparities in underserved communities, and contributes to the inequitable distribution of health care resources.  *Id.* at 31,444.  It further found that "individuals who have experienced discrimination in the health care context often postpone or do not seek needed care," and are

denied the ability to obtain health services provided to others, resulting in adverse health effects. *Id.*

67. Consistent with Section 1557's general statutory prohibition against discrimination, the 2016 Rule required that, "[e]xcept as provided in Title I of the ACA, an individual shall not, on the basis of race, color, national origin, sex, age, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which this part applies," and set forth specific prohibitions and exceptions. *Id.* at 31,469-70 (§ 92.101).

68. The 2016 Rule defined a "covered entity" as: "(1) An entity that operates a health program or activity, any part of which receives Federal financial assistance; (2) An entity established under Title I of the ACA that administers a health program or activity; and (3) The Department." *Id.* at 31,466 (§ 92.4). The rule defined "health program or activity" as "the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage." *Id.* at 31,467 (§ 92.4). The rule clarified that, where an entity is principally engaged in these activities, such as hospitals, group health plans, health insurers, and nursing or treatment facilities, all of that entity's operations are subject to Section 1557. *Id.*

69. Consistent with federal case law, HHS's own enforcement policies and practices, and the enforcement policies and practices of other federal agencies, the 2016 Rule defined discrimination "on the basis of sex" to include, but not be limited to, "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Id.*; *see also id.* at 31,387-88.

Although the rule stopped short of expressly including sexual orientation discrimination as a form of sex discrimination, it noted the rapidly evolving law on the question of whether federal sex discrimination laws prohibited sexual orientation discrimination, and observed that, at minimum, any LGBTQ person facing discrimination based on nonconformity to sex stereotypes would be covered by the law. *Id.* at 31,388-90.

70.     With respect to health insurance, the 2016 Rule specifically prohibited insurers from, on the basis of any protected category: denying, limiting, or refusing to issue insurance plans or policies, denying or limiting coverage, or imposing additional cost sharing or other limitations on coverage; maintaining discriminatory marketing practices or benefit designs; and denying or limiting coverage to transgender people both for routine and transition-related health care. *Id.* at 31,471-72 (§ 92.207).  Recognizing the unique barriers to adequate health care faced by the transgender community, the 2016 Rule specified that denying or limiting coverage to a transgender person for "health services that are ordinarily or exclusively available to individuals of one sex" because of the person's gender identity, or maintaining categorical exclusions or limitations on transition-related treatments and services, violates Section 1557's sex discrimination prohibition. *Id.* at 31,471 (§ 92.206).

71.     The 2016 Rule directed covered entities to provide LEP individuals with "meaningful access" to their health programs and activities by, *inter alia*, providing language assistance services at no cost. *Id.* at 31,470-71 (§ 92.201).  Under the rule, "[a] covered entity shall take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered in its health programs and activities." *Id.* at 31,470 (§ 92.201(a)).  The required language assistance services "must be provided free of charge, be accurate and timely, and protect the privacy and independence of the

individual with limited English proficiency," which included offering qualified interpreters for oral communications and qualified translators for written content at no cost to the individual.  *Id.* (§ 92.201(c)-(d)).  The 2016 Rule restricted entities' ability to rely on family members to provide translation or interpretation services, and imposed specific requirements for the use of video remote interpretation services.  *Id.* at 31,470-71 (§ 92.201(e)-(f)).

72.     The 2016 Rule required covered entities to take appropriate and ongoing steps to notify beneficiaries, enrollees, applicants, and members of the public of the entity's Section 1557-compliant nondiscrimination policy, including providing notice that the entity provides the language access services and auxiliary aids and services for individuals with disabilities required by the rule, and information on how to obtain those services.  *Id.* at 31,469 (§ 92.8).  The rule further required each entity to make its nondiscrimination notice available in the top 15 languages spoken by LEP individuals in the relevant state or states, include taglines translated into each of those languages on the entity's websites and in significant communications, and take other measures to ensure LEP individuals have notice of their rights.  *Id.*  To ease the burden on covered entities, HHS provided sample nondiscrimination notices and taglines as appendices to the 2016 Rule, making translated versions of both available for covered entities' use in 64 languages.  *Id.* at 31,453, 31,472-73.

73.     The 2016 Rule adopted a uniform legal standard applied to all forms of discrimination prohibited by Section 1557.  This included recognizing the availability of compensatory damages, associational discrimination claims, and disparate impact claims, as well as the existence of a private right of action to challenge prohibited discrimination in court.  *Id.* at 31,472 (§ 92.301); *see also id.* at 31,439-40.  As explained in the 2015 NPRM, HHS intended this approach to avoid inconsistent application of the enforcement mechanisms in the statutes

incorporated by Section 1557, and "to simplify and make uniform, consistent, and easy to understand the various nondiscrimination requirements and rights available under Section 1557, as appropriate." 80 Fed. Reg. 54,194.

74.    HHS declined to incorporate Title IX's various exceptions into the 2016 Rule, correctly finding that those exceptions apply specifically to educational institutions and are inapposite to the health care context. 2016 Rule at 31,380; *see* 20 U.S.C. 1681(a)(1)-(9). This included declining to incorporate Title IX's blanket religious exemption allowing religious schools to claim exemption from specific Title IX provisions that conflict with the school's religious tenets. *See* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12. As HHS explained, Section 1557 itself contains no religious exemption and, unlike religious schools where attendance is a matter of choice, patients needing health care often have no choice but to obtain health care and coverage from religiously-affiliated entities. 81 Fed. Reg. 31,380. Thus, HHS determined that a blanket religious exemption in the health care context "could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious, and in some cases, life-threatening results." *Id.* The Department explained that other protections for religious entities under federal law would still be available to religiously-affiliated entities in the absence of a blanket exemption. *Id.*

75.    In promulgating the 2016 Rule, HHS carefully weighed a variety of expected costs and benefits of the rule's requirements. 81 Fed. Reg. 31,444-65. The 2016 Rule identified costs associated with complying with Section 1557's sex discrimination prohibition (including the specific requirements pertaining to health care for transgender people) and with the rule's language access and notice requirements. *Id.* at 31,446-59. The rule noted that HHS intended to minimize the cost impact of the notice requirements by providing sample, translated notices and

taglines for entities' use. *Id.* at 31,453. HHS determined that, based on the evidence gathered, the costs associated with the rule's requirements would be offset by the public health benefits associated with individuals' ability to access health care free from discrimination. *Id.* at 31,459-62.

76. For example, the Department cited research showing that LEP individuals with access to adequate language assistance services "experience treatment-related benefits, such as enhanced understanding of physician instruction, shared decision-making, provision of informed consent, adherence with medication regimes, preventive testing, appointment attendance, and follow-up compliance," and that providers also benefit by the ability to "more confidently make diagnoses, prescribe medications, reach treatment decisions, and ensure that treatment plans are understood by patients." *Id.* at 31,459.

77. The Department also cited research demonstrating the health benefits to women and transgender people that would likely accrue from the specific sex discrimination protections articulated in the rule. *Id.* at 31,460. The Department noted, for example, that transgender people are frequently deterred from seeking care because of discrimination they have faced, resulting in negative health consequences and costs associated with untreated or inadequately treated conditions. *Id.* It projected that the rule "would result in more women and transgender individuals obtaining coverage and accessing health services," reducing health disparities and uncompensated care costs to the government. *Id.* at 31,460-61.

## III.  DEFENDANTS INITIATED THE 2019 RULEMAKING WITH THE PURPOSE OF UNDERMINING SECTION 1557'S PROTECTIONS

78. On June 14, 2019—just three years after the 2016 Rule was published and less than three years after that rule took effect—Defendants issued the 2019 NPRM, in which they proposed erasing or reversing many of the 2016 Rule's core protections. 84 Fed. Reg. 27,846.

79.     The 2019 NPRM proposed eliminating the definition of "on the basis of sex," thereby removing express protections based on sex stereotyping, gender identity, and pregnancy-related conditions; redefining "health program or activity" to newly exclude many private insurers, the FEHB program, Medicaid Part B plans, and many HHS-administered programs from the regulation's reach; weakening the 2016 Rule's language access requirements, including eliminating notice and tagline requirements meant to notify LEP individuals of their rights; eliminating the uniform legal standard for violations of Section 1557; and adding a blanket religious exemption not contained in or authorized by the Section 1557 statute.  The 2019 NPRM also proposed "conforming" amendments to HHS's Title IX regulations and several unrelated regulations for grant-making programs run by the Center for Medicare and Medicaid Services. *Id.* at 27,850-51, 27,856, 27,860, 27,865, 27,868, 27,869-70, 27,870-71, 27,883-84.

80.     The 2019 NPRM relied heavily on one district court case, *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016), to justify the removal of the express gender identity protections contained in the Rule.  84 Fed. Reg. 27,848 n.10.  The 2019 NPRM ignored that, in the years since the 2016 Rule was promulgated, most federal courts to consider the question had reached the contrary view, interpreting Section 1557 to prohibit discrimination against transgender people.  And, while HHS acknowledged that the questions of whether gender identity and sexual orientation discrimination prohibited by federal sex discrimination laws would likely be resolved by the Supreme Court in the coming term, 84 Fed. Reg. 27,855, the Department nevertheless proceeded with rulemaking without the benefit of the Supreme Court's decision in *Bostock*.

81.     During the notice and comment period, HHS received an outpouring of comments opposing the massive rewrite of its Section 1557 implementing regulations.  HHS received

198,845 comments in response to the 2019 NPRM from individuals, civil rights groups, medical and public health organizations, scholars, members of Congress, state and local agencies, health care providers, individuals, and others.  As with the earlier comment periods for the 2013 RFI and 2015 NPRM, thousands of comments opposing the 2019 NPRM described the widespread discrimination against transgender individuals, other LGBTQ people, women and other individuals seeking reproductive health care or with pregnancy-related conditions, LEP individuals, individuals with disabilities, and others, and described the necessity for the robust protections contained in the 2016 regulations.

82.     A coalition of 22 state attorneys general, joined by many of the Plaintiffs to this suit, opposed the rule, as did many of Plaintiffs' individual state agencies.[6]

83.     As the COVID-19 pandemic worsened in the United States this spring, on April 30, 2020, a similar coalition of 26 state attorneys general urged Defendants to either withdraw the proposed rule or suspend rulemaking during the pandemic.[7]  That letter cited data showing that the pandemic was exacerbating health disparities, particularly in communities of color and immigrant communities, and that Section 1557's robust nondiscrimination protections were more critical than ever to protect members of vulnerable groups from being denied adequate care during this unprecedented public health crisis.[8]  The letter warned that the publication of a final rule under these circumstances would unnecessarily burden health care providers and that, "[b]y removing critically important protections to help ensure that disproportionately impacted

---

[6] *Available at* https://www.regulations.gov/document?D=HHS-OCR-2019-0007-142194.
[7] *See* Letter from Attorney General Xavier Becerra to Secretary Alex Azar (Apr. 30, 2020), https://oag.ca.gov/news/press-releases/attorneys-general-becerra-and-healey-urge-hhs-not-finalize-rule-would-permit.
[8] *Id.*

communities get the care that they need, the Rule would undermine this crucial work and could prove deadly."[9]

84.      Nevertheless, Defendants issued a pre-publication version of the 2020 Rule on June 12, 2020, making only insignificant changes to the proposed rule.  Three days later, on June 15, 2020, the Supreme Court issued the *Bostock* decision, ruling that the prohibition on discrimination on the basis of sex under Title VII—and, by extension, the other federal statutes prohibiting sex discrimination, including Section 1557—necessarily encompassed discrimination based on transgender status and sexual orientation.  140 S. Ct. at 1737.  *Bostock* eviscerated a central premise of the 2020 Rule by confirming that federal sex discrimination prohibitions cover discrimination against someone for being LGBTQ.  *Id.*  Undeterred, however, Defendants proceeded to publish the Rule, unchanged, in the Federal Register on June 19, 2020.

## IV.      THE 2020 RULE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW

85.      The 2020 Rule fails to properly account for *Bostock* or the overwhelming weight of case law interpreting Section 1557, the immense evidence before HHS describing the myriad ways in which the proposed Rule will violate Section 1557 and frustrate the ACA's antidiscrimination mandate, and the substantial evidence that the Rule will harm LGBTQ people, women and other individuals seeking reproductive health care or with pregnancy-related conditions, LEP individuals, and other individuals experiencing discrimination that ACA and Section 1557 are intended to protect.

86.      Specifically, the 2020 Rule:

a.   strips HHS's Section 1557 regulations of the express protections against discrimination based on gender identity, sex stereotypes, and pregnancy-

---

[9] *Id.*

related conditions by (1) removing the definition of "on the basis of sex" in 45

C.F.R. § 92.4 that clarified that these are all forms of prohibited sex

discrimination, and repeating scores of times throughout the Rule's preamble

the Department's legally and factually flawed position that discrimination "on

the basis of sex" does not include discrimination against transgender people,

*id.* at 37,168, 37,177-80, 37,183-97; and (2) deleting the specific prohibitions

on discriminatory treatment of transgender people contained in §§ 92.206-207

of the 2016 regulations, including the prohibition on categorical coverage

exclusions on transition-related care and the requirement that "a covered

entity shall treat individuals consistent with their gender identity;"

b.   redefines "health program and activity" to newly exclude HHS programs not

establishing under the ACA and health insurers not "principally engaged" in

providing health treatments and services (except with respect to those

insurers' plans on the marketplace or that directly receive federal funding)

from the regulation's scope, *id.* at 37,244-45 (§ 92.3);

c.   guts the 2016 Rule's detailed language access requirements, including

deleting the notice and tagline requirements, removing the sample

nondiscrimination notices and taglines contained in the 2016 Rule, and giving

covered entities broad discretion to decide for themselves whether to provide

language access services at all based on a lenient four-factor test that fails to

account for individualized language needs of LEP individuals, *id.* at 37,245-

46 (§ 92.101);

d.  adopts broad religious exemptions not authorized by Section 1557's statutory language, effectively permitting religiously-affiliated providers and insurers to limit or deny care and coverage to patients and consumers for discriminatory reasons, *id.* at 37,205, 37,207-08;

e.  removes the 2016 Rule's uniform enforcement standard and adopts a fractured, piecemeal approach with different enforcement mechanisms for different protected classes, *id.* at 37,162;

f.  amends HHS's Title IX implementing regulations to incorporate religious exemptions broader than those required by Title IX, deleting the specific prohibition on "[a]iding or perpetuating discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;" *id.* at 37,207-08, and

g.  strikes existing express prohibitions on sexual orientation and gender identity discrimination from grant program requirements for managed care programs and the Programs for All-Inclusive Care for the Elderly ("PACE") program, which are wholly unrelated to Section 1557 or the ACA.  *Id.* at 37,218-19.

87.    In rolling back these protections, the Department did not attempt to rebut its earlier factual findings showing the pervasiveness of discrimination and health barriers to transgender people, women and others seeking reproductive health care, LEP individuals, and members of other protected groups, nor could it, as the administrative records developed through the 2013 RFI, 2015 NPRM, and 2019 NPRM demonstrate the significant and ongoing barriers to health care imposed by discrimination by health care providers and health insurers.  Unlike the

2016 Rule, which properly considered the public health costs of delayed or denied care resulting

from discrimination in its cost-benefit analysis, the Department's regulatory impact analysis in

the 2020 Rule was silent on adverse public health effects, and the related costs to individuals,

state and local governments, providers, and insurers, rendering the cost-benefit analysis

fundamentally flawed and unreliable.

88.    The 2020 Rule's amendments to the existing Section 1557 regulations,

individually and collectively, violate Section 1554 of the ACA, 42 U.S.C. § 18114, because they

create unreasonable barriers to care, impede timely access to health care services, and limit the

availability of health care treatments.  Moreover, the Rule's language access provisions interfere

with communications regarding a full range of treatment options between LEP patients and their

providers, and restrict the ability of health care providers to provide full disclosure of all relevant

information to LEP patients making health care decisions.

