# Exhibit 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al.<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.<br><br>        Defendants. | 1:20-cv-05583-AKH |

## DECLARATION OF WALKER WILSON

I, Walker Wilson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.    I am the Assistant Secretary for Policy at the North Carolina Department of Health and Human Services. I was previously the Director of the Health Policy Office at Blue Cross Blue Shield North Carolina, where I led the team analyzing federal regulations under the Affordable Care Act.

    2.    I submit this declaration in support of the State of North Carolina's litigation against the United States Department of Health and Human Services ("HHS"); Alex M. Azar II, in his official capacity as Secretary of HHS; and Roger Severino, in his official capacity as Director of HHS's Office for Civil Rights ("OCR") regarding the recently issued rule entitled Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority (the "2020 Rule").

    3.    I have compiled the information in the statements set forth below through personal knowledge and through DHHS personnel who have assisted me in gathering this information from our institution and on the basis of documents that have been provided to and/or

1

reviewed by me. I have also familiarized myself with the 2020 Rule in order to understand its immediate impact upon DHHS.

4. Federal law requires that all Medicaid providers in North Carolina comply with a number of anti-discrimination laws, including the Americans with Disabilities Act (ADA), Title VI of the Civil Rights Act of 1964 (Title VI), Section 504 of the Rehabilitation Act (Section 504), and Section 1557 of the Affordable Care Act (Section 1557).

5. The ADA requires the provision of reasonable accommodations. Such accommodations may include providing individuals who are deaf, deaf-blind, or hard of hearing with auxiliary aids and services, such as sign language interpreters, to achieve effective communication.

6. Section 504 protects qualified individuals with disabilities from discrimination on the basis of disability in the provision of benefits and services. Section 504 of the Rehabilitation Act of 1973 governs programs and activities that are conducted by U.S. Department of Health and Human Services (HHS) or receiving Federal financial assistance from HHS. This includes the Medicaid program.

7. Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives Federal funds or other Federal financial assistance. Programs that receive Federal funds cannot distinguish among individuals on the basis of race, color or national origin, either directly or indirectly, in the types, quantity, quality or timeliness of program services, aids or benefits that they provide or the manner in which they provide them. Courts have held that Title VI prohibits recipients of Federal financial assistance from denying limited English proficient (LEP) persons access to programs, based on their national origin.

8. Section 1557 builds upon already existing federal laws and prohibits discrimination on the basis of sex in any health programs and activities receiving federal financial assistance, such as Medicaid providers and the state Medicaid program. In general, the requirements adopted under Section 1557 include equal treatment of men and women with respect to health coverage and prohibitions against discrimination based on pregnancy, gender identity, and sex stereotyping. This section also updated notice requirements to ensure access to individuals with limited English proficiency (LEP).

9. The Department takes allegations of discrimination seriously, and accepts complaints from Medicaid participants who believe a provider has violated these anti-discrimination provisions. Violations of the civil rights laws could subject a Medicaid provider to sanctions, including but not limited to suspension and/or termination of the provider participation agreement.

10. DHHS has adopted grievance procedures to provide for the prompt and equitable resolution of complaints against Medicaid providers as well as divisions of DHHS to which these federal laws apply. Individuals can file complaints with the DHHS compliance attorney. Complaints are investigated and resolved by appropriate staff. There is a significant commitment of staff time to fully investigate, including interviewing individuals and reviewing documents. Complainants receive a written decision at the first level and an opportunity to have the matter reviewed by the Division Director. All of these complaints must be resolved in a timely manner. An increase in the number of complaints received will tax existing resources.

11. Executive Order Number 24, issued October 18, 2017 prohibits discrimination based upon activities and identities protected under existing federal and state law, including but not limited to race, color, ethnicity, national origin, age, disability, sex, pregnancy, religion,

National Guard or veteran status, sexual orientation, and gender identity or expression. These are referred to in the Executive Order as "prohibited grounds" for discrimination, harassment, or retaliation.

