**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

STATE OF NEW YORK, et al.,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
    HEALTH AND HUMAN SERVICES, et
al.,

        *Defendants*.

Case No. 1:20-cv-5583-AKH

---

**BRIEF OF U.S. HOUSE OF REPRESENTATIVES**
**AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

Elizabeth B. Wydra
Brianne J. Gorod
Praveen Fernandes
Ashwin P. Phatak
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036-2513
Tel: (202) 296-6889
brianne@theusconstitution.org

Douglas N. Letter
    *General Counsel*
Todd B. Tatelman
Megan Barbero
Josephine Morse
William E. Havemann
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Tel: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Amicus U.S. House of Representatives*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................. ii

INTEREST OF *AMICUS CURIAE* ..................................... 1

INTRODUCTION ........................................................... 1

ARGUMENT ................................................................. 6

THE TRUMP ADMINISTRATION'S DECISION TO WITHDRAW CERTAIN ANTI-
DISCRIMINATION PROTECTIONS FOR LGBTQ INDIVIDUALS AND TO IMPOSE
A SWEEPING RELIGIOUS EXEMPTION VIOLATES THE TEXT OF THE
AFFORDABLE CARE ACT AND UNDERMINES CONGRESS'S PLAN IN PASSING
IT ............................................................................ 6

    A.  The Affordable Care Act Responded to Serious Problems in America's Health
        Care System That Had Left Millions Without Access to Quality, Affordable Care . 6

    B.  Congress Passed the Affordable Care Act to Expand Access to Quality, Affordable
        Health Care, and the Act's Reforms Have Been Remarkably Successful ................. 9

    C.  The Trump Administration's Withdrawal of Certain Protections Against
        Discrimination in Health Care for LGBTQ Individuals Violates the Text of the
        Affordable Care Act and Undermines Congress's Plan in Passing It ....................... 13

    D.  The Trump Administration's Creation of a Sweeping Religious Exemption
        Violates the Text of the Affordable Care Act and Undermines Congress's Plan in
        Passing It .............................................................. 18

CONCLUSION ............................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cty.*,
    968 F.3d 1286 (11th Cir. 2020) ................................................................ 16

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020) ......................................................... 4, 14, 15

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ............................................................... 21

*Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*,
    648 F.3d 1235 (11th Cir. 2011) ................................................ 8

*Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430
    (4th Cir. Aug. 26, 2020) ........................................................ 15

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ................................................... 9, 10, 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................. 2, 8, 9

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ........................................................... 18

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ........................................................... 4

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................... 19

**Statutes, Legislative Materials, and Administrative Materials**

20 U.S.C. § 1681(a) ...................................................................... 3, 13

20 U.S.C. § 1681(a)(3) ............................................................... 6, 19, 21

26 U.S.C. § 36B .............................................................................. 10

26 U.S.C. § 4980H .......................................................................... 11

26 U.S.C. § 4980H(a) ...................................................................... 11

29 U.S.C. § 218a ............................................................................. 11

29 U.S.C. § 794(a) .......................................................................... 22

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

42 U.S.C. § 300gg(a) ............................................................................................ 12

42 U.S.C. § 300gg-1 ............................................................................................. 11

42 U.S.C. § 300gg-3 ............................................................................................. 11

42 U.S.C. § 300gg-4 ............................................................................................. 11

42 U.S.C. § 300gg-4(b) ........................................................................................ 12

42 U.S.C. § 300gg-6(a) ........................................................................................ 11

42 U.S.C. § 300gg-11 ........................................................................................... 11

42 U.S.C. § 300gg-12 ........................................................................................... 11

42 U.S.C. § 300gg-13 ........................................................................................... 11

42 U.S.C. § 300gg-14 ........................................................................................... 11

42 U.S.C. § 1396a(a)(10) ....................................................................................... 8

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ................................................................... 10

42 U.S.C. § 2000e-2(a)(1) ..................................................................................... 14

42 U.S.C. § 18022(b)(1) ....................................................................................... 11

42 U.S.C. § 18022(b)(4)(B) .................................................................................. 16

42 U.S.C. § 18022(b)(4)(C) .................................................................................. 16

42 U.S.C. § 18023(b)(1)(A) .................................................................................. 20

42 U.S.C. § 18023(b)(4) ....................................................................................... 20

42 U.S.C. § 18023(c)(2)(A) ................................................................................... 20

42 U.S.C. § 18023(c)(2)(A)(i) ............................................................................... 20

42 U.S.C. § 18031(b)(1) ....................................................................................... 10

42 U.S.C. § 18071 ................................................................................................. 10

42 U.S.C. § 18081 ................................................................................................. 10

42 U.S.C. § 18082 ................................................................................................. 10

42 U.S.C. § 18091(2)(C) ....................................................................................... 16

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

42 U.S.C. § 18091(2)(D) ................................................................................ 1, 10, 16

42 U.S.C. § 18113(a) ..................................................................................... 20

42 U.S.C. § 18116(a) ..................................................................................... *passim*

42 U.S.C. § 2000bb-1 .................................................................................... 20, 21

42 U.S.C. § 2000d ......................................................................................... 22

42 U.S.C. § 6102 ........................................................................................... 21

42 U.S.C. § 6103(b)(1)(A) ............................................................................. 21

Rule II.8(b), Rules of the U.S. House of Representatives, 116th Cong. (2019)
    https://perma.cc/J2SG-ZNDP ................................................................... 1

H. Rep. No. 111-299, pt. 1 (2009) ................................................................. 7

H. Rep. No. 111-299, pt. 3 (2009) ................................................................. 6, 7, 8

Nondiscrimination in Health Programs and Activities,
    81 Fed. Reg. 31,376 (May 18, 2016) ........................................................ 3, 9, 19, 22