**A.    The 2020 Rule's elimination of express sex discrimination protections for transgender people and individuals with pregnancy-related conditions is arbitrary, capricious, and contrary to law.**

89.    The 2020 Rule's removal of the definition of "on the basis of sex" from HHS's

Section 1557 regulations, which removes gender identity, sex stereotyping, and pregnancy-

related conditions as forms of expressly prohibited sex discrimination, is contrary to law because

it conflicts with well-established judicial interpretations of Section 1557 and other federal civil

rights laws prohibiting discrimination on the basis of sex, including the Supreme Court's recent

decision in *Bostock* holding that discrimination based on transgender status or sexual orientation

is discrimination on the basis of sex.  The Rule is also arbitrary and capricious because it

disregards *Bostock* and the weight of applicable federal case law holding that prohibited

discrimination on the basis of sex includes discrimination based on sex stereotypes, gender identity, sexual orientation, and pregnancy-related conditions.

90.     Section 1557 incorporates Title IX's prohibition on discrimination "on the basis of sex," and that prohibition must therefore be construed consistently with Title IX.  The Supreme Court has consistently recognized that Title IX must be construed expansively to "accord it a sweep as broad as its language," *North Haven Board of Education v. Bell*, 456 U.S. 512, 521 (1982), and, therefore "covers a wide range of intentional unequal treatment" on the basis of sex, *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 175 (2005). Accordingly, Section 1557 contains similarly broad protections against the various forms of discrimination "on the ground prohibited under" Title IX, *i.e.*, on the basis of sex, in the health care context.  42 U.S.C. § 18116(a).

91.     The Supreme Court's 1989 decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), established that Title VII prohibits discrimination based on sex stereotypes.  Since then, federal courts have consistently interpreted other federal laws prohibiting sex discrimination, including Title IX and Section 1557, to similarly prohibit discrimination based on sex stereotypes.  The 2020 Rule's removal of the express prohibition on sex stereotyping as a form of prohibited discrimination conflicts with this well-established case law.

92.     Even before the Supreme Court's June 15, 2020 decision in *Bostock* confirming that federal sex discrimination protections forbid discrimination against LGBTQ people based on gender identity, transgender status, sexual orientation, or sex stereotyping, numerous federal appeals courts had already held that LGBTQ people were protected against discrimination on these bases.  *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 131-32 (2d Cir. 2018) (en banc) (sexual orientation discrimination is a form of sex discrimination under Title VII), *aff'd*

*sub nom.*, *Bostock*, 140 S. Ct. at 1754; *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351-

52 (7th Cir. 2017) (en banc) (same); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d

560, 574-75 (6th Cir. 2018) (discrimination against transgender employee based on sex

stereotypes and transgender status violated Title VII), *aff'd sub nom.*, *Bostock*, 140 S. Ct. at

1754; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50, 1054

(7th Cir. 2017) (discrimination against transgender student was sex discrimination in violation of

Title IX and the Fourteenth Amendment's Equal Protection Clause); *Dodds v. U.S. Dep't of

Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (transgender girl denied access to girls' restroom likely

to succeed on Title IX claim); *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011)

(discrimination against transgender employee, which violated Fourteenth Amendment's Equal

Protection Clause, would also violate Title VII); *Barnes v. City of Cincinnati*, 401 F.3d 729, 740-

41 (6th Cir. 2005) (transgender employee stated Title VII claim under sex stereotyping theory);

*Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (same); *Schwenk v. Hartford*, 204 F.3d

1187, 1200-02 (9th Cir. 2000) (transgender plaintiff stated sex discrimination claim under

Gender Motivated Violence Act); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 216 (1st Cir.

2000) (transgender customer stated sex discrimination claim under Equal Credit Opportunity

Act).

93.     Consistent with this precedent, federal district courts have consistently interpreted

Section 1557 to prohibit health care discrimination against transgender people. *See Flack v. Wis.

Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1014-22 (W.D. Wis. 2019) (holding state

Medicaid program's categorical exclusion on gender-confirming treatments and services violated

Section 1557, the Medicaid Act, and the Fourteenth Amendment's Equal Protection Clause, and

permanently enjoining the exclusion); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997, 1002-03

(W.D. Wis. 2018) (holding similar exclusion under state employee health plan violated Section 1557, Title VII, and the Equal Protection Clause); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) (finding that "Section 1557 . . . prohibits discrimination on the basis of gender identity."); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (recognizing that "discrimination on the basis of transgender identity is discrimination on the basis of sex" cognizable under Section 1557).

94.     Defendants, in promulgating the 2020 Rule, ignored or discounted this case law—the reasoning of which was validated by the Supreme Court's decision in *Bostock*.  Instead, Defendants relied on:  decisions from the *Franciscan Alliance* case in the Northern District of Texas adopting a contrary interpretation (now abrogated by *Bostock*), *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016), *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019); *dissenting* opinions from circuit cases concluding that federal sex discrimination laws prohibit sexual orientation and gender identity discrimination; and the Department of Justice's since-rejected arguments contained in Supreme Court briefing in *Bostock*.  *See* 85 Fed. Reg. 37,179 n.83, 37,194 n. 201.  HHS's flawed legal analysis was unsupportable at the time the Rule was promulgated.  But even if this legal authority had been sufficient when the 2019 NPRM was published—which it was not—none of this analysis survives *Bostock*.  The 2020 Rule's continued reliance on this authority for its revisions is arbitrary, capricious, and contrary to law.

95.     In the 2019 NPRM, the Department recognized "the likelihood that the Supreme Court will be addressing the issue in the near future" of whether federal sex discrimination statutes prohibit discrimination on the basis of transgender status and sexual orientation, and that the expected decision in *Bostock* and its companion cases "will likely have ramifications for the

definition of 'sex'" under Section 1557.  84 Fed. Reg. 27,855, 27,857.  Yet, when *Bostock*

ultimately contradicted their favored position, Defendants promulgated the Rule anyway, without

altering their entirely rebuked theory that sex discrimination protections are only based on an

alleged "biological binary of male and female," 85 Fed. Reg. 37,178, n.74, or otherwise

attempting to explain how the purported legal justifications for the Rule survived *Bostock*.  The

Department's decision to do so was arbitrary, capricious, and contrary to law.

96.     Gender identity is an innate, internal sense of one's sex—*i.e.*, being male, female,

or nonbinary—and is a basic, immutable part of every person's core identity.  Transgender

people have a gender identity that is different than the sex they were assigned at birth.  The 2020

Rule's removal of the mandate that covered entities treat transgender people consistent with their

gender identity—and its elimination of the express prohibition on discriminatory insurance

coverage policies (including categorical exclusions or limitations on transition-related treatments

and services)—arbitrarily and capriciously disregards the strong record evidence that failing to

respect transgender people's gender identity in health care settings is discriminatory, harmful,

and increases the likelihood that they will experience delay or denial of necessary care.

Defendants' failure to properly consider the harms to transgender people's health and well-being

was arbitrary and capricious.

97.     In addition, the 2020 Rule's removal of pregnancy-related conditions as

recognized forms of sex discrimination was arbitrary, capricious, and contrary to law because it

failed to account for, and is at odds with, settled case law holding that unlawful discrimination on

the basis of sex includes discrimination based on pregnancy status.  *See UAW v. Johnson*

*Controls, Inc.*, 499 U.S. 187, 198-99 (1991); *Newport News Shipbuilding & Dry Dock Co. v.*

*EEOC*, 462 U.S. 669, 684 (1983); *DeMarco v. CooperVision, Inc.*, 369 F. App'x 254, 255 (2d

Cir. 2010).

98.     The 2020 Rule's removal of specific requirements for equal access to health care

programs and specific prohibitions against discrimination on the basis of sex in health insurance

coverage and benefit design is also arbitrary, capricious, and not in accordance with law.  *See* 85

Fed. Reg. 37,183-201 (discussing 2016 Rule provisions codified at 45 C.F.R. §§ 92.206, 92.207).

Elimination of the 2016 Rule's explicit prohibition on discriminatory insurance plan benefit

design, codified at 45 C.F.R. § 92.207, conflicts with the ACA and will hurt patients.  *See* 85

Fed. Reg. 37,176-177.  It will allow insurers to discriminate in benefit design by, for example,

meeting the minimum requirements necessary to be certified, but shaping the plan so that all of

the benefits necessary to treat certain conditions are placed in the highest cost-sharing tier.

**B.      The 2020 Rule's exclusion from the Rule's scope of health insurers not
          "principally engaged in the business" of providing health treatments and
          services, as well as many HHS-administered programs, is arbitrary,
          capricious, and contrary to law.**

99.     The statutory text of Section 1557 unambiguously provides that Section 1557's

prohibitions apply to "any health program or activity, *any part of which* is receiving Federal

financial assistance, including credits, subsidies, or contracts of insurance, or under *any* program

or activity that is administered by an Executive Agency or any entity established under this title

(or amendments)."  42 U.S.C. § 18116(a) (emphases added).  By these express terms—which are

consistent with the central objective of the ACA to combat discrimination in both the provision

of health care services and health insurance—the law applies to *all* of the operations of health

providers, health systems, insurance companies, state and local agencies, and other covered

entities that receive any federal financial assistance.

100.    The 2020 Rule dramatically narrows the scope of entities covered under Section

1557 in two ways, both in direct contravention of the plain text of the statute.  In so doing, the

2020 Rule arbitrarily and capriciously undermines the purpose of the ACA, namely, to increase

access to quality, affordable care in a nondiscriminatory manner.

101.    First, the Rule purports to limit Section 1557's reach *only* to HHS programs

established under Title I of the ACA, and not to other HHS programs or health programs or

activities administered by other federal agencies.  85 Fed. Reg. 37,170.  This limitation is

contrary to Section 1557's plain text, which applies Section 1557 to "*any* program or activity that

is administered by an Executive Agency *or* any entity established under this title," 42 U.S.C.

§ 18116(a) (emphases added).  Defendants turn Section 1557's text on its head by attempting to

exclude from Section 1557's scope all health programs or activities administered by HHS and

other executive agencies *except* for those programs established by HHS under Title I of the

ACA.  This erroneous construction is arbitrary, capricious, and contrary to Section 1557's

mandate.

102.    Second, the 2020 Rule purports to exclude the operations of entities not

"principally engaged in the business of healthcare," narrowly and arbitrarily defining

"healthcare" to exclude the provision of health *insurance*.  85 Fed. Reg. 37,244-45 (§ 91.2(b)-(c).

As the plain text of the statute and the 2016 Rule explain, Section 1557 applies to all of the

operations of any health insurer and other health programs and activities, if some part of that

insurer's operations received federal financial assistance or if that insurer offered a plan on an

exchange.  42 U.S.C. § 18116(a); 81 Fed. Reg. 31,430-31  For example, if a health insurer

offered an insurance plan on an exchange, Section 1557's protections apply to all of the insurer's

other plans and products, such as private employer-based health plans.  Now, under the 2020

36

Rule, any individual not on a marketplace plan or plan that receives federal financial assistance experiencing discrimination on *any* prohibited basis will be unable to challenge that discrimination through OCR's administrative enforcement process.

103.    This redefinition impermissibly narrows the broad definition of "covered entity" contained in the statute itself; improperly attempts to rewrite the statute by replacing the word "health" with "healthcare;" arbitrarily defines "healthcare" to exclude health insurance; and, by excluding many insurance beneficiaries from Section 1557's protections, frustrates the ACA's antidiscrimination mandate and central purpose of expanding nondiscriminatory access to health services and insurance.  Contrary to Section 1557's statutory mandate, the Rule will wrongfully exclude private insurers, the FEHB program, and Medicare Part B plans, among others, from the Rule's scope.

104.    For these reasons, the 2020 Rule's redefinition of covered "health program or activity" and the purported limitations on Section 1557's scope resulting from that redefinition, are arbitrary, capricious, and contrary to law.

**C.    The 2020 Rule's elimination of critical language access protections is arbitrary, capricious, and contrary to law.**

105.    Section 1557 incorporates Title VI's prohibition on national origin discrimination, 42 U.S.C. § 2000d, under which federal funding recipients are obligated to provide meaningful access to their programs to LEP individuals.  *See Lau v. Nichols*, 414 U.S. 563, 568-59 (1974).

106.    To effectuate Section 1557's prohibition on national origin discrimination, and recognizing the systemic barriers to health care faced by LEP individuals, the 2016 Rule contained strong protections intended "to provide meaningful access to *each individual* with limited English proficiency eligible to be served or likely to be encountered in [a covered entity's] health programs and activities."  81 Fed. Reg. 31,470 (§ 92.201(a)) (emphasis added).

The 2016 Rule's focus on providing meaningful language access to *individuals* was consistent with Section 1557's prohibition on discrimination against "an individual," 42 U.S.C. § 18116(a), not on LEP individuals as a group.  The 2016 Rule provided that language assistance services "must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency."  81 Fed. Reg. 31,470 (§ 92.201(c)).

107.    To determine covered entities' compliance with Section 1557, the 2016 Rule established standards by which HHS could determine whether an *individual* was provided meaningful access to a health program or activity through adequate language assistance services, using a two-part inquiry.  81 Fed. Reg. 31,470 (§ 92.201(b)).  This inquiry required HHS to: "(1) [e]valuate, and give substantial weight to, the nature and importance of the health program or activity and the particular communication at issue, to the individual with limited English proficiency; and (2) [t]ake into account other relevant factors, including whether a covered entity has developed and implemented an effective written language access plan, that is appropriate to its particular circumstances, to be prepared to meet its obligations . . . ."  *Id*.

108.    Contrary to the statutory text, the 2020 Rule removes the requirement of providing adequate language assistance services to LEP individuals, requiring merely that a covered entity "take reasonable steps to ensure meaningful access to [its] programs and activities by limited English proficient individuals" in general.  85 Fed. Reg. 37,245 (§ 92.101(a)).

109.    In addition, the 2020 Rule requires covered entities to provide language assistance services only after a self-assessment undertaken by the covered entities themselves.  85 Fed. Reg. 37,245 (§ 92.101(b)).  An entity must consider:

38

(i) [t]he number or proportion of limited English proficient individuals eligible to be served or likely to be encountered in the eligible service population;
(ii) [t]he frequency with which LEP individuals come in contact with the entity's health program, activity, or service;
(iii) [t]he nature and importance of the entity's health program, activity, or service; and
(iv) [t]he resources available to the entity and costs.

*Id.* Thus, HHS authorizes entities to decide, in the first instance, that they serve too few LEP individuals or have insufficient resources to warrant providing language assistance services. The Rule imposes certain requirements—including that language assistance services be offered free of charge—*only* when the entity has determined, based on its self-assessment, that it is obligated to provide such services at all. *Id.*

110. The 2020 Rule thus abandons the individualized assessments mandated by Section 1557 to ensure that every individual can seek and obtain health treatments, services, and insurance. In so doing, the 2020 Rule will likely result in many covered entities denying meaningful language assistance services to many LEP individuals. Even for entities in jurisdictions with stronger protections under state law, HHS's abandonment of these requirements will force state governments to assume the sole enforcement role for such protections.

111. The 2020 Rule's revision, which now authorizes covered entities to make a self-determination about whether to offer any language assistance services at all, with no specific directives or guidance on how an entity should weigh the factors in the four-factor inquiry, is arbitrary and capricious.

112. The 2020 Rule also deletes the existing regulation's notice and tagline requirements, and the sample translated notices and taglines that HHS previously provided to covered entities. The 2016 Rule mandated that covered entities notify LEP individuals of their

rights to language assistance services and their ability to complain about a denial of such services.  81 Fed. Reg. 31,442.  In contrast, the 2020 Rule will effectively deny information to LEP individuals on their rights to language assistance while seeking and obtaining health care services, as well as information on how to seek redress if those services are wrongfully denied. The elimination of these notice requirements is arbitrary and capricious because the 2020 Rule effectively delegates compliance with language assistance requirements to covered entities themselves.