12. Pursuant to the Executive Order, State agencies, boards, commissions, and departments under the jurisdiction of the Office of the Governor shall not discriminate, harass or retaliate on the basis of Prohibited Grounds in the following:

   a. provision of government services or in the administration of government programs, including, but not limited to, programs and services concerning public safety, health, and welfare;

   b. in awarding state contracts and state grants; and

   c. will not adopt policies or regulations barring, prohibiting, blocking, deterring, or impeding any individual who lawfully uses public facilities under their control or supervision, in accordance with that individual's gender identity.

13. The Department of Health and Human Services is a department under the jurisdiction of the Office of the Governor. It administers several services concerning public health and welfare. The Department has policies, guidance and contract protections against discrimination that offer more robust protections than provided under the 2020 Rule.

14. The Department's Division of State Operated Healthcare Facilities (DSOHF) oversees and manages 14 state-operated healthcare facilities that treat adults and children with mental illness, developmental disabilities, substance-use disorders and neuro-medical needs. DSOHF encompasses three psychiatric hospitals, three alcohol and drug abuse treatment centers, three neuro-medical treatment centers for individuals requiring skilled nursing care, three developmental centers for individuals with intellectual or developmental disabilities, and two

residential schools for children and adolescents who have severe emotional and behavioral needs.

15. DSOHF has approximately 11,000 employees, including staff who provide direct care to patients and residents, staff who provide other services on the grounds of the facilities, administrative staff in the facilities, and central office administrative staff who provide support services to the facilities.

16. DSOHF operates as North Carolina's safety-net provider for mental and behavioral health, intellectual and developmental disability, and substance use disorder treatment, offering care to individuals with a wide variety of needs at differing levels of care, regardless of ability to pay.

17. DSOHF patients and residents include individuals who identify as transgender.

18. In April 2020, DSOHF approved a policy on "Transgender and Non-binary Gender Identity Patients/Residents" (hereinafter, the Policy). The policy is to be effective in October 2020, as soon as staff training is completed.

19. The Policy implements North Carolina Executive Order 24. The stated purpose of the Policy document is "[t]o establish the policy for the treatment of transgender and non-binary gender identity patients/residents that is consistent with [DSOHF's] commitment to rights, equity and inclusion" and "to help create a safe and therapeutic healing environment for all patients/residents."

20. The Policy provides, in relevant Part:
   a. "DSOHF facilities do not discriminate against any person based on gender identity or gender expression… DSOHF facilities provide care to patients/residents in a manner that is consistent with current practice guidelines

and fulfills the requirements of accrediting bodies and regulatory authorities. Transgender patients/residents are recognized as having healthcare needs that may in some respects be different than those of other patients/residents… All DSOHF employees shall comply with current federal and NC laws as they pertain to transgender and non-binary gender identity patients/residents and shall also follow all DHHS/DSOHF policies regarding the care and treatment of transgender and non-binary gender identity individuals."

21. Members of DSOHF's Executive Leadership Team and other leaders within DHHS spent approximately 240 hours of work time developing the Policy.

22. DSOHF has planned training for employees on compliance with the Policy that is expected to require more than 10,500 total staff hours system-wide. DSOHF's planned training covers employees' legal obligations in relation to the Policy.

23. DSOHF leadership estimates that approximately 450 additional hours of staff time will be required to respond to questions and informal inquiries about implementation of the policy system-wide.

24. The 2020 Rule has caused confusion among DSOHF employees concerning the scope and nature of their obligations to support patients and residents of DSOHF facilities who identify as transgender.  DSOHF employees, including employees responsible for developing the Policy, have been forced to spend time researching and answering questions concerning the impact of the 2020 Rule on those obligations.  The 2020 Rule is likely to result in further staff confusion that will need to be addressed through training and additional staff contact opportunities during implementation of the Policy.