Nondiscrimination in Health and Health Education Programs or Activities,
    84 Fed. Reg. 27,846 (June 14, 2019) ....................................................... 21

Nondiscrimination in Health and Health Education Programs or Activities,
    Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) ............... 13, 14, 15

## Other Authorities

Kellan Baker & Laura E. Durso, *Why Repealing the Affordable Care Act Is Bad Medicine*
    *for LGBT Communities*, Ctr. for Am. Progress (Mar. 22, 2017),
    https://perma.cc/5U2W-KDZB ................................................................. 9, 13

David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What*
    *the Health Insurance Market Really Needs*, Harv. Bus. Rev. (Mar. 21, 2017),
    https://perma.cc/QB6H-K3J6 ................................................................... 7

Cong. Budget Office, *CBO's Analysis of the Major Health Care Legislation Enacted in*
    *Mar. 2010* (Mar. 30, 2011), https://perma.cc/7RZP-5H48 ..................... 10

Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*,
    Williams Inst. (Apr. 2011), https://perma.cc/XFR7-9GTJ ........................ 17

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Jaime M. Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. for Transgender Equality & Nat'l Gay & Lesbian Task Force (2011), https://perma.cc/9VJD-L3V7 ...................................................... 17

Katie Hafner, *As Catholic Hospitals Expand, So Do Limits on Some Procedures*, N.Y. Times (Aug. 10, 2018), https://perma.cc/S8DN-DSSA .................................. 22

Inst. of Med. of the Nat'l Academies, *The Health of Lesbian, Gay, Bisexual, and Transgender People* (2011), https://perma.cc/V8U4-HRMG .................................. 9

Jen Kates et al., *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Kaiser Fam. Found. (May 2018), https://perma.cc/6SFN-2YYB .................................................................. 17

Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* (2010), https://perma.cc/44C8-BPAF .................................................................. 18

Memorandum and Order, *Walker v. Azar*, No. 20-cv-2834, Dkt. No. 23 (E.D.N.Y. Aug. 17, 2020) ........................................................................ 5, 15

Memorandum Opinion, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-1630, Dkt. No. 56 (D.D.C. Sept. 2, 2020) .................................. 5, 15, 20

Movement Advancement Project and National Center for Transgender Equality, *Religious Refusals in Health Care: A Prescription for Disaster* (March 2018), https://perma.cc/4CT5-G7SF .................................................................. 22

Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018), https://perma.cc/GJ6C-KQKH .................................................................. 9

Nat'l LGBT Educ. Ctr., *Understanding the Health Needs of LGBT People* (Mar. 2016), https://perma.cc/AX83-9RWD .................................................................. 17

Frank Newport, *In U.S., Estimate of LGBT Population Rises to 4.5%*, Gallup (May 22, 2018), https://perma.cc/8TC8-BNSW ...................................................... 17

Namrata Uberio et al., U.S. Dep't of Health & Human Servs., *Health Insurance Coverage and the Affordable Care Act, 2010-2016* (2016), https://perma.cc/9N44-6ERZ ..... 12

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the United States House of Representatives[2] has a strong institutional interest in the effective and non-discriminatory implementation of the Patient Protection and Affordable Care Act.  In 2010, the House passed the Affordable Care Act after significant study into the problems with then-existing health insurance markets, and the House is thus particularly well-situated to explain to the Court why Congress enacted this landmark legislation, and how it has helped ensure that all Americans have access to quality, affordable health care and health insurance.  Moreover, the House is well-situated to explain why the Trump Administration's withdrawal of certain protections from discrimination in health care for LGBTQ (lesbian, gay, bisexual, transgender, and queer) individuals violates both the text of the Affordable Care Act and Congress's plan in passing it.  Finally, the House is well-situated to explain why the Administration's promulgation of a sweeping exemption that permits any religiously affiliated health care provider to refuse care to patients on the ground that doing so violates its religious beliefs also conflicts with the Act.

## INTRODUCTION

The Affordable Care Act is a landmark law that sought to achieve "near-universal coverage," 42 U.S.C. § 18091(2)(D), by making quality, affordable health care available to all

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] The Bipartisan Legal Advisory Group (BLAG) of the United States House of Representatives, which "speaks for, and articulates the institutional position of, the House in all litigation matters," has authorized the filing of an *amicus* brief in this matter.   Rule II.8(b), Rules of the U.S. House of Representatives, 116th Cong. (2019), https://perma.cc/J2SG-ZNDP.  The BLAG comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James E. Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip.  The Republican Leader and Republican Whip dissented.

Americans.  When Congress passed the Affordable Care Act in 2010, it was responding to serious problems affecting America's insurance and health care systems.  Many employers failed to offer coverage to their employees, and only a limited number of individuals were eligible for government health insurance programs like Medicaid.  Moreover, those who could not obtain coverage through their employer or Medicaid were forced to try their luck in the individual marketplace.  That marketplace was plagued with sky-high prices, care that was not comprehensive, and discriminatory practices that prevented millions of Americans from obtaining coverage.  These problems particularly harmed the LGBTQ community, which lacks insurance or is underinsured at disproportionate rates, and also faces discrimination on the basis of sexual orientation or gender identity at the hands of health care providers who refuse to provide care.

In response to these systemic flaws, Congress passed the Affordable Care Act "to increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 538 (2012) (opinion of Roberts, C.J.).  The law thus includes a number of provisions designed to expand access to quality health care to as many Americans as possible, and to remove discriminatory barriers to care and coverage.  First, it expands Medicaid to all low-income individuals.  Second, it creates a system of American Health Benefit Exchanges (Exchanges) that enable individuals who do not receive health insurance through their employer or through Medicaid to easily compare and purchase health insurance in the individual marketplace, and it provides tax credits to subsidize the cost of insurance for many lower- and middle-income individuals.  Third, it prevents insurers from discriminating on the basis of preexisting conditions and includes a number of other

protections designed to ensure that insurers and health care providers offer comprehensive care to a wide swath of consumers.