113.    These revisions are arbitrary and capricious because Defendants failed to properly consider the likelihood that the revisions will result in LEP individuals being denied language assistance services—and thus deny these individuals the ability to access health care and services, to communicate effectively with providers and insurers, or to understand their treatment regimens, among other things.  Because the revisions will result in discriminatory denial or limitation of access to health programs and activities on the basis of national origin, they conflict with Section 1557, frustrate its antidiscrimination mandate, and are arbitrary, capricious, and contrary to law.

114.    Defendants purport to justify the removal of these protections based, in large part, on the costs associated with the 2016 Rule's tagline requirement.  85 Fed. Reg. 37,162, 37,211, 37,224, 37,227, 37,232.  But Defendants fail to adequately consider the harms of the Rule, including the cost of confusion engendered by the removal of taglines and notices, the public health implications of reducing access to care and treatment, and the frustration of the ACA's mandate to expand access to health care.

D.     **The 2020 Rule's addition of a broad religious exemption is arbitrary and capricious, contrary to law, and exceeds HHS's statutory authority.**

115.    The 2020 Rule improperly incorporates the blanket religious exemption and "abortion neutrality" provision contained in Title IX, 20 U.S.C. §§ 1681(a)(3), 1688, into the Department's Section 1557 regulations.

116.    Unlike Title IX—which expressly exempts religiously affiliated educational institutions from provisions of Title IX that conflict with the institution's religious tenets, *see* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12—Section 1557 contains no religious exemption and does not authorize HHS to create a blanket exemption applicable to health programs and activities.

117.    Although Section 1557 incorporates the protected *classifications* contained in Title VI, Title IX, the Age Act, and Section 504 by banning discrimination "on the grounds prohibited under" those statutes, 42 U.S.C. § 18116(a), it does not incorporate those statute's exceptions.  To the contrary, the statute makes clear that its nondiscrimination prohibitions apply broadly to all covered entities, "except as otherwise provided for in [Title I of the ACA]."  Title I, like Section 1557, contains no religious exemption or abortion exception.

118.    The Department, when it promulgated the 2016 Rule, correctly declined to incorporate Title IX's enumerated exceptions, including the religious exemption, on the grounds that these exceptions specifically applied to educational institutions and were inapplicable in the health care context.  It also correctly declined to incorporate Title IX's "abortion neutrality" provision into the regulation, as Section 1557 itself does not incorporate that provision or otherwise limit the application of its protections with respect to abortion.

119.    The 2020 Rule's incorporation of these provisions from Title IX is contrary to law and in excess of the Department's statutory authority, as Section 1557 neither contains these exemptions nor authorizes HHS to import them from other statutes.

120.    The 2020 Rule's incorporation of these provisions is arbitrary and capricious because the Department failed to sufficiently justify the reversal of its earlier reasoning that incorporation of these exemptions was improper.  The addition of a blanket religious exemption into the Section 1557 regulations is also arbitrary and capricious because the Department failed to justify the application of exemptions designed to apply to educational institutions to the very different context of health care, or to sufficiently acknowledge or account for the harms to individuals who will be denied health treatments, services, and insurance coverage because of these exemptions.

121.    In so doing, the 2020 Rule fails to account for the fact that religiously affiliated health systems and insurers are becoming increasingly common in the American health care system and, for many people, are the only options available.  Because many individuals—particularly in rural areas—have limited health care options, these exemptions will, in many cases, effectively deny access to medically necessary care because of discrimination.  *See* 81 Fed. Reg. 31,380.  This harm, which the Rule arbitrarily and capriciously fails to adequately consider, frustrates Section 1557's antidiscrimination mandate and the ACA's purpose of expanding access to health care.

## E.    The 2020 Rule's elimination of the 2016 Rule's uniform enforcement scheme is arbitrary and capricious.

122.    The 2016 Rule imposed a uniform enforcement scheme for Section 1557, incorporating and adapting the enforcement mechanisms under Title VI, Title IX, the Age Act, and Section 504 into a single enforcement standard for all forms of prohibited discrimination

42

under Section 1557.  81 Fed. Reg. 31,439-40, 31,444.  The Department correctly determined that Section 1557 did not incorporate different enforcement mechanisms for discrimination on different bases, addressing concerns that doing so would create different standards for different protected classes.  *Id.* at 31,439-40.

123.    The 2020 Rule reversed this position without a reasonable explanation or sufficient justification.  It deleted the provisions providing uniformity across protected classifications including, for example, those provisions confirming that Section 1557 contains an implied private right of action, that complainants and private litigants are entitled to compensatory damages in appropriate circumstances, that disparate impact claims are cognizable under Section 1557, and that associational discrimination is a form of prohibited discrimination under the law.  85 Fed. Reg. 37,195, 37,199, 37,202-03, 37,203.  In its place, the Rule adopts a fractured approach incorporating, by reference, the various and conflicting enforcement standards under Title VI, Title IX, the Age Act, and Section 504 for claims of discrimination on the specific bases prohibited under each statute.

124.    By adopting this hodge-podge approach, under which victims of discrimination prohibited under Section 1557 have different rights depending on whether that discrimination was based on race, national origin, sex, age, or disability, the 2020 Rule arbitrarily and capriciously creates a confusing, illogical, and unduly burdensome set of standards that conflict with Section 1557's plain language and frustrate the statute's antidiscrimination mandate.  The standard is arbitrary and capricious because it fails to adequately address concerns adduced during the rulemaking process about how the Department would handle claims of intersectional discrimination (*e.g.*, discrimination against an individual based both on race and disability). Defendants claim that the 2016 Rule's uniform enforcement standard was "confusing" and a

"patchwork regulatory framework."  *Id.* at 37,162, 37,202.  But they fail to adequately explain how that uniform system, with clear requirements tailored to the health care context that applied to all forms of prohibited discrimination, was "confusing," or how the actual patchwork approach adopted by the 2020 Rule addressed that confusion.  For these reasons, the Rule is arbitrary and capricious.

**F.   The 2020 Rule's amendment of HHS's Title IX regulations is arbitrary, capricious, and contrary to law.**

125.   In addition to amending HHS's Section 1557 regulations, the 2020 Rule also makes so-called "conforming" amendments to HHS's Title IX regulations.  85 Fed. Reg. 37,243-45 (to be codified at 45 C.F.R. pt. 86).

126.   These amendments arbitrarily remove the longstanding prohibition on "[a]id[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees."  45 C.F.R. § 86.31(b)(7).

127.   Defendants do not adequately explain the removal of this prohibition, which is identical to like prohibitions in other agencies' Title IX regulations, including the Department of Education's Title IX regulations, 34 C.F.R. § 106.31(b)(6).  As the removal is without sufficient basis, sanctions the use of federal funds for discriminatory purposes, and frustrates Title IX's broad antidiscrimination mandate, it is arbitrary, capricious, and contrary to law.

**G.   The 2020 Rule's removal of protections against discrimination on the basis of sexual orientation and gender identity from unrelated regulations is arbitrary, capricious, and contrary to law.**

128.   The 2020 Rule also contains purported "conforming amendments" to several regulations of the Center for Medicaid and Medicare Services ("CMS"), a component of HHS, governing certain CMS contracts and programs.  85 Fed. Reg. 37,243 (to be codified at 42

C.F.R. §§ 438.3, 438.206, 440.262, 460.98, and 460.112).  These amendments removed express prohibitions on sexual orientation and gender identity discrimination by entities governed by those regulations.

129.    These earlier protections were included in the 2016 Rule to further the ACA's central purpose of expanding health care access and eliminating discrimination in health care and health insurance.  *See* 45 C.F.R. §§ 147.104(e), 155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), 156.1230(b)(2).

130.    These revisions are arbitrary and capricious because the removal of these express protections conflicts with the ACA's central purpose of dismantling discriminatory barriers to health care by eliminating protections against LGBTQ people without sufficient justification, despite the fact that Defendants had no legal obligation, under Section 1557, the ACA, or otherwise, to revisit these protections.

131.    Defendants failed to sufficiently address the public comments and other evidence objecting to these changes as unlawful and harmful to LGBTQ people.

132.    The removal of these provisions is contrary to law because it conflicts with HHS's statutory mandate under Section 1557 not to discriminate on the basis of sex in any of its programs or activities.  After *Bostock*, there is no question that discrimination based on sexual orientation and transgender status is prohibited discrimination "on the basis" of sex under federal civil rights laws, including under Section 1557, and HHS is required to administer its programs accordingly.  By removing these protections, the Department erroneously suggests that covered entities are no longer prohibited from discriminating against individuals on these bases.  The Department's publication of the Rule after *Bostock* and its failure to account for this intervening legal development are arbitrary and capricious.

133.    These revisions are also arbitrary and capricious because Defendants did not

estimate the costs or benefits of eliminating these protections.

**H.    The 2020 Rule was based on a flawed cost-benefit analysis that failed to account for significant costs, including those related to delayed or denied care resulting from discrimination, and is therefore arbitrary and capricious.**

134.    Defendants failed to consider the harms attendant to the 2020 Rule, protesting that

they lack data to consider those harms, rather than grappling with the serious costs imposed by

the Rule.  Thus, the Rule fails to take account of the substantial data, reports, and studies

submitted by commenters.

135.    The Rule makes no effort to take the costs or harms to transgender people into

account, stating: "the Department [] lacks the data necessary to estimate the number of

individuals who currently benefit from covered entities' policies governing discrimination on the

basis of gender identity who would no longer receive those benefits after publication of this

rule."  85 Fed. Reg. 37,225.  And the Department "lacks data to estimate what greater public

health costs, cost-shifting, and expenses may result from entities changing their

nondiscrimination policies and procedures after promulgation of this rule."  *Id.*  Despite lacking

data, making no effort to collect such data, and entirely disregarding extensive comments

detailing those harms, the Department chose to baldly assert, without support, that it "believes

the[] effects will be minimal."  *Id.*

136.    Similarly, HHS acknowledges that repealing notice and tagline requirements

"may impose costs, such as decreasing access to, and utilization of, healthcare for non-English

speakers by reducing their awareness of available translation services."  *Id.* at 37,232.  But the

Department "does not believe it has data" to calculate the value of benefits to individuals

needing translation services.  *Id.* at 37,233.  HHS also acknowledges that LEP individuals may

not be made aware of their right to file complaints with OCR.  *Id.* at 37,234.  But HHS states that it is "not . . . aware of a way to quantify [the] potential effects" of the remediable grievances LEP patients will suffer as a result.  *Id.*  Instead, the Department concludes that the repeal of notice and taglines will save regulated entities $585 million in annual costs with no measurable cost to LEP individuals from decreased access and information.  *Id.* at 37,224.

137.    With respect to changes to the language access plan provisions, HHS "acknowledges the potential of reduced awareness of the availability of language services by LEP individuals by the changes made in this rule," but concludes that the changes will save regulated entities $14.7 million with no measurable cost to LEP individuals or the public.  *Id.* at 37,235.

138.    HHS also claims it "lacks data or methods enabling it to provide quantitative estimates of any alleged economic impacts related to termination of pregnancy provisions" and refuses to calculate costs that would result from adopting Title IX's religious exemption.  *Id.* at 37,239.

139.    HHS also fails to consider costs from the public health harms that will result from the Rule, including, but not limited to, potential delays in or opting out of care due to increased discrimination and resulting adverse health outcomes and greater overall health care costs.

140.    Nor did HHS consider costs that will arise from confusion caused by the Rule.

141.    HHS's failure to consider significant costs is particularly problematic because it reverses the protections contained in the 2016 Rule, which induced significant reliance interests by individuals, health care providers, health insurers, and state and local governments, among others.

142.    The flawed cost-benefit analysis and failure to consider harms renders the Rule arbitrary and capricious.

**I.      The 2020 Rule is contrary to Section 1554 of the ACA**

143.    Section 1554 of the ACA forbids the HHS Secretary from promulgating "any regulation" that:

> creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; [or] (5) violates the principles of informed consent and the ethical standards of health care professionals.

42 U.S.C. § 18114.

144.    The Rule violates Section 1554 by creating unreasonable barriers and impeding timely access to medical care, including to patients on the basis of race, color, national origin, sex, disability, and age.  The Rule violates this provision by reversing nondiscrimination protections Defendants long recognized were needed to avoid patients being "denied opportunities to obtain [health care services provided to others, with resulting adverse effects on their health status," 80 Fed. Reg. 54,194; *see also* 81 Fed. Reg. 31,444, and by eliminating access to language provisions.

**V.    THE 2020 RULE WAS IMPROPERLY MOTIVATED BY DEFENDANTS' ANIMUS TOWARDS TRANSGENDER PEOPLE AND ANTIPATHY TO THEIR HEALTH CARE NEEDS**

145.    Defendants' reinterpretation of Section 1557's prohibition of discrimination "on the basis of sex" to exclude transgender people from the law's reach conflicts with the plain language of the statute, and arbitrarily and capriciously removes express protections from the existing regulations.  Defendants' new policy is not the product of reasoned decision-making,

nor is it based on a valid interpretation of the law or the prevailing medical consensus on the

health care needs of transgender people.  Rather, it is part of Defendants' long-running campaign

to attack the civil rights of transgender Americans and to push members of that community back

to the margins of society, a campaign fueled by Defendants' own well-documented contempt for

transgender people and the entire LGBTQ community.  Defendants have intended to undermine

Section 1557's statutory protections, as correctly articulated in the 2016 Rule, since the earliest

days of the Trump Administration.  The 2020 Rule fulfills Defendants' preordained—and

unjustifiable—goal of imposing barriers to transgender Americans' access to health care through

the Section 1557 rulemaking process.

146.    Defendants have acted with full awareness and disregard of the harms that the

2020 Rule will impose on transgender people and other members of the LGBTQ community.

During the notice and comment period, Defendants received thousands of comments opposing

the Rule because it would disproportionately impact members of the LGBTQ community.[10]  In

the Rule, HHS acknowledged that commenters highlighted the harms the Rule would impose on

LGBTQ people, including increased discrimination, increased barriers to health care, and stigma.

*See* 85 Fed. Reg. 37,181. Nevertheless, HHS dismissed this evidence, contending implausibly

that "[t]he Department knows of no data showing that the proper enforcement of Federal

nondiscrimination law according to statutory text," *i.e.*, based on HHS's erroneous view that

---

[10] *See, e.g.*, Comment of 22 State Attorneys General, 10-11, https://www.regulations.gov/document?D=HHS-OCR-2019-0007-142194; Comment of Lambda Legal, https://www.regulations.gov/document?D=HHS-OCR-2013-0007-0161; Comment of National Center for Lesbian Rights, 2-6, 9-10, https://www regulations.gov/document?D=HHS-OCR-2013-0007-0145; Comment of Transgender Legal Defense and Educational Fund, https://www.regulations.gov/document?D=HHS-OCR-2019-0007-149238; Comment of National Health Law Program, 51-59, https://www.regulations.gov/document?D=HHS-OCR-2019-0007-127004; Comment of CenterLink: The Community of LGBT Centers, https://www regulations.gov/document?D=HHS-OCR-2019-0007-83839; Comment of Callen-Lorde Community Health Center, https://www.regulations.gov/document?D=HHS-OCR-2019-0007-83372; Comment of American Psychiatric Association, 2-4, https://www.regulations.gov/document?D=HHS-OCR-2019-0007-107673;

Section 1557's protections only applied to "biological" sex, "will disproportionately burden individuals on the basis of sexual orientation or gender identity."  *Id.* at 37,181-82.