25. The Policy is an important measure to ensure that DSOHF is able to provide appropriate healthcare services to transgender patients and residents.

26. Transgender patients and residents in DSOHF facilities face distinct treatment challenges that would be exacerbated by discrimination in the treatment environment.

27. For example, hormone treatments utilized by some transgender patients can aggravate psychosis and/or mania, which requires especially careful coordination between primary care and psychiatry providers.  Protection from discrimination is essential to ensure that due attention is paid to particular vulnerabilities such as the foregoing.

28. DSOHF facilities serve individuals with behavioral health disorders, often during crisis.  Depending on the acuity of the unit, transgender patients may be targets of aggression from peers.

29. Transgender residents in DSOHF facilities may experience increased anxiety where no single room with a dedicated, individual bathroom is available.

30. The ability to provide care in a supportive, compassionate way that respects patients' sexual identify is critical to treating them and addressing their clinical issues. The inability to protect them from discrimination in a setting that should be safe can have seriously detrimental effects.

31. In the absence of anti-discrimination protections, transgender patients and residents may be fearful to share their concerns, questions, and preferences specific to their healthcare needs as transgender individuals.  This can have negative behavioral and physical health implications.

32. The 2020 Rule adversely impacts transgender patients and residents who receive treatment in DSOHF facilities, requiring additional staff attention and resources to be devoted to their care and to staff education on and enforcement of the Policy.

33. The Division of Health Benefits has established robust anti-discrimination contract requirements for the health plans that will be operating North Carolina's Medicaid Managed Care program.

34. The Medicaid program is funded with state and federal dollars, and is a program that is required to comply with Executive Order Number 24.

35. Divergence between federal and state protections will create confusion among providers, insurers, and the individuals who receive services from DHHS.

36. The DHHS staff who are involved in the complaint process will not have clear guidance in resolving complaints given the conflicting information about the protections afforded. Individuals will not know whether or not they fall into a class of persons who are protected and could be less likely to file a complaint.

37. DHHS has not yet modified any of its complaint procedures, policies, guidance or contract terms based upon the new regulation. It would be a huge undertaking to review all policies in our many programs of public assistance, our contract terms and employment policies. Once revised, DHHS would have to give notice to the millions of individuals served by the programs of public assistance, and individuals who are receiving direct services from DHHS. In addition, DHHS would have to retrain staff regarding the new OCR enforcement standard.

38. DHHS anticipates that it will see an increase in complaints filed under its Complaint procedures referenced above. At present, there are few complaints filed through this process, as individuals have the option of filing their complaint with the Office of Civil Rights.

DHHS will have to fill in the gap in enforcement created by the 2020 Rule.  Individuals who previously would have sought assistance from OCR will be forced to seek assistance from state agencies or bring private lawsuits.

39. These concerns have become more acute during the COVID-19 pandemic.  The COVID-19 pandemic has brought healthcare disparities to the forefront.  African Americans and LatinX/Hispanic communities make up a disproportionate number of North Carolina's COVID-19 laboratory confirmed cases and deaths. African Americans make up an estimated 22 percent of North Carolina's population and 31 percent (as of May 26, 2020) of laboratory confirmed COVID-19 cases and 35 percent of deaths. LatinX/Hispanic populations make 9.6 percent of North Carolina's population and 35 percent of confirmed COVID-19 cases. Disparities in health occur when the impact of a health risk is impacting a larger percentage of the population than the population's representation within the general population.

40. In June 2020, North Carolina saw a sustained increase in its confirmed cases of COVID-19 among the general population, and a disproportionately high percentage of cases statewide are among historically marginalized populations. In particular, North Carolina's Hispanic/LatinX communities are being hit hard by the virus, representing 44% of cases statewide (as of mid-June) where race and ethnicity are known.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 29th day of August, 2020 at Raleigh, North Carolina.

*Walker Wilson*

Walker Wilson
Assistant Secretary for Policy
North Carolina Department of Health and Human Services