Among other protections, the Act includes a broad anti-discrimination provision, Section 1557, which states that individuals may not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" receiving federal funding on the basis of an individual's race, color, national origin, sex, age, and disability.  42 U.S.C. § 18116(a) (referencing the "ground prohibited under" existing civil rights laws).  As relevant to this case, the provision prohibits health care discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972," *id.*, and Title IX in turn prohibits discrimination in education against any "person . . . on the basis of sex," 20 U.S.C. § 1681(a).

In 2016, the Department of Health and Human Services (the Department) published a final rule interpreting Section 1557's prohibition on health care discrimination on the basis of sex to include "discrimination on the basis of . . . gender identity."  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (May 18, 2016) (2016 Rule).  The rule also concluded that "Section 1557's prohibition of discrimination on the basis of sex includes, at a minimum, sex discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on gender stereotypes."  *Id.* at 31,390.  Moreover, the rule prohibited discrimination against a person on the basis of the sex of "an individual with whom the individual or entity is known or believed to have a relationship or association."  *Id.* at 31,472.  The Department's 2016 interpretation of Section 1557 was consistent with the plain text of the statute and effectuated Congress's goal of expanding access to quality, affordable health insurance and care and ensuring that Americans did not face discrimination in health care.

The Trump Administration, however, has now reversed course, issuing a new rule to implement Section 1557 that no longer protects against discrimination in health care because of an individual's sexual orientation or gender identity.  The rule also imports Title IX's sweeping religious exemption into the health care context, permitting any religiously affiliated health care provider to refuse care to patients if it maintains that providing such care would violate its religious beliefs.  And the Trump Administration has done all this in the midst of a global pandemic when access to health care is more critical than ever.  *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Mem.) (Roberts, C.J., concurring in denial of application for injunctive relief) ("COVID–19 [is] a novel severe acute respiratory illness that has killed . . . more than 100,000 nationwide.  At this time, there is no known cure, no effective treatment, and no vaccine.").  The Administration's new rule violates the text of Section 1557, the structure of the Affordable Care Act, and Congress's plan in passing the Act.

First, the rule's withdrawal of anti-discrimination protections for LGBTQ individuals violates the Act's text.  The Supreme Court recently held in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that when Congress outlawed discrimination on the basis of sex in Title VII of the Civil Rights Act of 1964, it prohibited discrimination on the basis of an individual's sexual orientation or gender identity.  *Id.* at 1737.  As the Court explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Id.* at 1741.  This result, the Court added, is "no more than the straightforward application of legal terms with plain and settled meanings."  *Id.* at 1743.

The relevant language of Section 1557 involves nearly the same "legal terms with plain and settled meanings"—discrimination on the basis of sex—that the Supreme Court conclusively interpreted in *Bostock*.  The Administration's new rule, which narrowly interprets the prohibition

on sex discrimination in the 2010 Affordable Care Act, cannot be reconciled with *Bostock*—as two courts have already held, *see* Memorandum and Order, *Walker v. Azar*, No. 20-cv-2834, Dkt. No. 23 (E.D.N.Y. Aug. 17, 2020); Memorandum Opinion, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-1630, Dkt. No. 56 (D.D.C. Sept. 2, 2020) (enjoining the new rule's elimination of "sex stereotyping" from the definition of discrimination on the basis of sex).

The new rule conflicts with not only the text of the Affordable Care Act, but also Congress's plan in passing it, which was to *expand* access to quality, affordable health insurance and care and to prevent discrimination against all Americans.  Indeed, Congress included several anti-discrimination provisions in the Affordable Care Act, including the prohibition on discrimination against individuals with preexisting conditions.  Section 1557 is part and parcel of Congress's plan to eliminate discrimination, and applying its protections to prevent discrimination against LGBTQ people is necessary to achieving that goal.  When Congress passed the Act, LGBTQ individuals often faced insurers and providers who refused to cover or care for them, even though the LGBTQ community often has significantly greater health care needs than other communities.  Thus, this Administration's withdrawal of existing anti-discrimination protections for LGBTQ individuals undermines Congress's plan in passing the Affordable Care Act to prevent discrimination and ensure that all Americans have access to the health care they need.

Second, the new rule's incorporation of Title IX's sweeping religious exemption cannot be reconciled with the text and structure of the Affordable Care Act.  Section 1557 prohibits discrimination on the "ground prohibited under" Title IX, which is "sex."  42 U.S.C. § 18116(a). While Title IX also includes a religious exemption, that exemption applies by its plain terms only

to "educational institution[s]," 20 U.S.C. § 1681(a)(3), and is limited to that context unless and until Congress provides otherwise.  Congress had good reasons for refusing to grant religious health care providers the blanket exemption to sex discrimination that Title IX grants religious educational institutions.  Individuals can choose not to attend religious schools, but often have little choice about where they receive health care, especially in rural locations and in emergency situations.  If Congress had intended to import such a sweeping exemption into the health care context, it would have done so explicitly.  But Congress did not even mention such an exemption in the text of the statute, even though it did include several targeted exemptions for religious objectors on issues such as abortion and medical aid in dying.

By riddling Section 1557's protections with exceptions, the Administration's decision to import Title IX's sweeping religious exemption into the health care context undermines Congress's plan to expand health care access.  Given the substantial number of religiously affiliated hospitals in the United States, patients across the country—who often have little choice in what hospital they visit—would be denied necessary treatments and care.  In short, Section 1557 was passed to expand access to care to all Americans, and by creating a massive loophole in that provision's protections, the Administration's new rule flatly undermines Congress's goal.