147.    Moreover, after the Supreme Court's decision in *Bostock*, Defendants' primary purported justification for promulgating the 2020 Rule—to "address legal concerns" that the 2016 Rule impermissibly interpreted Section 1557 to protect transgender people—was eviscerated.  Remarkably, the 2020 Rule cited the government's *briefing* in *Bostock*, but not the Supreme Court's intervening decision rejecting the arguments in that briefing, as "authority" for that position.  *See id.* at 37,178.  Defendants' decision to flout the Supreme Court's *Bostock* opinion—similar to their decision, in the 2019 NPRM, to brush aside binding circuit court precedent contradicting their position, *see supra* ¶ 92—only confirms that Defendants' decision to promulgate, and ultimately finalize, the 2020 Rule was based on discriminatory animus and a predetermined decision to attack transgender people's health care rights, with or without legal support.

   A.    **The 2020 Rule is part of the Trump Administration's campaign to eradicate civil rights protections for transgender people.**

148.    The 2020 Rule is of a piece with the Trump Administration's rhetoric and policies, which have long reflected a deep animus toward the LGBTQ community and transgender people in particular.  From the first days of the Administration, the White House and federal agencies, including HHS, have engaged in a sustained effort to reverse civil rights protections for this community.

149.    During the Obama Administration, federal agencies, including HHS, interpreted and enforced federal prohibitions on sex discrimination to include discrimination based on gender identity or transgender status.  Attorney General Eric Holder, in a December 2014 memorandum, advised Department of Justice officials that, based on the weight of recent

developments in federal sex discrimination case law, "the best reading of Title VII's prohibition

of sex discrimination is that it encompasses discrimination based on gender identity, including

transgender status," and, in turn, "the Department [of Justice] will no longer assert that Title

VII's prohibition against discrimination based on sex does not encompass gender identity *per se*

(including transgender discrimination)."[11]

150.   Less than a year after the 2016 Rule was promulgated, the Trump Administration

betrayed this commitment and, across federal agencies, began to dismantle federal protections

for transgender people.

151.   Numerous statements and actions by the President and high-ranking officials in

his Administration, including HHS officials, reflect animus toward transgender people, an

ongoing pattern of overt bias against the LGBTQ community at large, and a desire to roll back

civil rights protections for this community.  Delivering on his campaign promises to attack

LGBTQ rights, including to "strongly consider" appointing judges to reverse the Supreme

Court's recent marriage equality decision,[12] the Administration, has, among many other

examples, done the following:

- On February 22, 2017, the Departments of Education and Justice withdrew a

  guidance document to schools on their obligations under Title IX to treat transgender

  students in a nondiscriminatory way.[13]

---

[11] Mem. from Attorney General to U.S. Attorneys and Heads of Department Components, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (Dec. 15, 2014), https://www.justice.gov/file/188671/download.

[12] Elise Viebeck, *Trump Attacks Supreme Court Decision Legalizing Same-Sex Marriage*, Wash. Post (Jan. 31, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/01/31/trump-attacks-supreme-court-decision-legalizing-same-sex-marriage/.

[13] *See* U.S. Dep't of Educ. & U.S. Dep't of Justice, *Dear Colleague Letter on Transgender Students* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.docx.

- On July 26, 2017, the President abruptly declared in a series of tweets that "the United States Government will not accept or allow … [t]ransgender individuals to serve in any capacity in the U.S. Military,"[14] despite the fact that transgender people were already serving in the military.  The Pentagon, at the President's direction, subsequently adopted a policy banning enlistment by transgender individuals.[15]

- On October 4, 2017, Attorney General Sessions issued a memorandum to United States Attorneys and other Department of Justice ("DOJ") officials, reversing DOJ's position that Title VII's sex discrimination prohibition includes discrimination against transgender people based on gender identity.  In the memorandum, Attorney General Sessions wrote, "Title VII's prohibition on sex discrimination encompasses discrimination between men and women but does not encompass discrimination based on gender identity *per se*, including transgender status."[16]  The memorandum directed DOJ officials to adopt this litigation position in all pending and future matters.

- Days later, media reports quoted President Trump, in a discussion regarding LGBTQ rights, as motioning toward Vice President Pence and joking, "Don't ask that guy—

---

[14] Jeremy Diamond, *Trump to Reinstate US Military Ban on Transgender People*, CNN (July 26, 2017), https://www.cnn.com/2017/07/26/politics/trump-military-transgender/index.html.
[15] Presidential Mem. for Sec'y of Defense and Sec'y of Homeland Security (Aug. 25, 2017), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-defense-secretary-homeland-security/; Military Service by Transgender Individuals: Presidential Memorandum for the Sec'y of Defense and Sec'y of Homeland Security, 83 Fed. Reg. 13,367 (Mar. 23, 2018).
[16] *Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (Oct. 4, 2017), https://www.justice.gov/ag/page/file/1006981/download.

he wants to hang them all!,"[17] referencing the Vice President's well-known disdain for LGBTQ people and his past efforts to restrict their rights.[18]

- On December 5, 2017, Press Secretary Sarah Huckabee Sanders admitted that President Trump supports businesses denying services to LGBTQ customers.[19]

- In May 2019, the President announced his opposition to the Equality Act (H.R. 5), the federal legislation that would confirm and strengthen civil rights protections for LGBTQ Americans and others.[20]

- On July 1, 2020, the Department of Housing and Urban Development ("HUD") announced plans to promulgate a proposed rule modifying existing regulations to allow emergency homeless shelter providers to deny housing based on a "good faith belief that individual is not of the sex which the shelter's policy accommodates," including appearance and physical characteristics, effectively opening the door for shelters to exclude transgender and other gender nonconforming individuals.[21] This proposed rule would reverse HUD policy requiring, in accordance with the agency's nondiscrimination mandates, that individuals should be "placed, served, and accommodated in accordance with the gender identity of the individual." *Id.* §§

---

[17] Derek Hawkins, *Trump Reportedly Mocked Pence, Joked About Him Wanting to 'Hang' Gays*, Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/10/17/trump-mocked-pence-joked-about-him-wanting-to-hang-gays-new-yorker-profile/.
[18] Liam Stack, *Mike Pence and 'Conversion Therapy': A History*, N.Y. Times (Nov. 30, 2016), https://www nytimes.com/2016/11/30/us/politics/mike-pence-and-conversion-therapy-a-history.html.
[19] Neal Broverman, *Sarah Sanders: Trump OK With Businesses Hanging Antigay Signs*, The Advocate (Dec. 5, 2017), https://www.advocate.com/politics/2017/12/05/sarah-sanders-trump-ok-businesses-hanging-antigay-signs.
[20] Chris Johnson, *Exclusive: Trump Comes Out Against Equality Act*, Wash. Blade (May 13, 2019), https://www.washingtonblade.com/2019/05/13/exclusive-trump-comes-out-against-equality-act/.
[21] *HUD Updates Equal Access Rule, Returns Decision Making to Local Shelter Providers*, U.S. Dep't of Hous. & Urban Dev. (July 1, 2020), https://www.hud.gov/press/press_releases_media_advisories/HUD_No_20_099; *see* Proposed Modification Rule (July 1, 2020), https://www.hud.gov/sites/dfiles/PIH/documents/ProposedModificationRule.pdf.

5.105(a)(2), 106(b)(2). HUD Secretary Ben Carson has been widely quoted mocking homeless transgender women as "'big hairy men' trying to infiltrate women's homeless shelters.'"[22]

B.    **President Trump appointed Defendant Roger Severino to head HHS's Office for Civil Rights and to lead the agency's attacking on the health care rights of LGBTQ people.**

152.    Since early in the Trump Administration, HHS has joined the broader efforts to roll back protections for LGBTQ people.

153.    In 2017, President Trump appointed Defendant Roger Severino, an attorney with notorious and vocal opposition to LGBTQ rights, as the Director of HHS's OCR.

154.    In his previous role as the director of the Heritage Foundation's DeVos Center for Religion and Civil Society, Severino frequently expressed his disdain for transgender people and Section 1557's health care protections for them.

155.    After the 2015 NPRM, Severino co-authored a Heritage Foundation report in January 2016, criticizing the proposed rule for conferring "special rights" on transgender people and asserting that "maleness and femaleness are biological realities to be respected and affirmed, not altered or treated as diseases," and that "[g]ender identity and sexual orientation, unlike race or sex, are changeable, self-reported, and entirely self-defined characteristics."[23]   A few months

---

[22] *E.g.,* Tracy Jan & Jeff Stein, *HUD Secretary Ben Carson Makes Dismissive Comments About Transgender People, Angering Agency Staff*, Wash. Post (Sept. 19, 2019), https://www.washingtonpost.com/business/2019/09/19/hud-secretary-ben-carson-makes-dismissive-comments-about-transgender-people-angering-agency-staff/.

[23] Roger Severino & Ryan T. Anderson, *Proposed Obamacare Gender Identity Mandate Threatens Freedom of Conscience and the Independence of Physicians*, Heritage Foundation, (Jan. 8, 2016), http://report heritage.org/bg3089.

later, Severino co-authored another piece accusing the Obama Administration of "attempt[ing] to impose a new definition of what it means to be a man or a woman on the entire nation." [24]

156.    In a separate May 2016 op-ed piece in the *Daily Signal*, Severino criticized DOJ's lawsuit against North Carolina's anti-transgender restroom bill, again decrying the Obama Administration's enforcement of sex discrimination protections for transgender people.[25] Describing marriage equality as "the start, not end, of the left's LGBT agenda," Severino declared that "the radical left is using government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology."[26]  In that same piece, Severino repeatedly misgendered transgender people, describing transgender girls as "boys" and transgender boys as "girls," and attacked HHS's then-proposed 2016 Rule as "add[ing] to the problems" of what he described as the federal government's "overreach" in protecting the rights of transgender people.[27]  Severino has wrongfully belittled gender affirming medical procedures, including falsely describing certain gender-confirming procedures for transgender women as "breast implants in men and shaving down Adam's apples."[28]

157.    In late 2016, Severino and former U.S. Senator Jim DeMint (then-president of the Heritage Foundation) co-wrote an op-ed in the *Philadelphia Inquirer*, characterizing the Obama Administration's enforcement of federal sex discrimination protections to protect transgender

---

[24] Ryan T. Anderson & Roger Severino, *3 Ways Conservative Lawmakers Should Fight Obama's Bathroom Directive*, Daily Signal (May 23, 2016), https://www.dailysignal.com/2016/05/23/3-ways-conservative-lawmakers-should-fight-obamas-bathroom-directive/.
[25] Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power*, Daily Signal (May 9, 2016), https://www.dailysignal.com/2016/05/09/dojs-lawsuit-against-north-carolina-is-abuse-of-power/.
[26] *Id.*
[27] *Id.*
[28] Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common Sense*, Daily Signal (July 1, 2016), https://www.dailysignal.com/2016/06/30/pentagons-transgender-policy-at-odds-with-constitution/.

people as "radical social experiments."[29]  The op-ed referred to Gavin Grimm, a transgender teenage boy litigating a high-profile Title IX case against his Virginia school district for refusing to respect his male gender identity, misgendering him as "a gender-dysphoric teen girl" and improperly using the female pronoun "her" to refer to Grimm.[30]

158.    Months later, Severino was appointed head of HHS's OCR, where he has led the charge to undo the 2016 Rule and its protections for transgender people.

### C.  Since 2017, HHS has engaged in a Department-wide rollback of LGBTQ protections in its programs, activities, and policies.

159.    Defendants' reversal of the 2016 Rule is part of their broader campaign to eliminate or reduce protections for LGBTQ people.

160.    For example, in early 2017, HHS struck questions about LGBTQ demographic data from two data collection tools: the Annual Program Performance Report for Centers for Independent Living, an evaluation of programs serving people with disabilities, and the National Survey of Older Americans Act Participants, an annual, national survey of individuals served by programs funded by the Older Americans Act.[31]  These changes made it more difficult to assess the specific needs of LGBTQ people with disabilities and older LGBTQ adults.

---

[29] Jim DeMint & Roger Severino, *Commentary: Court should reject Obama's radical social experiment*, Philadelphia Inquirer (Nov. 7, 2016), https://www.inquirer.com/philly/opinion/20161107_Commentary__Court_should_reject_Obama_s_radical_social_e xperiment html.
[30] *Id.*
[31] Sejal Singh, *et al.*, *The Trump Administration Is Rolling Back Data Collection on LGBT Older Adults*, Ctr. for Am. Progress (Mar. 20, 2017), https://www.americanprogress.org/issues/lgbtq-rights/news/2017/03/20/428623/trump-administration-rolling-back-data-collection-lgbt-older-adults/.

161.    On December 14, 2017, staff at the Centers for Disease Control and Protection—a component of HHS—were instructed not to use the word "transgender" in official agency documents.[32]

162.    On January 23, 2019, OCR granted an exemption to adoption and foster care agencies in South Carolina, allowing religiously-affiliated services to discriminate against LGBTQ caregivers.[33]

163.    On May 21, 2019, HHS promulgated a regulation, Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170 (May 21, 2019), that would allow medical providers to cite their personal beliefs in refusing to provide a broad spectrum of services—including lifesaving care for LGBTQ patients.

164.    On November 1, 2019, HHS announced it would not enforce, and planned to repeal, regulations prohibiting discrimination based on gender identity, sexual orientation, and religion in all HHS grant programs.  These include programs to address the HIV, opioid, and youth homelessness epidemics, as well as hundreds of billions of dollars in other health and human service programs.[34]

165.    On May 12, 2020, HHS published a final rule eliminating collection of sexual orientation data of foster youth, foster and adoptive parents, and child guardians and rejecting proposals to collect gender identity data.[35]

---

[32] Lena H. Sun & Juliet Eilperin, *CDC Gets List of Forbidden Words: Fetus, Transgender, Diversity*, Wash. Post (Dec. 15, 2017), https://www.washingtonpost.com/national/health-science/cdc-gets-list-of-forbidden-words-fetus-transgender-diversity/2017/12/15/f503837a-e1cf-11e7-89e8-edec16379010_story html.
[33] Letter from Steven Wagner to Gov. McMaster (Jan.23, 2019), https://governor.sc.gov/sites/default/files/Documents/newsroom/HHS%20Response%20Letter%20to%20McMaster.pdf.
[34] *HHS Issues Proposed Rule to Align Grants Regulation with New Legislation, Nondiscrimination Laws, and Supreme Court Decisions*, HHS (Nov. 1, 2019), https://www hhs.gov/about/news/2019/11/01/hhs-issues-proposed-rule-to-align-grants-regulation html
[35] Adoption and Foster Care Analysis and Reporting System, 85 Fed. Reg. 28,410 (May12, 2020).

166.    And, shortly after HHS published the 2020 Rule, on June 24, 2020, the President

issued an Executive Order directing HHS to issue guidance on whether to include faith-based

organizations in foster care and adoption systems, saying that "[t]his guidance shall also make

clear that faith-based organizations are eligible for partnerships under title IV-E of the Act (42

U.S.C. 670 *et seq*.) [sic], on an equal basis, consistent with the First Amendment to the

Constitution."[36]  LGBTQ advocacy groups warned that this action is meant to protect faith-based

agencies that turn away qualified prospective foster and adoptive parents because of their gender

identity or sexual orientation.[37]

### D.    The 2020 Rule is rife with Defendants' animus toward transgender people.

167.    The preamble of the 2020 Rule echoes, sometimes verbatim, the rhetoric that

Defendant Severino used to criticize the 2016 Rule and other Obama-era policies protecting the

rights of transgender people before he joined HHS.  The Rule repeatedly refers to "biological"

sex distinctions, in an effort to deny the existence of transgender people, echoing Severino's use

of the phrase "biological . . . reality" from his Heritage Foundation tenure.  *See* 85 Fed. Reg.

37,180.