## ARGUMENT

**THE TRUMP ADMINISTRATION'S DECISION TO WITHDRAW CERTAIN ANTI-DISCRIMINATION PROTECTIONS FOR LGBTQ INDIVIDUALS AND TO IMPOSE A SWEEPING RELIGIOUS EXEMPTION VIOLATES THE TEXT OF THE AFFORDABLE CARE ACT AND UNDERMINES CONGRESS'S PLAN IN PASSING IT.**

### A. The Affordable Care Act Responded to Serious Problems in America's Health Care System That Had Left Millions Without Access to Quality, Affordable Care.

Congress passed the Affordable Care Act in response to serious problems plaguing America's health care system.  *See* H. Rep. No. 111-299, pt. 3, at 55 (2009) ("The U.S. health care system is on an unsustainable course.").  In 2007, "more than 45.7 million people were

uninsured . . . , representing more than one-seventh of the population." H. Rep. No. 111-299, pt. 1, at 320 (2009). Several factors contributed to this uninsured rate. First, there was "no federal requirement that employers offer health insurance coverage to employees or their families." H. Rep. No. 111-299, pt. 3, at 134. Accordingly, while almost all large employers offered their employees health insurance benefits, "[l]ess than half of all small employers (less than 50 employees) offer[ed] health insurance coverage to their employees." *Id.* at 322.

Second, when the Affordable Care Act was passed, health care costs were skyrocketing, making it difficult for most Americans to purchase insurance in the individual marketplace. "Between 1999 and 2008, health insurance premiums more than doubled as wages largely stagnated." *Id.* at 55-56 (citing testimony of Jacob Hacker).[3] Further, the United States "spen[t] substantially more than other developed countries on health care, both per capita and as a share of GDP." H. Rep. No. 111-299, pt. 1, at 320. This dramatic increase in health care costs affected employers—who "face[d] a growing challenge paying for health benefits while managing labor costs to succeed in a competitive market," *id.*—and federal and state budgets— "both directly, through spending on Medicare, Medicaid, and other programs, and indirectly, through tax expenditures for health insurance and expenses," *id.* at 320-21.

Third, millions of Americans who were not provided insurance benefits by their employers and could not afford or were denied coverage in the individual market were also ineligible for insurance through government programs like Medicaid. At the time, Medicaid offered federal funding to States only "to assist pregnant women, children, needy families, the

---

[3] *See* David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What the Health Insurance Market Really Needs*, Harv. Bus. Rev. (Mar. 21, 2017), https://perma.cc/QB6H-K3J6 ("premiums for . . . policies [in the individual market] were increasing more than 10% a year, on average, while the policies themselves had major deficiencies").

blind, the elderly, and the disabled in obtaining medical care." *NFIB*, 567 U.S. at 541 (citing 42 U.S.C. § 1396a(a)(10)).

Finally, the insurance and health care industries were riddled with discriminatory policies and practices.  For instance, insurance companies in many States were permitted to discriminate against individuals with preexisting conditions.  Because "'20 percent of the population account[ed] for 80 percent of health spending'" in 2009, "health insurers—particularly in the individual market— . . . adopted discriminatory, but not illegal, practices to cherry-pick healthy people and to weed out those who [we]re not as healthy."  H. Rep. No. 111-299, pt. 3, at 92 (quoting testimony of Karen Pollitz).

Such practices included: "denying health coverage based on pre-existing conditions or medical history, even minor ones; charging higher, and often unaffordable, rates based on one's health; excluding pre-existing medical conditions from coverage; charging different premiums based on gender; and rescinding policies after claims [we]re made based on an assertion that an insured's original application was incomplete."  *Id.*  As a result of these practices, "many uninsured Americans—ranging from 9 million to 12.6 million—voluntarily sought health coverage in the individual market, but were denied coverage, charged a higher premium, or offered only limited coverage that excludes a preexisting condition."  *Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1245 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. NFIB*, 567 U.S. 519.  Congress found that "[d]iscrimination based on health, gender and other factors has severe economic consequences for those who have been unable to find affordable health coverage and for those who have coverage, but are under-insured."  H. Rep. No. 111-299, pt. 3, at 92.

LGBTQ individuals were particularly harmed by these problems with the health insurance markets and suffered discrimination in the provision of care.  According to one study, "before the ACA's coverage reforms came into effect, 1 in 3 LGBT people making less than $45,000 per year . . . were uninsured."[4]  And for transgender individuals, even if they had coverage, insurance companies routinely excluded coverage for transition-related care, resulting in transgender individuals being unable to obtain medically necessary treatment for gender dysphoria.  *See* 81 Fed. Reg. at 31,460.  Moreover, even today, "[d]espite existing protections," LGBTQ individuals "face disturbing rates of health care discrimination," with one survey showing that eight percent of LGB individuals and 29 percent of transgender individuals had a doctor or other health care provider refuse to see them in the prior year because of their actual or perceived sexual orientation or gender identity.[5]  That discrimination can result in "outright denial of care or . . . the delivery of inadequate care," and "LGBT individuals have reported experiencing refusal of treatment by health care staff, verbal abuse, and disrespectful behavior, as well as many other forms of failure to provide adequate care."[6]

## B. Congress Passed the Affordable Care Act to Expand Access to Quality, Affordable Health Care, and the Act's Reforms Have Been Remarkably Successful.

To address these serious and systemic problems, Congress passed the Affordable Care Act "to expand coverage" while keeping health care costs in check.  *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015); *see NFIB*, 567 U.S. at 538 ("The Act aims to increase the number of

---

[4] Kellan Baker & Laura E. Durso, *Why Repealing the Affordable Care Act Is Bad Medicine for LGBT Communities*, Ctr. for Am. Progress (Mar. 22, 2017), https://perma.cc/5U2W-KDZB.