168.    The 2020 Rule does not just remove the provisions mandating nondiscriminatory

treatment of transgender patients and enrollees; it actually endorses discrimination and

mistreatment.  *See* 85 Fed. Reg. 37,185.  Defendants state, falsely, that "pronouns are not

stereotypes," and advocate that it is entirely proper for medical providers to deliberately

misgender their patients.  *Id.* at 37,191.  Defendants, improperly referring to transgender women

---

[36] See Executive Order on Strengthening the Child Welfare System for America's Children, White House (June 24, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-strengthening-child-welfare-system-americas-children/.
[37] Currey Cook, *Trump Signs Anti-LGBTQ Child Welfare Executive Order*, Lambda Legal (June 30, 2020), https://www.lambdalegal.org/blog/20200630_trump-admin-child-welfare-executive-order.

as "males," falsely contend that a "covered entity such as a healthcare provider is not impermissibly stereotyping biological males (notwithstanding their internal sense of gender) on the basis of sex if it uses pronouns such as 'him'; limits access to lactation rooms and gynecological practices to female users and patients; or lists a male's sex as 'male' on medical forms." *Id.* at 37,185.  This interpretation is contrary to Section 1557's express statutory protections.

169.    The Rule itself misgenders a transgender man mentioned in the preamble, intentionally and incorrectly referring to him as "her." *Id.* at 37,189.  The Rule also misgenders the late Aimee Stephens, a transgender woman and plaintiff in the *Harris Funeral Homes* case affirmed by the Supreme Court in *Bostock*, intentionally demeaning Ms. Stephens by falsely asserting that she "'quite obviously' is not 'a woman' because 'Stephens's sex' is male." *Id.* at 37,180.

170.    Given the animus-ridden language in the 2020 Rule, as well as the context in which it was written, the 2020 Rule not only gives health care providers and insurers license to discriminate against LGBTQ people, it actively invites them to do so.  In so doing, the Rule directly undercuts the central statutory purpose of Section 1557 to ensure that health care is available in a nondiscriminatory manner to all individuals in the United States.

171.    As evidenced by Defendants' words and actions, their hostility toward transgender people and the LGBTQ community as a whole—not any legitimate interpretation of Section 1557—infected the rulemaking process and drove the outcome here.  The rollback of protections in the Section 1557 regulations and unrelated CMS regulations was improperly motivated by a desire to single out LGBTQ people as a group for inferior health care protections.

172.     The end result is a fundamentally flawed Rule that has the purpose and effect of removing critical health care protections for LGBTQ people and explicitly licensing discrimination against them.  The Final Rule's endorsement of discriminatory treatment of transgender and gender nonconforming individuals is arbitrary, capricious, and contrary to Section 1557's statutory prohibitions and established precedent.  Moreover, because these discriminatory changes do not substantially advance any legitimate governmental interest, they also violate the equal protection guarantees of the Fifth Amendment.

## VI.     THE 2020 RULE HARMS PLAINTIFFS

173.     The 2020 Rule harms Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests, including by inflicting substantial and burdensome administrative and enforcement costs on Plaintiffs' state agencies and by harming the public health, which will increase uncompensated care costs that will be borne by Plaintiffs.

174.     The 2020 Rule will directly harm Plaintiffs in at least three ways.  First, the Rule will impose direct administrative and regulatory costs on Plaintiffs and their state agencies to mitigate confusion generated by the Final Rule.  For example, Plaintiffs must train staff, issue guidance, and engage in public education campaigns to mitigate the confusion engendered by the Rule. Second, by abdicating HHS's responsibility for the enforcement of Section 1557 and by purporting to significantly limit the scope of Section 1557's protections and the types of entities to which its protections apply, the Rule will cause Plaintiffs to incur increased costs from the investigation and enforcement of state anti-discrimination laws, particularly those that prohibit discrimination based on gender identity, sexual orientation, and pregnancy-related conditions, as well as all discrimination complaints against insurers the Rule newly and unlawfully excludes from the regulation's reach.  Third, the Rule will harm public health by reestablishing

discriminatory barriers to care for particularly vulnerable segments of Plaintiffs' populations, including transgender people, women and others seeking reproductive health care or with pregnancy-related conditions, LEP individuals, and others that will result in delayed or denied health care, requiring Plaintiffs and their residents to bear increased costs resulting from those harms.

> **A.     The 2020 Rule will impose direct administrative costs on Plaintiffs.**

175.     The 2016 Rule established comprehensive anti-discrimination protections in HHS's Section 1557 implementing regulations that have been coextensive with many state anti-discrimination protections, and created a federal enforcement scheme for discrimination in the health care context that operated in parallel to state enforcement schemes.  The practical result of this system was that HHS and the states shared responsibility for the enforcement of laws prohibiting discrimination by health care providers, health insurers, and other health programs and activities.  Once the Rule goes into effect, however, many of the Plaintiffs, including California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Wisconsin will have statutory, regulatory, or subregulatory protections against discrimination that offer more robust protections than those provided under the Rule.  Unlike the 2016 Rule, the 2020 Rule newly exempts many private employer-based plans, Medicare Part B plans, and the Federal Employee Health Benefits program from Section 1557's scope, except with respect to plans such insurers offer on the ACA exchange or that receive federal funding, like Medicaid plans.  In contrast, many Plaintiffs have antidiscrimination laws that: (1) apply to private insurance companies (including those offering employer-based plans); (2) make it unlawful to deny coverage or otherwise discriminate on the basis of gender identity, sexual orientation, and pregnancy status, in addition to discrimination based on other

protected characteristics; (3) mandate language assistance services for LEP individuals;

(4) require notices in commonly spoken languages other than English; and/or (5) require

qualified interpreters for individuals with disabilities.[38]

---

[38] *See, e.g.*, Cal. Gov't Code § 11135 (nondiscrimination); Cal. Code Regs. tit. 10, § 2538.3 (Language Assistance Program requirements); Colo. Code Regs. § 702-4: 4-2-17-6  (requiring carriers to note availability of language services in relevant notices); Conn. Gen. Stat. sec. 46a-64 (prohibiting discrimination in places of public accommodation on the bases of sex (including pregnancy), sexual orientation, and gender identity/expression); 18 Del. C. § 2304(22) (prohibiting discrimination in insurance based on sexual orientation and gender identity); D.C. Code § 31-2231.11(c) (prohibiting discrimination based on gender identity and expression in the provision of health insurance); Haw. Rev. Stat. §§ 378-2 (prohibiting discrimination in employment-based health plans, including on the bases of gender identity or expression and reproductive health decision), 431:10A-118.3, 432:1-607.3, and 432D-26.3 (prohibiting discrimination in insurance on the basis of actual or perceived gender identity), 489-3 (prohibiting discrimination in public accommodations, including on the basis of gender identity or expression); 775 Ill. Comp. Stat. 5/5-101(A)(6) (Illinois Human Rights Act prohibiting discrimination in health care and health insurance); 210 Ill. Comp. Stat. 87/15 (Language Assistance Services Act); 305 Ill. Comp. Stat. 5/5-30(j) (language access requirements for Managed Care Entities); Me. Rev. Stat. Ann. tit. 5 §§ 4553 (definition of sexual orientation includes gender identity), 4572-A (prohibiting discrimination based on pregnancy), 4592 (public accommodation discrimination includes sexual orientation as protected category); Md. Code Ann., Ins. § 15-1A-22 (prohibiting discrimination based on gender identity and sexual orientation in the provision of health insurance); Md. Code Regs. 10.67.05.01 (language access requirements for Managed Care Organizations); Mass. Gen. Laws ch. 175, § 24A (prohibiting state-regulated insurers from issuing health plans that include exclusions or coverage limitations based on sex, including excluding or limiting coverage based on an insured's transgender status); Mass. Gen. Laws ch. 151B, § 4 (prohibiting discrimination on the basis of sex, sexual orientation, or gender identity in the design and administration of fringe benefits, including health insurance and disability insurance); Mass. Gen. Laws ch. 176O, §§ 6(a)(10), (b)(9), 15(k) (language access requirements of health insurance carriers); Minn. Stat. § 363A.03, Subd. 44 (defining discrimination on the basis of sexual orientation, the definition of which includes gender identity); Minn. Stat. §§ 363A.11, 363A.03, Subd. 42 (prohibiting sex discrimination, which includes pregnancy status); Nev. Rev. Stat. §§ 449.101(1) (prohibiting discrimination on basis of gender identity or expression in medical facilities), 449.104(1), 449.103(1) (requiring medical facilities to have policies and cultural competency training for staff covering gender identity and expression), 651.070 (prohibiting discrimination on basis of gender identity or expression in public accommodations); N.J. Stat. Ann. § 10:5-12(f) (prohibiting places of public accommodation from discriminating on the basis of sex, pregnancy or breastfeeding, gender identity or expression, and affectional or sexual orientation, among other protected characteristics); N.J. Stat. Ann. § 10:5-12(l) (prohibiting insurance providers from refusing to do business with, or refusing to provide services to, someone on the basis of their sexual orientation or gender identity or expression); N.J. Stat. Ann. § 17:48-6oo (requiring health insurers and similar entities to "provide coverage regardless of gender identity [or] expression"); N.M. Stat. Ann. § 28-1-7 (prohibiting discrimination based on sexual orientation, gender identity, and pregnancy status); N.Y. Exec. L. § 296 (unlawful discriminatory practice to discriminate based on sexual orientation, gender identity or expression); N.Y. Ins. Law § 2607 (prohibiting discrimination in insurance issuing because of sexual orientation, gender identity or expression, and transgender status); N.Y. Comp. Codes R. & Regs. tit. 11, § 52.72 (Insurance Regulation 62) (prohibiting issuers from discriminating on grounds of pregnancy status, sexual orientation, gender identity, transgender status, or sex stereotyping); N.Y. Comp. Codes R. & Regs. tit. 10, § 405.7(a)(7) (requirements for hospital language assistance services); N.Y. Exec. Law § 296(2)(c)-(d) (requires entities covered by the New York Human Rights Law to provide auxiliary aids and services to individuals with disabilities to avoid discrimination against such individuals and defining "auxiliary aids and services" to include "qualified interpreters" and "qualified readers."); Or. Rev. Stat. § 746.021 (prohibiting discrimination based on gender identity in commercial insurance); Or. Rev. Stat. § 659.875(1) (same for Medicaid); Or. Admin. R. 839-005-0003 (same for public accommodations); R.I. Gen. Laws § 11-24-2 (prohibiting discrimination in places of public accommodation on the bases of sex (including pregnancy), sexual orientation, and gender identity/expression); Virginia Executive Directive Five: Access to Affordable,

176.    Because the 2020 Rule purports to narrow the scope of Section 1557's anti-discrimination provisions and dramatically reduces the number of entities to which those protections apply, but does not (and cannot) alter state and local protections that are consistent with Section 1557's statutory protections and have been coextensive with HHS's existing Section 1557 regulations, the Rule creates confusion among health care providers, insurers, and the public regarding the applicable standards and protections.

177.    Given the new divergence between HHS's Section 1557 regulations and state laws prohibiting discrimination in the health care context, and in light of the Rule's effective invitation to health providers and insurers to discriminate against vulnerable groups, Plaintiffs must ensure that regulated entities in their states understand their continuing obligations not to discriminate.  The Rule has already required, or will require, Plaintiffs to incur costs by issuing new or revised guidance, regulations, or legislation clarifying distinct state standards and specifying that more stringent state law standards governing anti-discrimination in health care continue to apply.  Given the confusion engendered by the Rule, Plaintiffs will incur costs issuing guidance and directives to clarify that Plaintiffs' state agencies will—in contrast to HHS—investigate discrimination in health care by a broad range of entities, including private insurance companies providing employer-based plans, and will—also in contrast to HHS—investigate complaints alleging discrimination on the basis of gender identity, sexual orientation, and pregnancy status; and continue to require language access and interpretive services.

---

Quality Health Care Coverage (2019) (ordering Virginia Secretary of Health and Human Resources to develop publicly-available Language Access Plan); Vt. Stat. Ann. tit. 8, § 4724 (prohibiting certain entities, including Qualified Health Plan issuers, from discriminating on the basis of gender identity); Wis. Stat. §§ 628.34, 609.22(4m), 632.746(2)(b), Wis. Admin. Code Ins. § 9-31(2) (prohibiting discrimination based on pregnancy-status).

178.     Defendants' issuance of the Rule and related publicity have caused many of Plaintiffs' residents—particularly those who are transgender—to worry that they are losing protections and may lose insurance coverage for medically necessary health care, even though state and local protections continue to exist.

179.     The Rule is already causing confusion and distress.  For example, since the Rule was issued on June 12, 2020, Trans Lifeline, a nationwide peer support and crisis hotline non-profit organization serving transgender people, has seen a marked increase in calls to the hotline—up from 155 on average in a typical day to 534 calls per day between June 12 and June 19, 2020, an increase of more than threefold.  Callers brought up the Rule in roughly 10 percent of recent hotline calls.

180.     Accordingly, the Rule will also require Plaintiffs to undertake efforts and incur costs to address the confusion caused by the Rule and to educate the public about their rights under state and local law.

181.     With respect to LEP individuals and elimination of the 2016 Rule's notice and tagline requirements, HHS admits that "an unknown number of persons are likely not aware of their right to file complaints with [OCR] and some unknown subset of this population may suffer remediable grievances, but will not complain to OCR absent notices informing them of the process."  84 Fed. Reg. 27,883; *see also* 85 Fed. Reg. 37,234 ("The Department continues, however, to not be aware of a way to quantify those potential effects.").  Accordingly, the Rule will require Plaintiffs to invest resources to inform LEP individuals of their rights to obtain language assistance services and to file complaints when they are denied those services or otherwise face discrimination by health care providers or insurers.

182.    Plaintiffs have already been forced to incur costs to remedy the confusion engendered by the Rule and anticipate that additional resources and costs will be required. Indeed, the Rule concedes that there will be "additional costs" "regarding training and revision of policies and procedures."  85 Fed. Reg. 37,163; *see also id.* at 37,236–238.

183.    For example, on June 28, 2020, New York's Department of Financial Services ("NYDFS") announced several actions taken by the agency to protect LGBTQ New Yorkers against discrimination in health insurance, notwithstanding HHS's rollback of federal protections under Section 1557.[39]  These actions included  amending the State's insurance regulations to prohibit discrimination based on an insured's or prospective insured's actual or perceived sexual orientation, gender identity or expression, or transgender status.  The amendment, which takes effect July 28, 2020, also prohibits policy exclusions for treatments related to gender transition, gender dysphoria, or gender incongruence.  Also as a result of the Rule, NYDFS also issued a Circular Letter on June 28, 2020, to remind regulated entities of New York's non-discrimination protections based on sexual orientation, gender identity or expression, and transgender status and the requirements pertaining to preventive care and screenings.[40]  Following publication of the Rule, NYDFS also updated its guide for transgender New Yorkers regarding their health care rights to assist transgender individuals in understanding their health insurance coverage for gender-affirming care and when New York's greater protections apply.[41]

---

[39] *Superintendent Linda A. Lacewell Announces Action to Protect LGBTQ New Yorkers Against Bias in Healthcare*, Dep't of Fin. Servs. (June 28, 2020), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202006282.
[40] *Insurance Circular Letter No. 13*, Dep't of Fin. Servs. (June 28, 2020), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2020_13.
[41] *Health Coverage Information for Transgender New Yorkers: What You Need to Know to Get Care*, https://www.dfs.ny.gov/consumers/health_insurance/transgender_healthcare.

184.    In addition, the New York State Division of Human Rights hosted a Know Your

Rights webinar on June 30, 2020 regarding New York state law protections, noting that despite

HHS's rollback of the regulatory protections against discrimination in health settings, New York

State's laws and rules, which include protections based on sexual orientation, gender identity or

expression, national origin, and pregnancy related conditions, among others, still apply.[42]

185.    As a result of the Rule, California's Department of Fair Employment and Housing

("CA DFEH") has already invested staff time to develop education materials and programs to

clarify that discrimination on the bases of gender identity and sexual orientation in health care

and insurance are unlawful under California law.  CA DFEH may also engage in a multi-lingual

campaign to educate LEP Californians about their rights due to the Rule's removal of notice and

tagline requirements and other language assistance requirements.