[5] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018), https://perma.cc/GJ6C-KQKH.

[6] Inst. of Med. of the Nat'l Academies, *The Health of Lesbian, Gay, Bisexual, and Transgender People* 62 (2011), https://perma.cc/V8U4-HRMG (internal citations omitted).

Americans covered by health insurance and decrease the cost of health care."); 42 U.S.C. § 18091(2)(D) (the Act aims to achieve "near-universal coverage").  The Affordable Care Act does so in various respects.

First, it provides funding to States to expand Medicaid coverage to all individuals earning up to 133 percent of the federal poverty level.  *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  The Congressional Budget Office estimated that this expansion newly provided coverage to millions of Americans.[7]

Second, for individuals who are not eligible for Medicaid and do not receive insurance from their employer, the Act provides for the creation of Exchanges through which individuals can purchase health insurance for themselves and their families.  The Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 135 S. Ct. at 2487 (citing 42 U.S.C. § 18031(b)(1)).  The Act then "s[ought] to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line." *Id*. (citing 26 U.S.C. § 36B).  "Individuals who meet the Act's requirements may purchase insurance with the tax credits, which are provided in advance directly to the individual's insurer." *Id.* (citing 42 U.S.C. §§ 18081, 18082).  The Act also requires insurers to reduce certain cost-sharing expenses—like deductibles and co-payments—for lower-income individuals, and requires the Department of Health and Human Services to reimburse insurers for these cost-sharing reductions.  *See* 42 U.S.C. § 18071.

Third, the Act includes various market reforms designed to expand access to insurance coverage.  For instance, the Act requires large employers to offer insurance to their employees or

---

[7] *See* Cong. Budget Office, *CBO's Analysis of the Major Health Care Legislation Enacted in Mar. 2010*, at 22-23 (Mar. 30, 2011), https://perma.cc/7RZP-5H48 (prepared statement of Douglas Elmendorf, Director, Cong. Budget Office).

pay a penalty, 26 U.S.C. § 4980H; to automatically enroll new and current employees of large employers in an employer-sponsored plan unless an employee opts out, 29 U.S.C. § 218a; and to offer adequate health insurance plans, 26 U.S.C. § 4980H(a). The Act also includes numerous other important provisions that, for example, prohibit insurers from imposing lifetime dollar limits on the value of coverage, 42 U.S.C. § 300gg-11; prohibit insurers from rescinding coverage except in the case of fraud, *id.* § 300gg-12; require individual and group health plans to cover preventive services without cost sharing, *id.* § 300gg-13; and allow children to stay on their parents' health insurance until age 26, *id.* § 300gg-14.

The Act further addresses the inadequacy of benefits in the individual and small group markets by expressly providing that insurance offered in those markets must include "essential health benefits." *Id.* § 300gg-6(a). While the law gave the Secretary of Health and Human Services authority to define what those "essential health benefits" would be, the law specified that "such benefits shall include at least the following general categories": ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance abuse disorder services, prescription drugs, rehabilitative and habilitative services, laboratory services, preventive and wellness services, chronic disease management, and pediatric services, including oral and vision care. *Id.* § 18022(b)(1). All of these reforms were designed to allow more Americans access to comprehensive insurance coverage.

Moreover, the Act includes reforms ensuring that no American is denied the ability to purchase health insurance. The Act prevents discrimination on the basis of preexisting conditions by including a guaranteed-issue provision prohibiting insurers from denying coverage to any individual because of a medical condition or their medical history, *see id.* §§ 300gg-1, 300gg-3, 300gg-4, and a community-rating provision prohibiting insurers from charging higher

premiums because of an individual's preexisting medical conditions, *id*. §§ 300gg(a), 300gg-4(b).

Finally, the Act includes an important anti-discrimination provision that prohibits discrimination in the provision of health insurance coverage and health care services.  Section 1557 of the Act provides that individuals may not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" receiving federal funding on the basis of an individual's race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116(a).  That provision of the law was a critical feature of Congress's effort to ensure that all Americans have access to the health care they need.

Through all of these reforms, and despite the Trump Administration's myriad efforts to subvert them, the Act has been highly successful in ameliorating the immense public health problem caused by having so many Americans without adequate health insurance.  As of 2016, approximately 12.7 million people had purchased plans on the state and federal Exchanges established by the Affordable Care Act.  Namrata Uberio et al., U.S. Dep't of Health & Human Servs., *Health Insurance Coverage and the Affordable Care Act, 2010-2016*, at 8 (2016), https://perma.cc/9N44-6ERZ.  And approximately 14.5 million more people began receiving comprehensive benefits through Medicaid and the Children's Health Insurance Program.  *Id.* Overall, there has been a net gain of more than 20 million Americans with health insurance coverage.  *Id.*  This gain spans many generational, ethnic, and racial groups, and has particularly benefited women, younger people, and Black and Hispanic individuals.  *Id.* at 2.  The Act has also led to a dramatic decrease in LGBTQ individuals without insurance coverage: one study

estimated that the number of low-income LGBTQ individuals without insurance dropped from 34% to 22% from 2013 to 2017.[8]

### C. The Trump Administration's Withdrawal of Certain Protections Against Discrimination in Health Care for LGBTQ Individuals Violates the Text of the Affordable Care Act and Undermines Congress's Plan in Passing It.

Even though it is critically important that all people be able to obtain health insurance in the midst of this global health crisis, and even though the Affordable Care Act included a broad anti-discrimination clause that prohibits discrimination in health care on the basis of sex, the Trump Administration promulgated a rule that takes away existing protection from discrimination for LGBTQ individuals. This rule violates the text of the Affordable Care Act and undermines Congress's plan in passing it.