186.    Similarly, the California Department of Insurance ("CA CDI") has already

incurred costs to issue a notice to all California health insurers to clarify that the Rule does not

preempt state law and that health insurers must continue to comply with California's anti-

discrimination laws.  The Rule will also require CA CDI to increase staffing and resources to

address confusion surrounding the Rule and its relation to more stringent state law protections.

CA CDI expects confusion triggered by the Rule will lead to additional calls to the Department.

The Rule will require hiring one or more compliance officers to field those inquiries.

187.    Several Massachusetts agencies have already had to, or will need to, promulgate

advisories or guidance as a result of the Rule.  For example, MassHealth—the program that

administers the Commonwealth's Medicaid program and Children's Health Insurance

Program—prepared and sent an advisory to all of its managed care plans and other stakeholders

---

[42] https://speakerdeck.com/nyshumanrights/know-your-rights-lgbtq-plus-rights-under-new-york-state-law.

to reiterate that state anti-discrimination laws (as well as managed care contracts) continue to prohibit discrimination on the basis of sexual orientation and transgender status, and require meaningful language access for MassHealth members.

188.   In addition, Massachusetts' Division of Insurance ("DOI") is preparing guidance for insurance carriers in the Commonwealth to make clear that Massachusetts state antidiscrimination laws, which prohibit discrimination on the basis of sex, sexual orientation, gender identity, and national origin, continue to apply to insurers within DOI's jurisdiction.  DOI is also working to ensure that its staff understands the continued applicably of state anti-discrimination protections and considering developing additional educational material.

189.   In anticipation of the Rule, Colorado's Division of Insurance ("CO DOI") promulgated DOI Regulation 4-2-62, which among other things, prohibits insurance carriers from discriminating on the basis of sexual orientation or gender identity, and also prohibits insurers from denying, canceling, limiting, or refusing to issue or renew a policy because of a person's sexual orientation or gender identity.  In light of the confusion caused by the Rule, CODOI has needed to undertake substantial and costly actions to remediate that confusion:  it updated its website to address LGBTQ resources (including distinguishing between state and federal rights and protections); will conduct additional training of staff to answer questions, navigate appeals, and triage support needs with LGBTQ community members who contact the Division; and may issue additional guidance to insurers about their obligations under state law, as well as educational materials for consumers to reduce confusion around the Rule.

190.   The Colorado Department of Health Care Policy and Financing ("COHCPF") has also begun to undertake substantial and costly actions out of serious concern that the Rule will confuse or embolden providers who do not understand or who disagree with LGBTQ and LEP

protections.  COHCPF has issued a clarifying bulletin regarding Colorado law to hospital leaders

and the state's hospital association and will provide similar clarifications to other health

providers in Colorado about the state's protections through oral and written communications.

Additionally, COHCPF has already provided an internal staff-wide training about the Rule and

Colorado's anti-discrimination protections, and participated in a town hall organized by the

state's largest LGBTQ advocacy group to provide clarity on the state's protections.

191.    In anticipation of the Rule, Connecticut's Commission on Human Rights and

Opportunities (CHRO) issued a declaratory ruling that, *inter alia*, prohibits insurers from selling

insurance plans that discriminate on the basis of sexual orientation or gender identity.[43]  The

week after the Rule was promulgated, Connecticut's Insurance Commissioner released new

guidance, in an attempt to respond to the significant confusion and concern caused by the rule,

reminding regulated entities and community members alike that Connecticut law prohibits

insurers and providers from discriminating on the basis of sexual orientation, or gender identity

or expression.[44]

192.    Because of the 2020 Rule, the District of Columbia Health Benefit Exchange

("HBX") will need to provide updated guidance to assister grantees, who provide application and

enrollment assistance to District residents seeking coverage through DC Health Link, the online

health insurance marketplace operated by DC Health Benefit Exchange Authority.  HBX will

also need to update trainings and guidance to assisters based on the Rule to help them address

questions related to the new Rule.  HBX will also provide training to internal staff and customer

---

[43] CHRO Declaratory Ruling on Petition Regarding Health Insurers' Categorization of Certain Gender-Confirming Procedures as Cosmetic (Apr. 17, 2020).
[44] Press Release, *Insurance Commissioner: Connecticut LGBTQ health care consumers remain protected from discrimination*, State of Ct. Ins. Dep't (June 18, 2020), https://portal.ct.gov/CID/News-Releases/Press-Releases/Press-Releases-20200618.

service representatives that serve their call center, and may need to update customer service scripts.

193.     Because of the Rule, the State of Hawaii's Department of Human Services Med-QUEST Division will likely need to expend funds to provide guidance, training, education, and revision of documents for health plans, providers, and recipients.

194.     Due to the Rule, state agencies in Illinois have been required to issue guidance clarifying the scope of state and federal law and devote substantial resources to addressing confusion created by the Rule.  For example, the Illinois Department of Human Rights ("IL DHR"), Department of Insurance ("IL DOI"), and Department of Healthcare and Family Services ("IL DHFS") issued a joint agency non-discrimination in health care services communication "to clarify the 2020 Final Rule's impact on residents of Illinois, to identify the protections from discrimination that exist in State law, and to remind the healthcare community of their ongoing obligations to deliver healthcare services in a non-discriminatory manner."[45]

195.     Additionally, IL DOI issued a company bulletin reminding health insurance issuers of Illinois laws that protect against discrimination based on sexual orientation or gender identity.[46]  To remediate the harmful effects of Defendants' decision to narrow the scope of Section 1557 through the Rule, IL DOI proposed its own rulemaking to expand the existing nondiscrimination protections for gender identity at Ill. Adm. Code tit. 50, § 2603.35, so that the protections apply to policy and claims practices relating to either group or individual health

---

[45] *Guidance Relating to Nondiscrimination in Healthcare Services in Illinois* (June 26, 2020), https://www2.illinois.gov/dhr/Documents/Joint%20Nondiscrimination%20Guidance.pdf.
[46] *Company Bulletin 2020-16 Health Insurance Coverage for Transgender, Nonbinary, and Gender Nonconforming Individuals, and for Individuals of All Sexual Orientations* (June 15, 2020), https://insurance.illinois.gov/cb/2020/CB2020-16.pdf.

insurance coverage, other than grandfathered health plans or excepted benefit policies.  *See* 43 Ill. Reg. 14,987 (Dec. 27, 2019).

196.    And IL DHFS issued a provider notice "to clarify that despite the federal Final Rule, medical assistance providers in Illinois are required to provide supplies and services without discriminating on the basis of sexual orientation or gender-related identity pursuant to the Illinois Human Rights Act, 775 ILCS 5, and 89 Ill. Adm. Code 140.12."[47]

197.    IL DHR is developing a community outreach plan and will hold training for staff in light of the Rule.

198.    To remediate the harmful effects of Defendants' decision to narrow the scope of Section 1557 through the Rule, the Illinois Department of Insurance proposed its own rulemaking to expand the existing nondiscrimination protections for gender identity at Ill. Adm. Code tit. 50, § 2603.35, so that the protections apply to policy and claims practices relating to either group or individual health insurance coverage, other than grandfathered health plans or excepted benefit policies.  *See* 43 Ill. Reg. 14,987 (Dec. 27, 2019).

199.    In light of the then-impending Rule, Maryland enacted new health anti-discrimination legislation to ensure that individuals would remain protected under state law regardless of HHS's efforts to roll back express protections in the Section 1557 regulations. H.B. 1120/S.B. 738, 2020 Leg., 441st Sess. (Md. 2020) to be codified at Md. Code Ann., Health-Gen. § 2-1001 *et seq.*; Md. Code Ann., Ins. § 15-1A-22 (Acts 2020, c. 620, § 1, eff. May 8, 2020; Acts 2020, c. 621, § 1, eff. May 8, 2020).  Since HHS's publication of the Rule, Maryland's Health Benefit Exchange has convened a workgroup to assess the Rule's impact

---

[47] *Provider Notice Re: Protections Against Discrimination Based on Sexual Orientation, including Gender-Related Identity Under the Illinois Human Rights Act* (June 29, 2020), https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn200629a.aspx.

including updated guidance that will need to be issued, regulations that may need to be issued, training needs, and consumer outreach and education needs.  Similarly, Maryland's Commission on Civil Rights ("MD CCR") is currently assessing the Rule's impact, including the impact on the Commission's enforcement resources.

200.    Because of the Rule, the Minnesota Department of Human Rights will need to conduct outreach and issue publications to ensure that the public understands they remain protected by state law.  And the Equal Opportunity and Access Division of the Minnesota Department of Human Services anticipates costs relating to revising guidance materials, increased calls from the public, and additional training and education in light of the Rule.

201.    The New Jersey Department of Health ("NJDOH") will likely need to update guidance to explain inconsistencies between federal- and state-level non-discrimination protections, and the New Jersey Division of Consumer Affairs will likely need to provide training for staff, consumers, and the regulated community.  Similarly, in lieu of federal notices, the NJDOH Office of Minority and Multicultural Health will need to work proactively with the NJDOH Health Systems branch, hospital associations, and primary care associations to ensure patients with LEP have options and the same standard access to health care. NJDOH will also need to remind grantees and licensees about the necessity of language access and non-discrimination in the absence of a federal mandate.

202.    Due to the Rule and concomitant concerns from consumers, the Oregon Health Authority ("OHA") and Oregon Department of Consumer and Business Services have sent guidance reassuring Oregon residents that discrimination against Medicaid and commercial health plan members based on gender identity remains prohibited under state law.  OHA will need to update current public-facing materials regarding anti-discrimination protections and send

out guidance related to language access to account for the Rule's changes.  The Rule also means that OHA will need to consistently and continuously reaffirm that affected individuals are protected by Oregon law and that there are remedies for discrimination.  The Rule creates fear and uncertainty in an already difficult and challenging climate and frustrates OHA's mission for health equity by creating additional barriers to care and associated fear.

203.    Rhode Island's Commission for Human Rights plans to conduct outreach to employers to remind them that the protected characteristics of pregnancy status, sexual orientation, and gender identity/expression are still covered under state law despite the Rule and other Rhode Island agencies, including the state-based health insurance exchange, are considering training for staff in light of the Rule, which would incur additional costs.  Rhode Island's Department of Health (RIDOH) plans to issue guidance to address confusion for health care professionals and health care facilities to highlight the important differences between what the Rule requires and what state law requires.

204.    Due to the Rule, the Vermont Department of Financial Regulation released a statement to remind regulated entities and Vermont's transgender community that Vermont law prohibits health insurers from unfairly discriminating based on gender identity.[48]

205.    The Wisconsin Department of Health Services also plans to (1) issue guidance in light of the Rule to address confusion likely to be experienced by health plans, providers, and members; (2) train and educate staff, benefit program members, and community partners on the Rule to mitigate any confusion; and (3) update public postings, fact sheets, and "know your rights" materials.  On June 29, 2020, the Wisconsin Office of the Commissioner of Insurance

---

[48] *On LGBTQ+ Rights: Vermont and U.S. Supreme Court Lead* (June 17, 2020), https://dfr.vermont.gov/other/lgbtq-rights-vermont-and-us-supreme-court-lead.

("WI OCI") issued a bulletin clarifying legal requirements regarding nondiscrimination in health insurance coverage for individuals who are transgender or gender dysphoric.[49]  Additionally, WI OCI is in the process of updating consumer information publications and compiling a fact sheet on individual rights in light of the Rule.

206.    Other Plaintiffs also intend to issue guidance to address confusion within the regulated community, revise or update public-facing materials to clarify non-discrimination protections, provide training for agency staff, and/or engage in community outreach as a result of and to counteract the 2020 Rule.

### B.    Plaintiffs will incur increased enforcement costs and burdens as a result of the 2020 Rule.

207.    In addition, the Rule will injure Plaintiffs by causing them to incur additional costs through investigation and enforcement of state civil rights protections banning discrimination in health care settings and health insurance.

208.    Most Plaintiffs have one or more state agencies with jurisdiction to investigate discrimination in the health care context and have established complaint or grievance procedures to address discrimination in that context, including, for example, health departments, agencies dedicated to human rights, and state insurance commissioners or departments.  Plaintiffs' agencies receive complaints from the public, investigate the facts giving rise to those complaints through various investigative tools, and attempt to resolve complaints.  Many of Plaintiffs' state agencies have mechanisms for issuing findings or determinations of violations, enforcing determinations or orders, and collecting any applicable damages or penalties.

---

[49] *Nondiscrimination Regarding Coverage for Insureds Who Are Transgender or Gender Dysphoric*, Wi. Off. of Comm'r of Ins. (June 29, 2020), https://oci.wi.gov/Pages/Regulation/Bulletin20200629Nondiscrimination.aspx.

209.    The Rule will burden Plaintiffs with increased enforcement costs as the Rule diverts discrimination complaints from federal to state enforcement agencies.  As the Rule limits the scope and breadth of OCR's federal enforcement against discrimination, individuals who previously would have sought assistance from OCR will be forced to seek assistance from state agencies or bring private lawsuits.

210.    Complainants alleging discrimination (on any of the grounds covered by Section 1557) against entities that were covered by OCR's prior interpretation of Section 1557, but are no longer covered under the Rule, will no longer be able to file complaints with OCR; instead, they will likely turn to state agencies for assistance.  For example, after the 2020 Rule becomes effective, an individual who is subject to race discrimination by a health insurance company offering an employer-sponsored plan will have no recourse with OCR.  Whereas HHS should bear the primary responsibility of enforcing discrimination prohibitions in all forms against health care entities, the Department's refusal to do so will expose state and local enforcement agencies to continuing enforcement costs from individuals seeking relief from discrimination.

211.    Likewise, although the Supreme Court's *Bostock* decision requires OCR to investigate complaints relating to discrimination based on transgender status and sexual orientation, by flouting *Bostock* and other case law, the Rule instead will demand that such complaints to be filed with state agencies instead of OCR.  And as noted above, HHS acknowledges that LEP individuals may not be aware of their rights under federal law with the repeal of the notice and taglines requirements; therefore, LEP individuals will likely turn to state agencies instead.

212.    By wrongfully suggesting that sexual orientation and gender identity are outside Section 1557's scope, the Rule will invite discrimination and confusion within the regulated

community.  In so doing, the Rule will directly increase the prevalence of discrimination in Plaintiffs' jurisdictions.  Plaintiffs and their enforcement agencies will bear the burden of this, as their enforcement resources will be required to enforce civil rights standards in their jurisdictions.

213.    Moreover, by falsely suggesting that Section 1557's protections do not encompass discrimination on the basis of sexual orientation and gender identity, or that insurers need not cover transition-related care or cover other health services for transgender people in a nondiscriminatory manner, the Rule threatens to induce covered entities to roll back or reduce certain protections they previously understood to be required by the law.  With HHS's abdication of its enforcement obligations through the Rule, the burden of holding these entities accountable for maintaining nondiscriminatory policies or practices, or making discriminatory coverage determinations on these bases, will now fall entirely to state and local enforcement agencies and the courts.

214.    To handle the increase in complaints, state agencies will be forced to shift enforcement priorities in order to manage their already-limited resources or incur costs by hiring additional investigators, counsel, data analysts, and other staff to properly investigate discrimination claims and enforce state laws.

215.    For example, CA DFEH does not have discretion to decline to process and investigate complaints within its jurisdiction, so any increase in complaints necessarily increases its workload.  CA DFEH anticipates that processing and resolving complaints that historically could have been filed with OCR could result in at least $1,346 to $2,308 of staff time per complaint, and that even a conservative estimate supports an increase of 24 complaints per year

being filed by transgender individuals for discrimination in health care and insurance due to the Rule.