1. The portion of the new rule that fails to prohibit discrimination in health care based on individuals' sexual orientation or gender identity directly conflicts with the text of the Affordable Care Act. When Congress passed the Act, it included a broad anti-discrimination provision that prohibits discrimination in health care based on several characteristics included in long-standing civil rights laws. In particular, Section 1557 prohibits discrimination in health care "on the ground prohibited under . . . title IX of the Education Amendments of 1972," 42 U.S.C. § 18116(a), which in turn prohibits discrimination against any person "on the basis of sex," 20 U.S.C. § 1681(a).

In its revised rule, the Administration took the position that "the ordinary public meaning of the term 'sex' in Title IX is unambiguous" and refers to a "biological binary meaning of sex." Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,179-80 (June 19, 2020). Based on that erroneous

---

[8] Baker & Durso, *supra* note 4.

understanding, the Administration concluded that Title IX, and in turn Section 1557, does not protect against discrimination based on sexual orientation or gender identity, and withdrew the prior regulation's protections.  *Id.* at 37,183-86.

That understanding has now been explicitly rejected by the Supreme Court.  In *Bostock v. Clayton County*, the Court held that Title VII's prohibition on discrimination in employment "because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), prohibits discrimination on the basis of an individual's sexual orientation or gender identity. 140 S. Ct. at 1737.  As the Court explained, "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex" because "[s]ex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids."  *Id.*  It is thus "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Id.* at 1741.

This holding applies squarely to Section 1557 of the Affordable Care Act.  If a health care provider refuses to provide care to a male individual "for no reason other than the fact he is attracted to men, the [health care provider] discriminates against him for traits or actions it tolerates in . . . female[s].  Put differently, the [provider] intentionally singles out [a patient to deny care] based in part on the [patient's] sex, and the affected [patient's] sex is a but-for cause of [the denial of care]."  *Id.* at 1741.  Likewise, a health care provider who refuses service to a "transgender person who was identified as a male at birth but who now identifies as a female," but willingly cares for "an otherwise identical [patient] who was identified as female at birth . . . intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in a[] [patient] identified as female at birth."  *Id.*  The patient's "sex plays an unmistakable and impermissible role in the . . . decision" to deny care.  *Id.* at 1741-42.  Said another way, "to

discriminate on the[] grounds [of sexual orientation or gender identity] requires [a health care provider] to intentionally treat individual [patients] differently because of their sex." *Id.* at 1742.

Notably, before putting the new rule into effect, the Administration conceded that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the basis of sex' under Title IX" because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'" 85 Fed. Reg. at 37,168.  Nevertheless, the Administration refused to alter its analysis in the revised version of its rule released on June 19, 2020—four days *after* the *Bostock* decision was released.[9]  *See Walker*, Memorandum and Order, at 24-25 ("The timing might even suggest to a cynic that the agency pushed ahead specifically to avoid having to address an adverse decision.  But whether by design or bureaucratic inertia, the fact remains that HHS finalized the 2020 Rules without addressing the impact of the Supreme Court's decision in *Bostock*.");  *Whitman-Walker*, Memorandum Opinion, at 56-57 ("Notwithstanding *Bostock*'s clear import for the meaning of discrimination based on sex under Title IX, HHS plowed ahead with the 2020 Rule implementing that precise statutory phrase without even pausing to consider the Court's decision").[10]  The rule thus violates the text of Section 1557 and Title IX, as now explicated by the Supreme Court, and it must be invalidated.

---

[9] The Administration suggests in its rule that the Court's reasoning in *Bostock* might not apply to Section 1557 because "the binary biological character of sex (which is ultimately grounded in genetics) takes on special importance in the health context."  85 Fed. Reg. at 37,168. But the *Bostock* decision *assumed* that "sex" means "biological sex," and nevertheless held that discrimination against LGBTQ people is discrimination on the basis of sex.  *See Bostock*, 140 S. Ct. at 1739 ("we proceed on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female").

[10] Since the new rule was promulgated, two courts of appeals have concluded that *Bostock* requires interpreting Title IX to prevent discrimination on the basis of gender identity. *See Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430, at *21 (4th Cir. Aug. 26, 2020); *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1305 (11th Cir. 2020).

**2.** In addition to violating the text of Section 1557, the Administration's new rule also undermines Congress's plan in passing the Affordable Care Act.

As explained above, Congress passed the Act to "achieve[] near-universal coverage," 42 U.S.C. § 18091(2)(D), by expanding insurance coverage and health care access to all Americans. Thus, the Act contains numerous provisions that prevent discrimination against more vulnerable populations, both in the issuance of insurance and the provision of health care.  For instance, as described above, the Act protects individuals with pre-existing conditions by "bar[ring] insurers from taking a person's health into account when deciding whether to sell health insurance or how much to charge." *King*, 135 S. Ct. at 2485.  That requirement was intended to "add millions of new consumers to the health insurance market, increasing the supply of, and demand for, health care services, and [to] increase the number and share of Americans who are insured." 42 U.S.C. § 18091(2)(C).  Similarly, the Act prohibits individual and small-group health insurance plans from making "coverage decisions, determin[ing] reimbursement rates, establish[ing] incentive programs, or design[ing] benefits in ways that discriminate against individuals because of their age, disability, or expected length of life." *Id.* § 18022(b)(4)(B).  It also requires such plans to "take into account the health care needs of diverse segments of the population, including women, children, persons with disabilities, and other groups." *Id.* § 18022(b)(4)(C).