216.    In Massachusetts, several state agencies have enforcement authority over complaints of discrimination in the health care and insurance contexts.  For example, the Massachusetts Commission Against Discrimination ("MCAD") processes and investigates complaints of discrimination in public accommodations and employment, among other areas.  In fiscal year 2019, MCAD received and processed 3,364 new complaints, a third of which involved allegations of discrimination on the basis of sex, sexual orientation, transgender status, or national origin.  The Massachusetts DOI is the primary regulator of insurance carriers in Massachusetts and is responsible for investigating discrimination complaints against insurers, including those that allege discrimination on the basis of sex, sexual orientation, transgender status, and national origin.  DOI estimates that it could cost between $100 and $150 to process and investigate each new complaint of discrimination within DOI's jurisdiction.  MassHealth has enforcement authority over any MassHealth provider who discriminates against any MassHealth member on the basis of sex, sexual orientation, transgender status, or national origin.  MassHealth provides coverage to nearly 1.8 million Massachusetts residents.  Each of these agencies has a significant workload and will need to devote staff time and resources to processing and investigating each new complaint of discrimination.  It is reasonable to expect that these agencies will receive additional complaints of discrimination that could have been filed with OCR prior to the Rule.

217.    Colorado estimates that it will cost $171.30 to process and investigate each complaint regarding discrimination against transgender people within CO DOI's jurisdiction.

218.     In Illinois, IL DHR affirms that investigating additional complaints will divert resources from the other work of the agency.  IL DHR investigates allegations of discrimination in the area of public accommodations attributable to 14 different protected categories.  These categories include the ACA's identified bases of race, color, national origin, sex, disability and age.  Each charge requires the dedication of IL DHR resources, equipment, and staff (intake, investigative, supervisors, legal and office support).  Without additional staff and resources, each new charge added to the agency's inventory displaces the other charges that are pending investigation and processing.  The cost to process a charge in Fiscal Year 2019 was $4,695.65.

219.     In Maryland, the MD CCR has concurrent jurisdiction with the Maryland Department of Health and the Maryland Insurance Administration in the enforcement of health-related discrimination complaints, including discrimination based on gender identity and sexual orientation.  Because HHS will no longer protect Marylanders from these forms of discrimination, MD CCR anticipates an increase in complaints, which will require the it to divert already-limited resources to review and investigate the complaints.

220.     Because Michigan law requires that the Michigan Department of Civil Rights ("MDCR") investigate all complaints of discrimination, increased complaints related to discrimination in health care caused by the Rule may burden MDCR's resources and slow down the investigation and processing for all cases.

221.     The Minnesota Department of Human Rights ("MN DHR") affirms that investigating additional charges of discrimination will divert resources from the other work of the agency.  Each charge requires the dedication of Department resources, equipment, and staff (including investigators, attorneys, and administrative personnel).  MN DHR estimates the cost

to process and investigate a typical charge of discrimination in state fiscal year 2020 was approximately $2,200 to $3,000.

### C. The 2020 Rule will harm public health and impose additional costs on Plaintiffs' health care systems.

222.    Plaintiffs have protectable interests in the health and well-being of adults and children who live in their states.  The Rule harms these interests. In addition, Plaintiffs' health care systems will be forced to bear increased costs attendant to these harms, as the Rule impairs public health and increases burdens to Plaintiffs' already-strained health care systems.

223.    The Rule purports to remove and reduce federal regulatory protections for LGBTQ individuals, women and others seeking reproductive health care or with pregnancy-related conditions, LEP individuals, and other protected groups (due to the narrowed scope of coverage of insurance plans), and it does so during the worst public health crisis in a century. The Rule will create confusion among Plaintiffs' residents about their rights and will cause some individuals to delay or avoid seeking care.

224.    The public health effects of eliminating anti-discrimination protections are clear, as HHS itself has previously determined that discrimination in the health care context leads to "poor and inadequate health care" and "exacerbate[s] existing health disparities in underserved communities."  81 Fed. Reg. 31,444.  HHS also long recognized that individuals who have experienced discrimination in the health care context often postpone or do not seek needed health care, resulting in adverse health outcomes.  *Id.*  By increasing the likelihood that LGBTQ individuals, LEP individuals, and others will hesitate to seek care because they fear discrimination, the Rule puts everyone at increased risk.  Delaying care, in turn, results in avoidable human suffering and a "marketplace comprised of higher medical costs due to delayed treatment, lost wages, lost productivity, and misuse of people's talents and energy."  *Id.*

225.     Moreover, deterring individuals from accessing timely care is particularly catastrophic for public health in light of COVID-19.  Such barriers to care result in delayed testing, contact tracing, and isolation, thereby impairing Plaintiffs' ability to reduce the spread of disease in Plaintiffs' jurisdictions.

### 1.  The Rule harms LGBTQ individuals.

226.     As discussed above, the Rule eliminates the 2016 Rule's express protections against sex discrimination based on gender identity and sex stereotyping.  The 2020 Rule advances a narrative that transgender people are not welcome in health care settings, which will generate fear, confusion, and uncertainty for these vulnerable people.  Some transgender individuals will delay or avoid seeking care.  By emboldening discrimination, the Rule increases the likelihood that transgender individuals will encounter discrimination in health care settings.  This will have negative health consequences for LGBTQ people (and public health in general) and exacerbate health disparities that already exist.

227.     The effect of discrimination on health outcomes for LGBTQ people, as well as access to health care services, is well documented.[50]  LGBTQ persons report experiencing barriers to receiving medical services, including disrespectful attitudes, discriminatory treatment, inflexible or prejudicial policies, and even outright refusals of essential care, leading to poorer

---

[50] Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV*, 5-7 (2010), https://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring.pdf; *see also* Jennifer Kates, *et al.*, Kaiser Family Foundation, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender (LGBT) Individuals in the U.S.* (May 3, 2018), https://www.kff.org/report-section/health-and-access-to-care-and-coverage-lgbt-individuals-in-the-us-health-challenges/.

health outcomes and often serious or even catastrophic consequences. Transgender people in particular report disparate treatment and even overtly hostile treatment from providers.[51]

228.   One report shows that roughly one in six LGBTQ people avoid seeking medical care due to concerns about discrimination because they are LGBTQ.[52]

229.   As a result of discrimination in health care, as well as systemic oppression and devaluation associated with social stigma, LGBTQ individuals experience worse physical health compared to their heterosexual and non-transgender counterparts,[53] have higher rates of chronic conditions,[54] and are at higher risk for certain mental health and behavioral health conditions, including depression, anxiety, and substance misuse.[55]  For similar reasons, LGBTQ youth, in particular, report a greater incidence of mental health issues and suicidal behaviors, suffer bullying and victimization to a greater extent than heterosexual youth, and have difficulty addressing concerns related to their sexual identity with their medical providers.[56]

230.   Past experiences of bias, humiliation, harsh treatment, and isolation, as well as perceived bias by health care providers, can discourage LGBTQ individuals from seeking care, which in turn results in poorer health outcomes due to delays in diagnosis, treatment, or preventive measures.[57]

---

[51] *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality, 97 (2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf; *see also* Kates, *supra* n.50.
[52] *Discrimination in America*, Robert Wood Johnson Foundation (Nov. 2017), https://www.rwjf.org/content/dam/farm/reports/surveys_and_polls/2017/rwjf441734.
[53] Kates, *supra* n.50.
[54] *Id.*
[55] *Id.* at 8.
[56] Hudaisa Hafeez, *et al*., *Health Care Disparities Among Lesbian, Gay, Bisexual, and Transgender Youth: A Literature Review*, Cureus (Apr. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5478215/; *see also* Michelle M. Johns, *et al*., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, U.S. Department of Health and Human Services/Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (Jan. 25, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf.
[57] Lambda Legal, *supra* n.50, at 12.

231.    By affirmatively announcing that OCR will not investigate sex discrimination on the basis of sexual orientation and gender identity, the Rule signals that such discrimination will be tolerated by the federal government.  As a result, LGBTQ individuals may be confused about what anti-discrimination protections remain in place and delay care because they fear discrimination.

232.    As a result of the Rule and related confusion and fear of discrimination, LGTBQ individuals who do seek care may avoid disclosing their sexual orientation or transgender status to their health care providers.  This may result in adverse health consequences for LGBTQ people because health care providers may not screen for relevant infections or cancers or may fail to order medically indicated tests or screenings.  It harms individual patients and the public health in general when medical problems remain undetected and untreated.  These problems are compounded by the current pandemic.  Delaying care can lead to chronic conditions, which put individuals at a higher risk for COVID-19.

> **2.  The Rule harms women and others seeking reproductive health care and with pregnancy-related conditions.**

233.    By unlawfully incorporating Title IX's blanket religious exemption and abortion exception, and repealing the 2016 Rule's clarification that sex discrimination includes pregnancy-related conditions, the 2020 Rule will create confusion about the scope of protections against these forms of discrimination under federal law.  In turn, the Rule may prevent or discourage women and other individuals seeking reproductive health care from accessing that care.

234.    The Rule also serves to further stigmatize abortion and may embolden providers to deny abortion care (potentially including contraception).

235.    As the Department recognized in 2016, "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious, and in some cases, life threatening results." 81 Fed. Reg. 31,380.

236.    Discriminatory denials of service will result in an increase in unplanned pregnancies, which are associated with poor birth outcomes and maternal health complications, including preterm birth, low birth weight, stillbirth, and early neonatal death.[58] Women facing an unplanned pregnancy are more likely than those with planned pregnancies to receive late or no prenatal care, to smoke and consume alcohol during pregnancy, to suffer from perinatal mood disorders, and to experience domestic violence during pregnancy.[59]

237.    Individuals facing unplanned pregnancy are also more likely to experience economic hardship and insecurity.[60] Economic security is associated with improved health outcomes, including lower risk of disease, better mental health, greater access to medical care, and longer life expectancy.

238.    Births resulting from unplanned pregnancies are likely to be publicly funded through state Medicaid and the Children's Health Insurance Program. In 2006, births resulting from unplanned pregnancies cost the states and the federal government nearly $11.1 billion in

---

[58] Megan Kavanaugh, *et al.*, *Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers*, Guttmacher Institute (July 2013), http://www.guttmacher.org/report/contraception-and-beyond-health-benefits-services-provided-family-planning-centers; Caitlin Gerdts, *et al.*, *Side Effects, Physical Health Consequences, and Mortality Associated with Abortion and Birth after an Unwanted Pregnancy*, Women's Health Issues (Jan.-Feb. 2016), https://www.sciencedirect.com/science/article/pii/S1049386715001589.
[59] *Clinical Preventive Services for Women: Closing the Gaps*, Institute of Medicine, 103 (2011), https://www.nap.edu/read/13181/chapter/1.
[60] Diana Greene Foster, *et al.*, *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, Am. Journal of Pub. Health (Feb. 7, 2018), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2017.304247.

costs.[61]  In California, 62 percent of unplanned births are publicly funded, primarily by Medi-Cal, the state's Medicaid program, and in Massachusetts, 59 percent of unplanned births are publicly funded.[62]

239.    The children of individuals denied care also face negative development, health, caregiving, and socioeconomic consequences.[63]

240.    Accordingly, by creating confusion and emboldening health care providers to deny reproductive health care, the Rule harms women, families, and society in general.

### 3.  The Rule harms individuals with limited English proficiency (LEP).

241.    The Rule's weakening of protections for LEP individuals and elimination of the notice and taglines requirements will exacerbate difficulties faced by LEP individuals attempting to access health care.

242.    More than 67 million people in the U.S. speak a language other than English at home and more than 25 million people are LEP, meaning they speak English less than "very well."[64]

243.    Language-related barriers severely limit an individual's opportunity to access health care services, assess options, express choices, follow medication instructions, ask

---

[61] Adam Sonfield, *et al.*, *The Public Costs of Births Resulting from Unintended Pregnancies: National and State-Level Estimates*, Perspectives on Reproductive and Sexual Health (June 2011), https://www.guttmacher.org/journals/psrh/2011/05/public-costs-births-resulting-unintended-pregnancies-national-and-state-level.

[62] *Id.* at Table 1.

[63] Diana Greene Foster, *et al.*, *Effects of Carrying an Unwanted Pregnancy to Term on Women's Existing Children*, The Journal of Pediatrics (Feb. 2019), https://www.jpeds.com/article/S0022-3476(18)31297-6/fulltext; Diana Greene Foster, *et al.*, *Comparison of Health, Development, Maternal Bonding, and Poverty Among Children Born After Denial of Abortion vs After Pregnancies Subsequent to an Abortion*, JAMA Pediatrics (Nov. 2018), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2698454.

[64] U.S. Census Bureau, *Characteristics of People by Language Spoken at Home, American Community Survey 1-Year Estimates*, tbls. S1601, S1603 (2018), https://data.census.gov/cedsci/table?q=language&hidePreview=false&tid=ACSST1Y2018.S1601.

questions, and seek assistance.[65]  LEP patients receive a lower quality of care than English-proficient patients in terms of incidence of medical errors and understanding of the treatment plans.[66]  Removing existing protections only continues these inequities in health care delivery.

244.    By contrast, access to quality interpreter services ensures fewer errors in communication, significantly shorter hospital stays, reduces 30-day readmission rates, and improves overall patient satisfaction.

245.    By removing and weakening language access requirements the Rule will diminish public knowledge of the means and methods for accessing health care and health insurance. Standardization and posting requirements under the 2016 Rule alerted both the public and providers of the critical importance of interpreter services.  By eliminating notice requirements, the 2020 Rules shifts the burden back to LEP individuals seeking care to know about their rights to language assistance services and to demand those services.  LEP individuals will not learn of their rights and the programs and services available to them, which will result in poorer health outcomes.  LEP individuals may be subject to misinformation and will not be able to access health care as timely and adequately as English speakers can.

246.    The COVID-19 pandemic makes language access services especially critical, as health care providers must quickly triage patients of all backgrounds according to their symptoms and public health officials attempt to distribute information and guidance documents

---

[65] Nat'l Health Law Program & Access Project, *Language Services Action Kit*, 40 (Feb. 2004), https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_fund_report_2002_may_providing_language_interpretation_services_in_health_care_settings__examples_from_the_field_lep_actionkit_reprint_0204_pdf.pdf.

[66] Alexander R. Green & Chijioke Nze, *Language-Based Inequity in Health Care: Who is the "Poor Historian"?*, American Medical Association Journal of Ethics, 263-271 (Mar. 2017), https://journalofethics.ama-assn.org/sites/journalofethics.ama-assn.org/files/2018-05/medu1-1703.pdf.

to diverse communities.  Early reports indicate that LEP patients may face worse outcomes when seeking emergency care for COVID-19 symptoms.[67]

247.    Additionally, as medical services are more frequently provided through telehealth due to the pandemic, access to qualified interpreters is crucial.  Yet the 2020 Rule lowers the qualification standards for interpreters and eliminates real-time video interpretation services.

### 4.  The Rule harms protected persons on newly non-covered insurance plans.

248.    By narrowing the scope of covered entities, the Rule creates confusion and uncertainty for individuals who have or are considering private, employer-sponsored health insurance plans.  In light of the Rule, individuals may reasonably not know whether their insurance company will continue to offer or renew coverage on a non-discriminatory basis, may be confused as to whether more-protective state laws—where they exist—apply, and may reasonably believe based on the announcement of the Rule that some of their medically necessary procedures will no longer be covered.