Section 1557 of the Act was likewise adopted to achieve Congress's goal of ensuring universal access to health care by preventing discrimination.  Just as Congress in Title VII adopted a broad prohibition on discrimination in employment, Congress concluded that the same broad prohibition on discrimination was necessary in the often life-or-death context of health-

16

care.  And given that there are approximately 9 million LGBTQ people in the United States,[11]

and potentially far more,[12] prohibiting discrimination against individuals on the basis of

transgender status and sexual orientation is critical to achieving that goal.

LGBTQ people often have significant health care needs that make access to affordable

care especially necessary.  "Research studies on same-sex couples find that LGB individuals

have higher rates of unmet medical need because of cost and are less likely to have a regular

provider."[13]  LGBTQ people also experience disproportionate rates of HIV infection: men who

have sex with men account for more than two-thirds of HIV diagnoses nationwide, even though

they only account for 2% of the general population, and around 28% of transgender women in

the United States have HIV.[14]

Moreover, transgender individuals are "more likely to live in poverty and less likely to

have health insurance than the general population," with a 2011 survey of transgender

individuals tragically showing that "nearly half (48%) of respondents postponed or went without

care when they were sick because they could not afford it."[15]  Indeed, when the Affordable Care

Act was passed, "many health plans include[d] transgender-specific exclusions that den[ied]

---

[11] Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Inst. (Apr. 2011), https://perma.cc/XFR7-9GTJ.

[12] Frank Newport, *In U.S., Estimate of LGBT Population Rises to 4.5%*, Gallup (May 22, 2018), https://perma.cc/8TC8-BNSW.

[13] Jen Kates et al., *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Kaiser Fam. Found. 12 (May 2018), https://perma.cc/6SFN-2YYB.

[14] Nat'l LGBT Educ. Ctr., *Understanding the Health Needs of LGBT People* 5 (Mar. 2016), https://perma.cc/AX83-9RWD.

[15] Kates et al., *supra* note 12, at 14 (citing Jaime M. Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. for Transgender Equality & Nat'l Gay & Lesbian Task Force (2011), https://perma.cc/9VJD-L3V7).

transgender individuals coverage of services provided to non-transgender individuals, such as surgical treatment related to gender transition, mental health services, and hormone therapy." *Id.*

Finally, as described above, LGBTQ people face enormous discrimination in the provision of health care.  In one large study in 2010, at the time the ACA passed, a staggering 56 percent of LGB people and 70 percent of transgender and gender non-conforming people had experienced some form of discrimination in health care, which includes "being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health status; or health care professionals being physically rough or abusive."[16]  And this discrimination in health care is consistent with the discrimination that LGBTQ people face in nearly all aspects of their lives. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015) ("Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate.").  In short, ensuring that LGBTQ people can access care when they need it is necessary to achieving Congress's goal to expand access to health care to all Americans.

**D. The Trump Administration's Creation of a Sweeping Religious Exemption Violates the Text of the Affordable Care Act and Undermines Congress's Plan in Passing It.**

The Administration's new rule also dramatically undermines the Act by creating a broad religious exemption for health care providers.  That exemption would permit religiously affiliated hospitals and care providers to discriminate against patients and refuse care if they

---

[16] Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* 5 (2010), https://perma.cc/44C8-BPAF.

maintain that doing so is required by their religious beliefs.  That change violates the text and structure of the Affordable Care Act and undermines Congress's plan in passing it.

**1.**   Nothing in the text of Section 1557 suggests that Congress wished to import Title IX's religious exemption into the health care context.  Section 1557 references Title IX only once, providing that health care providers or insurers shall not discriminate "*on the ground prohibited* under . . . title IX of the Education Amendments of 1972."  42 U.S.C. § 18116(a) (emphasis added).  The "ground prohibited under" Title IX is "sex."  While Title IX also includes a religious exemption, that exemption states that Title IX's prohibition on sex discrimination in education "shall not apply to *an educational institution* which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization."  20 U.S.C. § 1681(a)(3) (emphasis added).  Thus, by its plain terms, that exemption applies only to "educational institution[s]."  If Congress had intended to import this exemption into the health care context, it would have done so explicitly.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

The substantial differences between the educational and health care contexts explain why Congress chose to treat them differently.  For one thing, "students or parents selecting religious educational institutions typically do so as a matter of choice"—they can normally choose public school or a different college—while "individuals may have limited or no choice of [health care] providers, particularly in rural areas or where hospitals have merged with or are run by religious institutions."  2016 Rule, 81 Fed. Reg. at 31,380.  "[C]hoice of providers may be even further circumscribed in emergency circumstances."  *Id.*  Moreover, unlike the educational context, "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in

some cases, life threatening results." *Id.* Given these significant differences, Congress would not have imported Title IX's sweeping educational exemption into the Affordable Care Act by mere implication. *Cf. Whitman-Walker*, Memorandum Opinion, at 66 (holding that because the Administration failed to consider "the potential negative consequences that importing a blanket religious exemption into Section 1557 might have for access to health care," its rule "flunks the APA's standards for reasoned decisionmaking").

That conclusion is particularly apparent given that Congress explicitly included in the Affordable Care Act certain exemptions for religious providers, even as it declined to include a sweeping religious exemption like Title IX's. For instance, regarding abortion, the Act makes clear that qualified health plans cannot be required to provide coverage for abortions, *see* 42 U.S.C. § 18023(b)(1)(A), and that qualified health plans may not discriminate against individual health care providers because they refuse to provide abortions, *see id.* § 18023(b)(4). Furthermore, the Affordable Care Act prohibits discrimination against any health care entity that refuses to provide "assisted suicide, euthanasia, or mercy killing." *Id.* § 18113(a). Incorporating Title IX's sweeping religious exemption on top of these existing provisions would override the carefully crafted system of exemptions that Congress chose to include in the Act.