249.    Fear of discrimination deters individuals from seeking medical care.  For example, nearly 1 in 5 Latinos have avoided medical care due to concern of being discriminated against or treated poorly.[68]  And 22 percent of Black Americans have avoided medical care for fear of discrimination.[69]

---

[67] *See e.g.*, David Velasquez, *et al.*, *Equitable Access to Health Information for Non-English Speakers Amidst the Novel Coronavirus Pandemic*, Health Affairs (Apr. 2, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200331.77927/full/; Claudia Boyd-Barrett, *Community Groups Serve as Pandemic Information Lifeline to Non-English Speakers*, California Health Report (Mar. 31, 2020), https://www.calhealthreport.org/2020/03/31/community-groups-serve-as-pandemic-information-lifeline-to-non-english-speakers/.
[68] *Discrimination in America: Experiences and Views of Latinos*, Robert Wood Johnson Foundation (Oct. 2017), https://www.rwjf.org/content/dam/farm/reports/surveys_and_polls/2017/rwjf441402.
[69] *Discrimination in America: Experiences and Views of African Americans*, Robert Wood Johnson Foundation (Oct. 2017), https://www.rwjf.org/content/dam/farm/reports/reports/2017/rwjf441128.

250.    The Rule is particularly troubling in light of the health inequities exacerbated by the COVID-19 pandemic.  Black and Latino of the United States have been three times as likely to become infected with COVID-19 as white residents, according to data covering 640,000 infections detected in nearly 1,000 U.S. counties.[70]  And Black and Latino people have been nearly twice as likely to die from the virus as white people.[71]

### 5.   The Rule's Public Health Harms Will Impose Additional Costs on Plaintiffs and their Health Care Systems.

251.    As HHS has previously recognized, *see supra* ¶¶ 5, 74, 87, 224, 235, delaying care results in higher medical costs later.  Some of those costs will be borne by Plaintiffs in the form of higher government-funded health care costs and increased costs of care for uninsured patients by public hospitals.

252.    Plaintiffs administer and oversee multiple federal- and state-funded health care programs, including Medicaid, Children's Health Insurance Program, and other sources partially funded by Plaintiffs.  For example, California administers Medi-Cal, its version of Medicaid.  Similarly, Massachusetts' MassHealth program provides coverage to nearly 1.8 million Massachusetts residents, including critical coverage to particularly vulnerable segments of the populations, such as children and people with disabilities.  And New York pays health care costs for eligible low-income and moderate-income residents, including children, through its Medicaid program and a number of other programs funded in whole or in part by the State.  As individuals delay treatment due to fear of discrimination, health insurance programs funded partially by the States will face increased expenses.

---

[70] Richard A. Oppel, Jr., *et al.*, *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. Times (July 5, 2020), https://www nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data html?action=click&module=Top%20Stories&pgtype=Homepage.
[71] *Id.*

253.    Many states also run public hospitals and cover the cost of care when patients do not have health insurance.  Although most New Yorkers have health insurance, more than one million residents are uninsured.[72]  Many of New York's uninsured are poor or low-income: more than 77 percent (approximately 776,000 people) had incomes below 400 percent of the federal poverty level.  *See id.*  New York's communities of color are more likely to be without insurance coverage.[73]  And nearly one-quarter of all noncitizens residing in New York State—or more than 484,000 individuals—were uninsured in 2016.  *Id.*  Given these figures, higher costs due to delayed treatment of those who fear discrimination will in turn increase uncompensated care costs for public hospitals in New York.

254.    In the 2016 Rule, HHS specifically found that expanded anti-discrimination protections would lead to a decrease in uncompensated care payments.  81 Fed. Reg. 31,461 (recognizing that anti-discrimination protections under the 2016 Rule will contribute to a decrease in payments by the federal government for uncompensated care costs).  Accordingly, Defendants' elimination of the express anti-discrimination protections contained in HHS's Section 1557 regulations will inevitably increase the more than $19 billion dollars states already pay each year to reimburse providers for uncompensated care.[74]  In fact, state and local governments fund approximately 37.6 percent of government funded uncompensated care costs.[75]

---

[72] *See NYS Uninsured Rate Continues to Decline*, Greater N.Y. Hosp. Ass'n (Oct. 7, 2019), https://www.gnyha.org/news/nys-uninsured-rate-continues-to-decline/.

[73] *Success in the Empire State: Health Insurance Coverage Trends*, N.Y. State Health Found. (Nov. 14, 2017), https://nyshealthfoundation.org/wp-content/uploads/2017/11/success-in-the-empire-state-health-insurance-trends-NY.pdf.

[74] *See* Teresa A. Coughlin, *et al.*, *Uncompensated Care for the Uninsured in 2013: A Detailed Examination*, Kaiser Family Found., at 4 (May 30, 2014), https://www.kff.org/uninsured/report/uncompensated-care-for-the-uninsured-in-2013-a-detailed-examination/ (cited at 81 Fed. Reg. 31,461 n.380).

[75] *See* Teresa A. Coughlin, *et al.*, *An Estimated $84.9 Billion In Uncompensated Care Was Provided In 2013; ACA Payment Cuts Could Challenge Providers*, Health Affairs, 811 at Ex. 4 (May 2014), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2013.1068.

255.     Some of Plaintiffs' residents have insurance plans underwritten by companies in other states with fewer anti-discrimination protections.  Accordingly, residents with insurance plans written out-of-state may be denied care that would be covered by a plan written in their home state.  When such residents are denied coverage, they may have to turn to state-funded care.

256.     Additionally, some of Plaintiffs' residents may engage in interstate travel to jurisdictions that lack Plaintiffs' robust state-level protections against discrimination in health care.  When Plaintiffs' residents travel to or study in states with fewer protections and suffer discrimination or are denied care, Plaintiffs' jurisdictions may bear the enforcement costs and public health repercussions when residents return home.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Violation of APA; 5 U.S.C. § 706—Contrary to Law)

257.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

258.     The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

259.     The 2020 Rule is not in accordance with the law because it unlawfully exempts entities subject to Section 1557; incorporates religious and abortion exemptions under Title IX into Section 1557—but not Title IX's prohibition on sex discrimination on the basis of pregnancy status, gender identity, and sex stereotyping; and limits protections against national origin discrimination that require meaningful access to health care programs and activities.

260.     The 2020 Rule conflicts with the Supreme Court's holding in *Bostock v. Clayton County* that the plain meaning of sex discrimination encompasses discrimination based on an individual's sexual orientation or gender identity.

261.     The Rule eliminates protections based on sexual orientation and gender identity in unrelated regulations promulgated under different statutes, which conflicts with controlling legal authority regarding the meaning of "sex."

262.     The Rule conflicts with Section 1557 by failing to make available the enforcement mechanisms of Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act in the case of discrimination against a person on the basis of any protected characteristic under the underlying statutes.

263.     The 2020 Rule also runs counter to Section 1554 of the ACA, which, *inter alia*, forbids the HHS Secretary from promulgating "any regulation" that creates "unreasonable barriers" or "timely access" to health care.

264.     The Rule is therefore "not in accordance with law" as required by the APA.  5 U.S.C. § 706(2)(A).

265.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SECOND CLAIM FOR RELIEF
### (Violation of APA; 5 U.S.C. § 706—In Excess of Statutory Authority)

266.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

267.     Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

268.   Defendants may only exercise authority conferred by statute.  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

269.   The 2020 Rule exceeds statutory authority because it creates a broad religious exemption, which gives religiously-affiliated providers and insurers license to deny care and coverage for discriminatory reasons.

270.   The 2020 Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA.  5 U.S.C. § 706(2)(C).

271.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## THIRD CLAIM FOR RELIEF
### (Violation of APA; 5 U.S.C. § 706—Arbitrary, Capricious, and Abuse of Discretion)

272.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

273.   The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary," "capricious," or an "abuse of discretion."  5 U.S.C. § 706(2)(A).

274.   The 2020 Rule is arbitrary and capricious because HHS's justification for its decision runs counter to the evidence before the agency, disregards material facts and evidence, and fails to consider important aspects of the problem, including patient harms imposed on LGBTQ individuals, women and others seeking reproductive health care or with pregnancy-related conditions, LEP individuals, rural patients, and other vulnerable populations.

275.   The 2020 Rule is also arbitrary and capricious because it fails to adequately justify its departure from HHS's prior policy on which there are substantial reliance interests.

276.   The 2020 Rule is also arbitrary and capricious because it is based on a flawed cost-benefit analysis.  The Rule does not adequately quantify or consider the harms that will result.

277.    The Rule is arbitrary and capricious because it is pretextual.  For example, while HHS purports to base its Rule on the "plain meaning" of "on the basis of sex," HHS finalized the Rule without change after the Supreme Court issued its decision directly to the contrary in *Bostock*.

278.    The Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

279.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**FOURTH CLAIM FOR RELIEF**
**Violation of Fifth Amendment**
**(Due Process—Equal Protection Based on Unconstitutional Animus)**

280.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

281.   Under the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution, the federal government cannot deny to any person the equal protection of its laws.  The Due Process Clause prohibits the federal government from discriminating against individuals on the basis of sex.  U.S. Constitution Amend. V.

282.   Defendants were motivated by discriminatory animus toward transgender people and other members of the LGBTQ community when they promulgated the Rule.

283.   Defendants intend to target transgender individuals with the Rule as part of their broader efforts to stigmatize LGBTQ people.

284.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**REQUEST FOR RELIEF**

WHEREFORE, the States respectfully requests that this Court:

1.      Declare that the 2020 Rule is arbitrary, capricious, an abuse of discretion, or not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2.      Declare that the 2020 Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

3.      Declare that the 2020 Rule violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution;

4.      Postpone the effective date of the 2020 Rule pursuant to 5 U.S.C. § 705;

5.      Vacate and set aside the 2020 Rule;

6.      Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Rule;

7.       Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.      Grant such other relief as the Court deems just and proper.

Dated:  July 20, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
 *Chief Counsel for Federal Initiatives*

Elena Goldstein
 *Deputy Chief, Civil Rights Bureau*

By: */s/ Joseph J. Wardenski*
Joseph J. Wardenski, *Senior Trial Counsel*
Fiona J. Kaye, *Assistant Attorney General*
Travis England, *Assistant Attorney General*
Marissa Lieberman-Klein, *Special Assistant
Attorney General***
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8441
Joseph.Wardenski@ag.ny.gov

*Attorneys for the State of New York*

XAVIER BECERRA
*Attorney General of California*

Renu R. George*
 *Senior Assistant Attorney General*
Kathleen Boergers*
 *Supervising Deputy Attorney General*

By: */s/ Neli Palma*
Neli N. Palma, *Deputy Attorney General**
Lily Weaver, *Deputy Attorney General**
Martine D'Agostino, *Deputy Attorney General**
Office of the California Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
(916) 210-7522
Neli.Palma@doj.ca.gov

*Attorneys for the State of California*

MAURA HEALEY
*Attorney General of Massachusetts*

By:  */s/ Amanda Hainsworth*
Amanda Hainsworth, *Assistant Attorney General**
Kimberly A. Parr, *Assistant Attorney General**
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 963-2618
amanda.hainsworth@state.ma.us

*Attorneys for the Commonwealth of
Massachusetts*

PHILIP J. WEISER
*Attorney General of Colorado*

By:  */s/ Eric R. Olson*
Eric R. Olson, *Solicitor General\**
Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov

*Attorneys for the State of Colorado*

KARL A. RACINE
*Attorney General*
*District of Columbia*

By:  */s/ Kathleen Konopka*
Kathleen Konopka
*Deputy Attorney General, Public Advocacy*
*Division*
Office of the Attorney General for the District of
Columbia
441 4th St., N.W. Suite 630S
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov

*Attorneys for the District of Columbia*

CLARE E. CONNORS
*Attorney General of Hawaii*

By: */s/ Kalikoʻonalani D. Fernandes*
Kalikoʻonalani D. Fernandes, *Deputy Solicitor*
*General\**
Office of the Hawaii Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorney for the State of Hawaii*

WILLIAM TONG
*Attorney General*
*State of Connecticut*

By:  */s/ Joshua Perry*
Joshua Perry
*Special Counsel for Civil Rights*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5372
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*

By: */s/ Vanessa L. Kassab*
Christian Douglas Wright, *Director of Impact*
*Litigation*
Vanessa L. Kassab, *Deputy Attorney General\**
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE  19801
(302) 577-8600
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: */s/ Joyce Otuwa*
Joyce C. Otuwa, *Assistant Attorney General\**
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
(312) 857-8386
JOtuwa@atg.state.il.us

*Attorney for the State of Illinois*

AARON M. FREY
*Attorney General of Maine*

By:  /s/ *Susan P. Herman*
Susan P. Herman*
*Chief Deputy Attorney General*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8814
susan.herman@maine.gov

*Attorneys for Plaintiff State of Maine*

DANA NESSEL
*Attorney General of Michigan*

By:  /s/ *Toni L. Harris*
Fadwa A. Hammoud*
*Solicitor General*
Toni L. Harris*
Tracy Van den Bergh*
*Assistant Attorneys General*
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
VandenBerghT@michigan.gov

*Attorneys for Plaintiff State of Michigan*

BRIAN E. FROSH
*Attorney General of Maryland*

By:  /s/ *Kimberly S. Cammarata*
Kimberly S. Cammarata*
*Director, Health Education and Advocacy Unit*
200 St. Paul Place
Baltimore, MD 21202
(410) 576-7038
kcammarata@oag.state.md.us

*Attorneys for the State of Maryland*

KEITH ELLISON
*Attorney General of Minnesota*

By:  /s/ *Megan J. McKenzie*
Megan J. McKenzie*
*Assistant Attorney General*
445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101-2128
(651) 757-1405
megan.mckenzie@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
*Attorney General*
*State of Nevada*

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
  *Solicitor General*
Craig A. Newby
  *Deputy Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for the State of Nevada*


HECTOR BALDERAS
*Attorney General of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas*
*Chief Deputy Attorney General*
New Mexico Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
(505) 490-4060
tmaestas@nmag.gov

*Attorneys for Plaintiff State of New Mexico,*
*by and through Attorney General Hector Balderas*


GURBIR S. GREWAL
*Attorney General of New Jersey*

Mayur P. Saxena, *Assistant Attorney General*
Melissa Medoway*, Section Chief, Deputy Attorney*
*General**

By:  */s/ Marie Soueid*
Marie Soueid, *Deputy Attorney General*
John T. Passante, *Deputy Attorney General**
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-2564

*Attorneys for Plaintiff State of New Jersey*


JOSHUA H. STEIN
*Attorney General of North Carolina*

By:  */s/ Sripriya Narasimhan*
Sripriya Narasimhan*
*Deputy General Counsel*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6421
SNarasimhan@ncdoj.gov

*Attorneys for the State of North Carolina*

ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

By: /s/ *Brian A. de Haan*_____
Brian A. de Haan
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-3806
brian.a.dehaan@doj.state.or.us

*Attorneys for the State of Oregon*


PETER F. NERONHA
*Attorney General of the State of Rhode Island*

By: /s/ *Michael W. Field*_____
Michael W. Field*
*Assistant Attorney General*
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2380
mfield@riag.ri.gov

*Attorneys for State of Rhode Island*

JOSH SHAPIRO
*Attorney General*
*Commonwealth of Pennsylvania*

By: /s/ *Amber Sizemore*_____
Amber Sizemore, Deputy Attorney General*
Jacob Boyer, Deputy Attorney General*
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938
asizemore@attorneygeneral.gov
jboyer@attorneygeneral.gov

*Attorneys for the Commonwealth of Pennsylvania*


THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: /s/ *Benjamin Battles*_____
Benjamin Battles, *Solicitor General*
Emily Adams, *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
benjamin.battles@vermont.gov

*Attorneys for the State of Vermont*

MARK R. HERRING
*Attorney General of Virginia*

By: */s/ Ryan S. Hardy*
Ryan S. Hardy, *Assistant Attorney General*\*
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
(804) 786-0969
rhardy@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

JOSHUA L. KAUL
*Attorney General of Wisconsin*

By: */s/ Steven C. Kilpatrick*
Steven C. Kilpatrick, *Assistant Attorney General*\*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792
kilpatricksc@doj.state.wi.us

*Attorneys for State of Wisconsin*

*\*Applications for pro hac vice admission forthcoming*

*\*\* Application for admission to SDNY forthcoming*