Title IX's broad religious exemption is also incompatible with other protections that Congress opted to provide to religious health care providers in the Affordable Care Act. Congress specified that the Affordable Care Act shall not "be construed to have any effect on Federal laws regarding . . . conscience protection," *id.* § 18023(c)(2)(A) & (A)(i), including the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1. RFRA prohibits the government from substantially burdening a person's exercise of religion unless doing so furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

*Id.*  Its protections are "very broad," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014), but they are not boundless.  Rather, RFRA requires a balancing between the interests of religious observers and the interests of the government.  Title IX's religious exemption, by contrast, requires the government to grant an exemption any time a religious entity maintains that certain action "would not be consistent with the religious tenets of such organization," 20 U.S.C. § 1681(a)(3), no matter the governmental interest at stake.  Importing Title IX's religious exemption into the health care context, then, would overturn the careful balancing of the interests of religious objectors and patients that Congress put in place when it applied RFRA to the health care context.

To justify including this sweeping and extra-textual religious exemption in the new rule, the Trump Administration points out that the 2016 rule included exemptions from the other three statutes referenced in Section 1557, but not Title IX's religious exemption, and suggests that this disparity is inexplicable.  *See* Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846, 27,864 (June 14, 2019).  But the antidiscrimination provisions contained in the other three statutes referenced in Section 1557 apply to *all* federal programs, not just educational institutions.  For example, the Age Act prohibits "*any program or activity receiving Federal financial assistance*" from discriminating "on the basis of age."  42 U.S.C. § 6102 (emphasis added).  It makes sense that the exemptions to that provision—for instance, for actions that "take[] into account age as a factor necessary to the normal operation or the achievement of any statutory objective," *id.* § 6103(b)(1)(A)—would apply in the health care context, as the Age Act already applies to all federal programs and activities.  So too with the exemptions in Title VI and Section 504, which together prohibit discrimination on the basis of race, color, national origin, or disability in "any program or activity receiving Federal financial

assistance." 42 U.S.C. § 2000d; 29 U.S.C. § 794(a).  In contrast with these provisions, Title IX's prohibition on discrimination based on sex, and its exemption for religious institutions, by their plain terms apply only to *educational* institutions.

**2.**  The Administration's decision to import Title IX's religious exemption to the health care context cannot be reconciled with Congress's plan to expand health care access to every American.  Religiously affiliated hospitals encompass a growing share of all hospitals in the United States.  *See* 2016 Rule, 81 Fed. Reg. at 31,379 (summarizing comments noting "that mergers of religiously-affiliated hospitals with other hospitals have deepened concerns that would be raised by providing a religious exemption, as the mergers may leave individuals in many communities with fewer health care options offering the full range of women's health services").  One in six hospital patients nationwide is now treated in a Catholic facility, and in 10 states, at least 30% of acute-care hospital beds are in a hospital affiliated with a Catholic health care system.[17]

Under the Administration's new rule, religious hospitals could refuse care to LGBTQ individuals, women seeking pregnancy-related care, individuals seeking treatment for drug addition, HIV-positive individuals or those seeking prophylactic drugs, or individuals seeking contraception, if doing so violates the caregiver's or hospital's religious beliefs.[18]  Whatever the merits of such an exemption in the educational context, importing the exemption into the health care context undermines Congress's plan in passing the Affordable Care Act given that many patients have no choice but to receive care at whatever hospitals exist in their communities.  In

---

[17] Katie Hafner, *As Catholic Hospitals Expand, So Do Limits on Some Procedures*, N.Y. Times (Aug. 10, 2018), https://perma.cc/S8DN-DSSA.

[18] *See* Movement Advancement Project and National Center for Transgender Equality, *Religious Refusals in Health Care: A Prescription for Disaster* 9 (March 2018), https://perma.cc/4CT5-G7SF.

short, a broad religious exemption would create a substantial loophole in Section 1557's

obligation not to discriminate against individuals on the basis of sex, making that provision an

antidiscrimination protection in name only.  That was not Congress's plan when it passed the

Affordable Care Act.

* * *

The Administration's new rule withdrawing certain existing anti-discrimination

protections for LGBTQ people and imposing a sweeping religious exemption to the anti-

discrimination provisions that remain does not comport with the plain text of Section 1557, the

structure of the Affordable Care Act, or with Congress's plan in passing the Act.  The rule

should be invalidated.

## CONCLUSION

For the foregoing reasons, the House submits this brief in support of Plaintiffs.

Respectfully submitted,

/s/ Douglas N. Letter

| | |
|---|---|
| Elizabeth B. Wydra | Douglas N. Letter |
| Brianne J. Gorod |    *General Counsel* |
| Praveen Fernandes | Todd B. Tatelman |
| Ashwin P. Phatak | Megan Barbero |
| CONSTITUTIONAL ACCOUNTABILITY | Josephine Morse |
|    CENTER | William E. Havemann |
| 1200 18th Street NW, Suite 501 | OFFICE OF GENERAL COUNSEL |
| Washington, D.C. 20036-2513 | U.S. HOUSE OF REPRESENTATIVES |
| Tel: (202) 296-6889 | 219 Cannon House Office Building |
| brianne@theusconstitution.org | Washington, D.C. 20515 |
| | Tel: (202) 225-9700 |
| | douglas.letter@mail.house.gov[19] |

*Counsel for Amicus U.S. House of Representatives*[*]

September 17, 2020

---

[19] *Amicus* certifies that (a) no party's counsel authored any part of this brief, (b) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief, and (c) no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of this brief.  All counsel represent U.S. House of Representatives.

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives, including any counsel specially retained by the Office of General Counsel, are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court."  2 U.S.C. § 5571(a).