**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 1:20-cv-5583-AKH |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ADMINISTRATIVE PROCEDURE ACT CLAIMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

SOURCES CITED FROM ADMINISTRATIVE RECORD ....................................... vii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.      Plaintiffs have standing to challenge the 2020 Rule. ........................................ 1

II.     The 2020 Rule violates the Administrative Procedure Act. .............................. 6

       A.     The 2020 Rule is contrary to law. ........................................................ 6

       B.     The Rule's exemption of religious organizations from Section 1557's nondiscrimination mandate is without statutory authority.................................. 16

       C.     The 2020 Rule is arbitrary and capricious. ......................................... 17

III.    The Court should reject Defendants' request to narrow the scope of relief. ................... 29

CONCLUSION......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Sch. Bd. of St. Johns Cty.*,
  968 F.3d 1286 (11th Cir. 2020) ..........................................................................23

*Barnes v. City of Cincinnati*,
  401 F.3d 729 (6th Cir. 2005) ..............................................................................18

*Bostock v. Clayton County, Georgia*,
  140 S. Ct. 1731 (2020)..........................................................................6, 18, 20

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..............................................................................................17

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ................................................................................3

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017)..................................................................................2

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984)................................................................................................6

*Conley v. Nw. Fla. State Coll.*,
  145 F. Supp. 3d 1073 (N.D. Fla. 2015)..............................................................20

*Consol. Rail Corp. v. Darrone*,
  465 U.S. 624 (1984)................................................................................................9

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)................................................................................................5

*Delaware Dep't of Nat. Res. & Env. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015)................................................................................25

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)...........................................................................................3

*Dep't of Revenue of Or. v. ACF Indus., Inc.*,
  510 U.S. 332 (1994)................................................................................................8

*Doe v. Mercy Catholic Med. Ctr.*,
  850 F.3d 545 (3d Cir. 2017)................................................................................28

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018), aff'd sub nom., *Bostock*, 140 S. Ct. .........................................18

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ................................................................................................23, 27

*FCC v. Fox Television Stations, Inc.*,
    566 U.S. 502 (2009) .........................................................................................................25

Franciscan Alliance v. Burwell,
    227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) ....................................................................23

*Getty v. Fed. Sav. & Loan Corp.*,
    805 F.2d 1050 (D.C. Cir. 1987) ......................................................................................29

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .......................................................................................18

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), reh'g en banc denied, 976 F.3d 399 (4th Cir.
    2020) .................................................................................................................................23

*Henley v. FDA*,
    77 F.3d 616 (2d Cir. 1996)...............................................................................................25

*Judulang v. Holder*,
    565 U.S. 42 (2011)...........................................................................................................24

*King v. Burwell*,
    576 U.S. 473 (2015).............................................................................................................7

*Loving v. IRS*,
    742 F.3d 1013 (D.C. Cir. 2014) .........................................................................................8

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015).....................................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................................17, 24, 26

*New York v. Scalia*,
    No. 20-cv-1689 (GHW), 2020 WL 5370871 (Sept. 8, 2020) ................................1, 5

*New York v. Trump*,
    No. 20-cv-5770, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020), vacated on
    other grounds, 141 S. Ct. 530 (Dec. 18, 2020) .................................................................3

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y.), aff'd, 139 S. Ct. 2551 (2019) ................................................1

*New York v. U.S. Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019)........................................................................................5

*New York v. U.S. Dep't of Labor*,
   No. 20-cv-3020 (JPO), 2020 WL 4462260 (S.D.N.Y. Aug. 3, 2020) ......................................5

*Nuclear Energy Inst., Inc. v. EPA*,
   373 F.3d 1251 (D.C. Cir. 2004)................................................................................................8

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989).........................................................................................................18, 20

*Rosa v. Park W. Bank & Tr. Co.*,
   214 F.3d 213 (1st Cir. 2000)...................................................................................................18

*Schmitt v. Kaiser Foundation Health Plan of Washington*,
   965 F.3d 945 (9th Cir. 2020) .........................................................................................8-9, 16

*Schwenk v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) ................................................................................................18

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ..................................................................................................18

*Sorenson v. Sec'y of Treasury*,
   475 U.S. 851 (1986)..................................................................................................................8

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)..............................................................................................................1

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..................................................................................................................2

*Tovar v. Essentia Health*,
   857 F.3d 771 (8th Cir. 2017) ....................................................................................................8

*UAW v. Johnson Controls, Inc.*,
   499 U.S. 187 (1991).........................................................................................................18, 20

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978)................................................................................................................20

*Walker v. Azar*,
   No. 20-CV-2834 (FB)(SMG), 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020)............ 13, 19-20

*Walker v. Azar*,
   No. 20-CV-2834 (FB)(SMG), 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020) ........................13

*Washington v. HHS*,
   No. 20-cv-1105 (JLR), 2020 WL 5095467 (W.D. Wash. Aug. 28, 2020) ...............................3

*Whitman- Walker v. U.S. Dep't of Health and Human Servs.*,
   No. 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ................................... passim

**FEDERAL STATUTES**

42 U.S.C. § 18116(a) ..................................................................................................... passim

42 U.S.C. § 300gg-1 - 300gg-2 ...............................................................................................7

42 U.S.C. § 300gg-6(a) .............................................................................................................7

42 U.S.C. §§ 300gg-3 – 300gg-5 ............................................................................................7

42 U.S.C. § 18113 .....................................................................................................................8

20 U.S.C. § 1687(3)(A)(ii) .....................................................................................................10

29 U.S.C. § 794(a) ..................................................................................................................12

42 U.S.C. § 1396A(a)(4) ................................................................................................... 14-15

20 U.S.C. §§ 1681(a)(3) .................................................................................................... 15-16

20 U.S.C. § 1688 .....................................................................................................................15

5 U.S.C. § 706(2)(C) ...............................................................................................................16

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (Mar. 22,
   1988) ...................................................................................................................................10

**FEDERAL REGULATIONS**

45 C.F.R. § 92.3 ......................................................................................................................11

45 C.F.R § 92.4 .......................................................................................................................12

45 C.F.R. § 92.206 ............................................................................................................ 12-13

45 C.F.R. § 92.207 ..................................................................................................................12

45 C.F.R. § 92.6 ......................................................................................................................16

45 C.F.R. § 92.207(b)(3)-(5) ..................................................................................................22

45 C.F.R. § 92.207(3), (5)...........................................................................................22

45 C.F.R. § 92.207(4) ...............................................................................................22

*Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability*, 81 Fed. Reg. 27,498, at 27,538 (May 6, 2016) ....................................14

*Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19, 2020) ...................................... passim

*Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,375, at 31,446 (May 18, 2016).................................................................................. passim

*NPRM, Nondiscrimination in Health and Education Programs or Activities*, 84 Fed. Reg. 27,846, at 27,876 (June 14, 2019) .............................................. 4, 18-19

## SOURCES CITED FROM ADMINISTRATIVE RECORD

| Document Name/Description | AR Citation | Page(s) |
|---|---|---|
| Comment of American Academy of Pediatrics & Society for Adolescent Health & Medicine | AR-00143082-152 | 27 |
| Comment of American Medical Student Association | AR-00129673-697 | 27 |
| Comment of Association of American Medical Colleges | AR-00117573-579 | 27 |
| Comment of American College of Obstetricians & Gynecologists | AR-00140029-037 | 22 |
| Comment of Endocrine Society | AR-00140060-064 | 22 |
| Comment of Gender Justice | AR-00162001-013 | 27 |
| Comment of HIV Health Care Access Working Group | AR-00152645-659 | 27 |
| Comment of Jim Collins Foundation, Inc. | AR-00167459-494 | 22 |
| Comment of Lambda Legal | AR-00164228-251 | 28 |
| Comment of Law and Religion Scholars | AR-00142058-070 | 27, 28 |
| Comment of Mount Sinai Health System | AR-00098434-436 | 22 |
| Comment of NARAL Pro-Choice America | AR-00141589-601 | 27 |
| Comment of National Alliance of State & Territorial AIDS Directors | AR-00144879-894 | 22, 27 |
| Comment of National Asian Pacific Women's Forum | AR-00154243-261 | 27 |
| Comment of National Health Law Program | AR-00129291-378 | 22, 28 |
| Comment of National Hispanic Leadership Agenda | AR-00153944-965 | 27 |
| Comment of National Latina Institute for Reproductive Health | AR-00154056-074 | 22, 27 |
| Comment of Planned Parenthood Federation of America & Planned Parenthood Action Fund | AR-00164132-154 | 27 |
| Comment of Yale New Haven Pediatric Gender Clinic | AR-00159800-803 | 22 |
| Comments of 22 States | AR-00146049-071 | 28 |

## INTRODUCTION

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment presents no valid reasons why this court should not grant Plaintiffs' Motion.  First, Defendants fail to refute Plaintiffs' clear demonstration that they have standing to challenge Defendants' promulgation of the Final Rule, *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule" or "Rule").  Second, Defendants' merits-based arguments similarly carry no weight.  Plaintiffs have presented substantial record evidence establishing that Defendants violated the Administrative Procedure Act ("APA") in promulgating the 2020 Rule.  For the reasons explained below and in Plaintiffs' opening brief, the Court should grant summary judgment in favor of Plaintiffs and vacate the 2020 Rule in its entirety.

## ARGUMENT

I.   **Plaintiffs have standing to challenge the 2020 Rule.**

To show standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[1]  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Plaintiffs have established four injuries traceable to the rule and redressable by the requested relief: (1) the 2020 Rule will increase the administrative burden on State-operated

---

[1] Contrary to Defendants' claim that Plaintiffs' submission of a Local Rule 56.1 statement "has no place in this litigation," Defs.' Rule 56.1 Resp. at 1 (ECF No. 131), the federal government in other litigation has "concede[d] that the Court may, and indeed should, look at evidence beyond the Administrative Record to make findings of fact relevant to the standing inquiry."  *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 573 & n.30 (S.D.N.Y.), *aff'd*, 139 S. Ct. 2551 (2019); *see also New York v. Scalia*, No. 20-cv-1689 (GHW), 2020 WL 5370871, at *9 (Sept. 8, 2020) (citing cases).

programs; (2) the 2020 Rule will increase the States' enforcement costs for state-level analogues of the Affordable Care Act's nondiscrimination provision; (3) Plaintiffs' health care costs will be higher because the 2020 Rule puts the States' residents at greater risk of adverse health impacts and the States bear the costs for some of those residents; and (4) the 2020 Rule harms Plaintiffs' *parens patriae* interests in the health and well-being of their residents.[2]  Pls.' Mem. Supp. Summ. J. 13-27 (ECF No. 109).

Defendants first argue that Plaintiffs' future injuries are too speculative to establish injury-in-fact.  Defs.' Mem. Opp. Summ. J. 4-11 (ECF No. 130).  But the uncontroverted fact and expert evidence establishes not only that Plaintiffs' threatened injuries are "certainly impending," but that in many instances they have already occurred.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see* Exs. 1-49 (ECF Nos. 111-1–111-49) (declarations from state agencies, nonprofit organizations, and experts in support of summary judgment); Exs. 54-55 (ECF Nos. 129-1–129-2) (supplemental declarations in support of Plaintiffs' opposition to Defendants' motion to dismiss).  This is not a case involving unfounded fears of increased discrimination in the future; rather, Plaintiffs' unrebutted factual showing establishes a "substantial risk" of harm, *Susan B. Anthony List*, 573 U.S. at 158, supported by the commonsense proposition that removing penalties for discrimination makes that discrimination more likely to occur.  *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.) ("When performing that inherently imprecise task of predicting or speculating about causal effects [in standing analysis], common sense can be a useful tool.").  Indeed, a

---

[2] Without even attempting to cite or distinguish binding Second Circuit caselaw to the contrary, Defendants argue that States may not invoke *parens patriae* standing against the federal government.  Defs.' Mem. Opp. Summ. J. 31-32.  But States may invoke *parens patriae* interests in an action against the federal government to enforce federal law.  *See* Pls.' Mem. Opp. Mot. to Dismiss 16-18 & n.7 (ECF No. 128); *see also* Pls.' Mem. Supp. Summ. J. 21-22.

three-judge district court in this Circuit held just a few months ago that fear of adverse future consequences by Plaintiffs' residents supported the injury required for standing. *New York v. Trump*, No. 20-cv-5770, 2020 WL 5422959, at *16 (S.D.N.Y. Sept. 10, 2020) (three-judge court), *vacated on other grounds*, 141 S. Ct. 530 (Dec. 18, 2020).

Moreover, Plaintiffs have provided specific—and unrebutted—evidence that since the 2020 Rule went into effect 13 insurers have instituted categorical prohibitions on certain health treatments for transgender people, including at least one company, Bright Health, which offers plans in two of the Plaintiff States. Ex. 49 ¶¶ 10-12 (ECF No. 111-49). Defendants make a handful of arguments why this evidence fails to support Plaintiffs' standing, Defs.' Mem. Opp. Summ. J. 16-20, but the changes in coverage by Bright Health and other insurers clearly establish that the Rule is already causing an increase in discrimination towards transgender individuals.[3] These concrete facts address the "problem" identified by the court in *Washington v. HHS*, No. 20-cv-1105 (JLR), 2020 WL 5095467 (W.D. Wash. Aug. 28, 2020), on which Defendants so heavily rely. Therefore, Plaintiffs demonstrate "'the predictable effects of Government action on the decisions of third parties,' which is sufficient" to prove standing. *Id.*, 2020 WL 5095467, at *8 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *California v. Azar*, 911 F.3d 558, 571-73 (9th Cir. 2018)).

While Defendants speculate that Bright Health may not have changed its policy because of the Rule, Defs.' Mem. Opp. Summ. J. 17, 20, the U.S. Department of Health and Human Services ("HHS") has conceded that changing Section 1557 *will* impact insurance coverage. For example, HHS itself admitted that the 2016 Rule "likely induced many covered entities to

---

[3] Defendants also concede that insurers had limited time to effectuate changes for the 2021 plan year, Defs.' Mem. Opp. Summ. J. 17-18, bolstering Plaintiffs' argument that further changes will occur.

conform their policies and operations to reflect gender identity as protected classes" and

anticipated that "*as a result of*" the rule, some "covered entities may revert to the policies and

practices they had in place before" the 2016 Rule—without any mention of the *Franciscan*

*Alliance* injunction that Defendants now invoke. *NPRM, Nondiscrimination in Health and*

*Health Education Programs or Activities*, 84 Fed. Reg. 27,846, at 27,876 (June 14, 2019) ("2019

NPRM") (emphasis added). Indeed, an analysis of insurance plan options covering the last five

years reflects that the number of insurers using exclusions increased significantly *after* HHS

issued the 2020 Final Rule. Ex. 49 ¶¶ 10-13 (ECF No. 111-49).[4] Thus, it is substantially likely

that the Rule has led and will continue to lead insurers to adopt categorical exclusions, and

vacating it would redress Plaintiffs' resulting injuries.[5]

Defendants' accusation that Plaintiffs seek to "manufacture" standing by incurring

administrative and enforcement costs, Defs.' Mem. Opp. Summ. J. 22-23, is unsupported,

categorically false, and contrary to the summary judgment record. *See* Pls.' Mem. Supp. Summ.

---

[4] Defendants try to contest this evidence by asserting that the number of insurers decreased to four in 2021. Defs.' Reply in Supp. Mot. to Dismiss 37 n.13 (ECF No. 136). However, as explained in Katie Keith's declaration, "[f]or 2021, transgender-specific exclusions were used by Alliant Plans in Georgia, Bright Health in its plans in eight states, MercyCare in Illinois, and UnitedHealthcare in its plans in three states," totaling 13 insurers, Ex. 49 ¶ 10 n.8, whereas in 2020, there were only five insurers using transgender-specific inclusions, *id.* ¶ 11. The prevalence of categorical prohibitions has thus doubled on a statewide basis in just one year.

[5] Defendants attempt to undermine Plaintiffs' expert, Jaclyn White Hughto, by noting that "numerous studies" she cites pre-date the Rule. Defs.' Mem. Opp. Summ. J. 20. Setting aside the unremarkable fact that there is not yet an extensive body of academic literature relating to a Rule that was promulgated just seven months ago, Hughto's professional opinion is based on not only those numerous studies but also her own extensive research, experience, and expertise in the field. On those bases, she concludes that the Rule will lead to an increase in the denial of insurance claims for medical gender affirmation services, Ex. 37 ¶¶ 37, 65 (ECF No. 111-37). Defendants do not assert that Hughto is unqualified to opine on this subject as an expert, and do not offer any contrary testimony. Hughto's testimony further establishes that Plaintiffs' injuries are traceable to the 2020 Rule.

J. 16 n.12 (citing declarations detailing administrative costs), 17 n.16 (same), 19 n.22 (citing

declarations detailing enforcement costs), 20 n.25 (same); *see also* Ex. 54 ¶ 5 (ECF No. 129-1)

(describing complaint received in September 2020 by California's Department of Fair

Employment and Housing alleging healthcare discrimination based on transgender status and

resources required to address).  Rather, the law is clear that States' reasonable allocation of

resources for increased enforcement in light of the federal government's decision to curtail

federal protections will satisfy standing.  *See, e.g.*, *Scalia*, 2020 WL 5370871, at *9-12.

    With regard to the increase in Plaintiffs' health care costs, Defendants attempt to walk

back their candid concession of public health harms that the agency acknowledged when

promulgating the 2020 Rule.  Defs.' Mem. Opp. Summ. J. 21. But the Rule itself

straightforwardly—and correctly—recognizes that "greater public health costs, cost-shifting, and

expenses . . . may result from entities changing their nondiscrimination policies and procedures

after the promulgation of this rule."  85 Fed. Reg. at 37,225.  That the agency was unable to put a

dollar figure on these increased costs is not a basis to conclude that the costs will not arise.  *New*

*York v. U.S. Dep't of Labor*, No. 20-cv-3020 (JPO), 2020 WL 4462260, at *4 (S.D.N.Y. Aug. 3,

2020) ("[N]o precedent requires the Court to . . . demand specific numerical projections. . . .

[A]ll New York must show is that it will be injured, not the magnitude of its injury.").  And

Defendants' convenient litigating position cannot supplant the agency's acknowledged factual

finding when it promulgated the 2020 Rule.  *New York v. U.S. Dep't of Health & Human Servs.*,

414 F. Supp. 3d 475, 548, 550, 534 n.35 (S.D.N.Y. 2019).[6]

---

[6] While Defendants' contend that Plaintiffs have not adequately shown standing for each
provision of the Rule, Plaintiffs need only prove standing for "each claim" they assert under the
APA "for each form of relief sought," *i.e.*, vacatur.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S.
332, 352 (2006) (citations omitted).  And in any event, Plaintiffs have shown standing as to each

**II.     The 2020 Rule violates the Administrative Procedure Act.**

**A.  The 2020 Rule is contrary to law.**

Defendants have failed to rebut Plaintiffs' arguments that the 2020 Rule is contrary to

law in several ways.  As Plaintiffs have explained, the Rule impermissibly excludes most health

insurers and HHS-administered programs from the scope of Section 1557 through a tortured and

impermissible reading of the statute.  The Rule also effects an impermissible change in the law

by removing a definition of discrimination "on the basis of sex" and eliminating critical

protections for transgender and other LGBTQ individuals from the Section 1557 regulation and

unrelated regulations, in contravention of the clear state of the law after the Supreme Court's

decision in *Bostock v. Clayton County, Georgia,* 140 S. Ct. 1731 (2020).  Defendants' arguments

to the contrary have no merit.

**1.     The 2020 Rule's definition of "health program or activity" is contrary to law.**

*a.     Chevron deference does not apply to Defendants' drastic alteration to the definition of "health program or activities."*

Defendants rely entirely on *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43

(1984), to support their narrowing of the scope of health programs and activities subject to

Section 1557.  Defs.' Mem. Opp. Summ. J. 33-39.  Under the Rule, "health program or activity"

excludes entities "principally or otherwise engaged in the business of providing health

insurance," 85 Fed. Reg. at 37,244-45 (§ 92.3(c)), thereby removing a large segment of health

insurers from Section 1557's nondiscrimination requirements.  As explained in Plaintiffs'

---

challenged provision of the Rule.  *See* Pls.' Mem. Opp. Mot. to Dismiss 19-38; ECF Nos. 111-1–
111-49, 129-1–129-2.

memorandum supporting summary judgment, because the statute is not ambiguous, Defendants'
construction should not receive deference.  Pls.' Mem. Supp. Summ. J. 27-34.

The text of Section 1557 is clear.[7] The statute prohibits discrimination by "*any health
program or activity*, *any part of which* is receiving Federal financial assistance."  42 U.S.C. §
18116(a) (emphasis added).  A plain reading of "health program or activity" includes many
activities conducted by health insurers related to (and controlling) consumers' health.  For
example, among other activities, health insurers design benefits, establish prescription drug
formularies, recruit networks of providers, and develop payment structures to reimburse such
providers for services rendered to consumers.  These activities quintessentially implicate the
"health" of persons falling within the scope of protections afforded by the ACA, namely, those
accessing health care through private or public insurance.  *See King v. Burwell*, 576 U.S. 473,
478-79 (2015).

Defendants make no compelling arguments against this clear reading of the statute.
Instead, Defendants point to "Congress's explicit regulation of health insurers throughout the
ACA" to offer that Congress did not intend Section 1557 to apply to health insurers.  Defs.'
Mem. Opp. Summ. J. 35.  To be sure, Congress used different terms across various provisions of
the ACA to refer to entities, including health insurers, that are regulated by the law.[8]  But that

---

[7] Defendants erroneously suggest that Plaintiffs rely on Section 1557's reference to "contracts of
insurance" as evidence that Congress unambiguously intended Section 1557 to apply to health
insurers.  *See* Defs.' Mem. Opp. Summ. J. 35-36 (citing their own regulation's reading of the
statute that "contracts of insurance" refers to a type of "Federal financial assistance" rather than a
type of "health program or activity.")  Plaintiffs never made this argument, and in any event, it is
irrelevant to a finding that the statute is unambiguous.

[8] *See, e.g.*, 42 U.S.C. §§ 300gg-1 – 300gg-2, 300gg-6(a) (describing requirements applicable to a
"health insurance issuer for health insurance coverage offered in the individual or small group
market."); 42 U.S.C. §§ 300gg-3 – 300gg-5; 300gg-6(b), 300-gg-7 – 300gg-8 (describing

does not render the term "health program or activity" in Section 1557 ambiguous.  To the contrary, the fact that health insurance providers are swept within the scope of the ACA's multitude of requirements governing activities affecting consumers' health demonstrates Congress' clear intent that Section 1557's application to any *health* program or activity would similarly apply to health insurers.  *Cf. Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) (observing that "identical words used in different parts of the same [A]ct are intended to have the same meaning.") (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)).[9]

The Court should therefore reject Defendants' claim that their interpretation of Section 1557 is due *Chevron* deference.

> b.   *Even if Chevron deference applied, Defendants' interpretation is impermissible.*

Defendants' opposition doubles down on their reliance on the Civil Rights Restoration Act of 1987 ("CRRA")—a statute passed decades prior to the ACA's enactment—as justification for excising almost all health insurers from the scope of Section 1557's coverage.  Defs.' Mem. Opp. Summ. J. 37-38.  Plaintiffs previously explained why Defendants' selective importation of

---

requirements applicable to "group health plan[s]" and "health insurance issuer[s] offering group or individual health insurance coverage"); 42 U.S.C. § 18113 (defining "health care entity" to include "a health insurance plan").

[9] Defendants claim that Plaintiffs rely on "little more than" a single Ninth Circuit decision in support of their argument that the text of Section 1557 unambiguously applies to a broader swath of health insurers than those covered by the 2020 Rule.  Defs.' Mem. Opp. Summ. J. 34.  But Plaintiffs need not cite to precedent holding that Section 1557 is unambiguous for this court to find that it is so; rather, in conducting a *Chevron* step one analysis, all traditional tools of statutory construction must be employed: text, structure, purpose, and history.  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004); *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014).  Regardless, Defendants do not point to any case law holding that Section 1557 is ambiguous; indeed, to the extent that courts have considered claims of discrimination against health insurers under Section 1557, none has held that the statute precludes such claims.  *See, e.g.*, *Schmitt v. Kaiser Foundation Health Plan of Washington*, 965 F.3d 945, 951 (9th Cir. 2020); *Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017).

parts of the CRRA into the 2020 Rule is not based on a permissible construction of Section 1557. Pls.' Mem. Supp. Summ. J. 30-34. Defendants' arguments in response demonstrate that their reasoning cannot be squared with the text of Section 1557.

First, Defendants present no compelling reason why Section 1557—which adopted only the "grounds prohibited" under and "enforcement mechanisms" provided by Title VI, Title IX, Section 504, and the Age Discrimination Act—required them to turn to the CRRA to decipher any of its text. *See Schmitt*, 965 F.3d at 953 (observing that Section 1557's incorporation of "grounds prohibited" by preexisting statutes "is not typically understood to encompass the legal elements necessary to establish a discrimination claim; it is simply the protected classification at issue"); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634-35 (1984) (holding that Congress, in crafting Section 504, incorporated only the "remedies" available under Title VI and did not incorporate other limiting language found in unrelated Title VI provisions) (internal quotations and citations omitted). Indeed, Section 1557's description of "health program or activity" appears in a set of clauses *entirely apart* from the statute's reference to the preexisting civil rights statutes. *See* 42 U.S.C. §18116(a). And while the phrase "program or activity" appears in both the CRRA and Section 1557, in the latter statute Congress specifically added the word "health" before it to delineate its scope. Defendants therefore had no credible reason to turn to the CRRA in their interpretation of Section 1557's reference to "health program or activity."

Second, the CRRA's definition of "program or activity" is entirely redundant to the language Congress elected to include in Section 1557. Plaintiffs did not, as Defendants suggest, claim that Defendants' chosen interpretation must be "necessary" for it to be compliant with the APA. Defs.' Mem. Opp. Summ. J. 39. Rather, Plaintiffs explained that Defendants' *incorporation* of the CRRA to interpret Section 1557 was "unnecessary," rendering their reliance

on the CRRA to interpret Section 1557 baseless.  Pls.' Mem. Supp. Summ. J. 31-33.  As Defendants acknowledge (Defs.' Mem. Opp. Summ. J. 37), the CRRA added language to underlying civil rights statutes to ensure that the statutes applied to all of the operations of covered entities, "any part of which is extended Federal financial assistance[.]"  *See* Civil Rights Restoration Act, Pub. L. No. 100-259, 102 Stat. 28 (Mar. 22, 1988) §§ 2, 3, 4(2), 5(3), 6.  But Section 1557 already included this proviso, rendering CRRA's primary amending provisions entirely redundant in this context.  *See* 42 U.S.C. § 18116(a).  Defendants therefore had no plausible need to turn to the CRRA to interpret any part of Section 1557, let alone "health program or activity."

Third, even if the CRRA were relevant to the interpretation of Section 1557, Defendants' selective importation of some of its terms to excise most health insurers from the ambit of Section 1557 lacks reasonable basis.  Defendants claim that the CRRA "defines 'program or activity' to encompass all operations of regulated entities only when they are 'principally engaged in the business of providing . . . health care.'"  *See* Defs.' Mem. Opp. Summ. J. at 37-38 (citing 20 U.S.C. § 1687(3)(A)(ii).  But this observation provides no support for their next logical leap: that the scope of such entities excludes health insurance companies.  Neither the CRRA nor the underlying statutes explicitly or implicitly exclude health insurance companies from their ambit.[10]  And as explained *supra,* at 7, health insurers plainly perform activities central to consumers' health.[11]

---

[10] Nor have Defendants made any effort to square their determination that health insurers do not provide health care here with their decision to include health insurers within the definition of "health care entities" purportedly exempt from providing certain health services under Defendants' "Conscience Rule."  *See* Pls.' Mem. Supp. Summ. J. 33, n. 40.

[11] Defendants return to their oft-cited analogy comparing health insurance to "homeowner's insurance" as support for their distinction between "health care" and the provision of insurance.

For these reasons, the Rule's exclusion of most private health insurance companies from

Section 1557's scope is based on an erroneous and impermissible interpretation of the statute, is

entitled to no deference, and is contrary to law.

>        **2.      Defendants' exclusion of most HHS-administered programs from
>                  Section 1557's coverage impermissibly construes Section 1557.**

Defendants' opposition also fails to justify their decision to exclude most HHS-

administered programs from the scope of Section 1557, the plain terms of which prohibit

discrimination "under any program or activity that is administered by an Executive Agency."

*See* 42 U.S.C. § 18116(a). As Plaintiffs have explained, Pls.' Mem. Supp. Summ. J. 34-36,

Defendants breached the frontier of reasonable statutory exegesis to conclude that Section 1557

prohibits discrimination only by "[a]ny program or activity administered by the Department [of

Health and Human Services] under Title I." 85 Fed. Reg. at 37,244-45 (§ 92.3). A plain reading

of the statute reveals that Section 1557 applies to all programs and activities administered by

HHS, and (separately) to other entities established under Title I of the ACA. *See* 42 U.S.C. §

18116(a).

While Plaintiffs acknowledge that Section 1557 applies only to *health* programs and

activities administered by Executive Agencies (Pls.' Mem. Supp. Summ. J. 35, n. 42), this does

not render Defendants' chosen interpretation any more valid. Defendants' interpretation

excludes HHS health programs and activities administered by the Centers for Medicare &

Medicaid Services ("CMS"), the Centers for Disease Control and Prevention, Indian Health

Service, the Health Resources and Services Administration, and the Substance Abuse and Mental

---

Defs.' Mem. Opp. Summ. J. 39. But the analogy is inapt and ignores important distinctions
between the markets for housing and health care services. One does not need homeowner's
insurance to be housed. By contrast, as a practical matter, in the United States one needs health
insurance to access most non-emergency medical services.

Health Services Administration, among others.  *See Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,375, at 31,446 (May 18, 2016); *see also Whitman- Walker v. U.S. Dep't of Health and Human Servs.*, No. 20-1630 (JEB), 2020 WL 5232076, at *5 (D.D.C. Sept. 2, 2020).  Paradoxically, all of these programs are subject to the non-discrimination requirements of Section 504, the only one of the statutes referenced in Section 1557 that already applied to federally conducted programs.  *See* 29 U.S.C. § 794(a) (prohibiting discrimination on the basis of disability "under any program or activity conducted by any Executive agency").  For these reasons, Defendants cannot point to any evidence of Congressional intent to drastically limit Section 1557's scope in the manner they have chosen here, and their limitation of the scope of HHS programs subject to 1557 is contrary to law.

> ### 3.      The Rule's removal of the definition of "on the basis of sex" violates the ACA.

Defendants do not seek *Chevron's* refuge to justify the 2020 Rule's elimination of the definition of "on the basis of sex."  Instead, they argue that this aspect of the 2020 Rule was not an interpretation of Section 1557 at all.  Defs.' Mem. Opp. Summ. J. 42-45.  But not only did the Rule eliminate the 2016 Rule's definition of "on the basis of sex," it also removed the express prohibitions on discrimination against transgender people.  *See* 81 Fed. Reg. at 31,467 (former 45 C.F.R §92.4), 31,471-72 (former §§ 92.206, 92.207).  Defendants attempt to cast Plaintiffs' arguments as attacking these changes under an "arbitrary and capricious" theory.[12]  But all of these substantive changes are likewise contrary to law because they are predicated on Defendants' interpretation of Section 1557's statutory prohibition on discrimination "on the basis

---

[12] Plaintiffs separately address Defendants' arguments as to Plaintiffs' arbitrary and capricious claims *infra* at 17-22.

of sex." *See* Pls.' Mem. Supp. Summ. J. 36-39.  The outcome was a rule whose substance is at

odds with the clear state of the law after the Supreme Court's decision in *Bostock*.

Tellingly, Defendants make no attempt to grapple with *Walker v. Azar*, No. 20-CV-2834

(FB)(SMG), 2020 WL 4749859, at *8-9 (E.D.N.Y. Aug. 17, 2020), which expressly concluded

that the Rule was likely contrary to law.  There, like here, Defendants argued that their avowed

decision to hew to the statutory text in drafting the 2020 Rule immunized them from any claim

that the Rule was contrary to law.  *See id*. at *8.  The court in *Walker* disagreed, observing that

the text of the 2020 Rule's preamble made clear that "a central reason for HHS's action was a

fundamental disagreement as to whether Title IX—and, by implication, § 1557—prohibited

discrimination based on gender identity and sex stereotyping."  *Id*. at *9.  Recognizing the

implications of *Bostock* for the definition of sex-based discrimination under Section 1557, the

court determined that Plaintiffs established a substantial likelihood of success on their claim that

the Rule was "contrary to law" because, through the Rule, "HHS took a position on that issue . . .

but that position was effectively rejected by the Supreme Court."  *Id*; *see also Walker v. Azar*,

No. 20-CV-2834 (FB)(SMG), 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020) (applying

same reasoning in enjoining repeal of gender identity protections in § 92.206).

Thus, Defendants' reliance on their preferred, yet erroneous, interpretation of Section

1557's prohibition on sex-based discrimination is contrary to law.

### 4.    The Rule's removal of nondiscrimination protections from CMS-funded managed care programs is contrary to law.

For similar reasons, Defendants' elimination of express regulatory prohibitions on sexual

orientation and gender identity discrimination in CMS-funded managed care programs is also

contrary to law.  *See* 85 Fed. Reg. at 37,243 (codified at 42 C.F.R. §§ 438.3, 438.206, 440.262,

460.98, and 460.112).

13

First, the Rule purports to align the CMS regulations with Section 1557 based on the same faulty premise—to "return to the plain meaning of 'on the basis of sex,'" 85 Fed. Reg. at 37,162—undergirding Defendants' unlawful removal of protections against gender identity and sex stereotyping discrimination from the Section 1557 regulations. Defendants claim that Plaintiffs challenge the "reasonableness" of the change to CMS regulations, not the change itself, and that Plaintiffs cannot challenge the agency's motivations as being contrary to law. Defs.' Mem. Opp. Summ. J. 45. Those assertions mischaracterize Plaintiffs' argument. As explained above, Plaintiffs contend that the *premise* on which HHS made these changes (to "return to the plain meaning of 'on the basis of sex,'" 85 Fed. Reg. at 37,162) is itself faulty and contrary to law. Defendants' motivation for making the change is enlightening, but immaterial; they cannot base the change itself on a premise that is contrary to law, regardless of their motivations. And if that premise is contrary to law with regards to the definition of "on the basis of sex," then the amendments to unrelated CMS regulations are contrary to law in the same manner as the other 2020 Rule provisions.

Second, Defendants' effort to utilize the 2020 Rule to amend an entirely separate regulatory framework has no basis in law. Defendants utilized the 2020 Rule as a vehicle to amend CMS regulations that themselves were not promulgated pursuant to Section 1557. The CMS regulations at issue were promulgated in 2016 under Section 1902 of the Social Security Act, 42 U.S.C. § 1396A(a)(4). While they involve nondiscrimination requirements imposed upon certain covered entities, they did not implement any statutory nondiscrimination requirement, but were instead made to "assure that care and services are provided in a manner consistent with the best interest of beneficiaries under Section 1902(a)(19) of the [Social Security] Act." *See Medicaid and Children's Health Insurance Program (CHIP) Programs;*

*Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability*, 81 Fed. Reg. 27,498, at 27,538 (May 6, 2016).  Defendants claim that they are entitled to deference under *Chevron* for their decision to make these "conforming" amendments to the CMS regulations, (Defs.' Mem. Opp. Summ. J. 45), but such deference is appropriate only when an agency is interpreting an ambiguous provision of a statute.  That is not the case here, where it is contrary to law for Defendants to amend unrelated CMS regulations as part of their implementation of Section 1557.  Because Section 1557 does not govern Section 1902 of the Social Security Act, the Court's decision in *Bostock* has no bearing on these CMS regulations, and the LGBTQ protections in these regulations were warranted regardless.  Defendants therefore had no cause to revisit them as part of the rulemaking for the 2020 Rule, and their stated reasons for doing so are patently invalid.

Finally, to the extent that these amendments to CMS regulations now authorize managed care programs to discriminate based on sexual orientation or gender identity, they violate HHS's own obligation under Section 1557 to administer its health programs and activities in a nondiscriminatory manner.  42 U.S.C. § 18116(a).  Defendants assert that the amendments to the CMS regulations cannot violate Section 1557 because they simply continue to prohibit discrimination "on the basis of sex," as Section 1557 requires.  Defs.' Mem. Opp. Summ. J. 45.  Defendants' primary defense is to rely on their erroneous interpretation of the law that discrimination "on the basis of sex" does not include discrimination on the basis of gender identity or sexual orientation.  *See id*.  This defense is unavailing in the face of the clear law after *Bostock*.  Defendants' amendment to these unrelated CMS regulations is therefore contrary to law.

**B. The Rule's exemption of religious organizations from Section 1557's nondiscrimination mandate is without statutory authority.**

Defendants fail to point to any statutory authority permitting them to incorporate Title IX's broad religious exemption (20 U.S.C. § 1681(a)(3)) and "abortion neutrality" provision (20 U.S.C. § 1688), 85 Fed. Reg. at 37,245 (§ 92.6).  As Plaintiffs have explained, those provisions were incorporated in excess of HHS's statutory authority and must be set aside.  *See* Pls.' Mem. Supp. Summ. J. 41-42; 5 U.S.C. § 706(2)(C).

Defendants argue that these substantive modifications of the law represent a reasonable construction of Section 1557's "incorporation" of Title IX.  Defs.' Mem. Opp. Summ. J. 47. They specifically rely on 20 U.S.C. § 1681(a)(3) and the CRRA's amendments to Title IX, 20 U.S.C. § 1687.  But Defendants' chosen construction impermissibly redefines terms in Section 1557 and exceeds the boundaries of the authority provided to them in the statute.

As explained *supra*, 8-9, Section 1557 does not wholesale "incorporate" any of the underlying civil rights statutes on which it is based.  Rather, it prohibits discrimination "on the ground prohibited under" these statutes, including Title IX. 42 U.S.C. § 18116(a).  *Schmitt* is not to the contrary.  Defs.' Mem. Opp. Summ. J.  47.  There, the court found that "Section 1557(a) incorporates only the prohibited "ground[s]" and that "a prohibited "ground" for discrimination . . . is simply the protected classification at issue."  *Schmitt*, 965 F.3d at 953.  While *Schmitt* did not involve a claim under Section 1557's prohibition on sex-based discrimination, the word "ground" in Section 1557 applies to all of the section's protected classes in the same way.  *See* 42 U.S.C. § 18116(a).  And *Schmitt* makes clear that Section 1557 incorporates *only* the protected classification and enforcement mechanisms from the incorporated statutes.  *See Schmitt*, 965 F.3d at 953.  Defendants present no justification for adding these extra-statutory exemptions by fiat.

16

Defendants further rely on their construction of the term "program or activity," turning once again to the CRRA's definition of "program or activity."  Defs.' Mem. Opp. Summ. J. 49. But as explained above, Defendants had no need to turn to the CRRA to interpret any provision of Section 1557, including the definition of "program or activity."  Defendants present no evidence that Congress elected to import this foreign term from the CRRA, and Defendants' decision to do so contravenes the text of Section 1557 and lacks legal authority.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

### C.  The 2020 Rule is arbitrary and capricious.

Defendants have failed to rebut the substantial evidence in the record that the 2020 Rule is arbitrary and capricious.  Their rescission of the definition of "on the basis of sex" and express protections for transgender people is harmful and has no valid legal or factual basis.  Their elimination of protections for limited English proficient persons frustrates Section 1557's purpose, is contrary to the weight of the evidence, and does not consider the harm to LEP individuals unable to access care.  And their incorporation of Title IX's religious exemption and "abortion neutrality" provision fails to consider the harms resulting from the likely denial of care to individuals.

### 1.  The Rule's rescission of sex discrimination protections for transgender, gender nonconforming, and pregnant individuals is arbitrary and capricious.

#### a.  HHS's "good reasons" for repealing the 2016 Rule's protections lack merit and are inconsistent with clear Supreme Court precedent.

Defendants allege that they had four "good reasons" for repealing the 2016 Rule's express protections for transgender people, women, and others seeking reproductive healthcare. Defs.' Mem. Opp. Summ. J. 63-65, 68.  All purported rationales lack merit and highlight Defendants' "fail[ure] to consider . . . important aspect[s] of the problem." *Motor Vehicle Mfrs.*

17

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Indeed, controlling

precedent makes clear that anti-transgender discrimination, sex stereotyping, and pregnancy

discrimination constitute sex discrimination under federal civil rights law.[13]  And Defendants

present no meaningful rebuttal to the myriad ways Plaintiffs have shown that, as the record

reflects, Defendants acted arbitrarily and capriciously in eliminating explicit prohibitions on

these types of discriminatory conduct through the 2020 Rule.

First, Defendants assert that their repeal of the 2016 Rule's express protections is

warranted due to their "value judgment" against "placing HHS in the driver's seat in defining the

outer boundaries of" unlawful sex discrimination under federal civil rights law.  *See* Defs.' Mem.

Opp. Summ. J.  63.  But Defendants ignore *Bostock* and the clear weight of prior case law

applying *Price Waterhouse* to hold that discrimination against transgender people is a form of

prohibited sex stereotyping.[14]  Far from falling on the "outer boundaries," Defs.' Mem. Opp.

Summ. J. 63, federal courts have consistently held that anti-transgender discrimination is

inherently sex discrimination "[a]ny way you slice it."  *Bostock*, 140 S.Ct. at 1746.

Second, Defendants give primacy to "consisten[cy]" with "the views of the Department

of Justice, other Federal agencies, and internally." *See* 84 Fed. Reg. at 27,857.[15]  This makes no

---

[13] *Bostock,* 140 S.Ct. at 1741; *Price Waterhouse v. Hopkins*, 490 U.S. 228, at 251 (1989); *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 198-99 (1991).

[14] *See, e.g.*, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574-75 (6th Cir. 2018) (holding discrimination against transgender employee based on sex stereotypes and transgender status violated Title VII), *aff'd sub nom.*, *Bostock*, 140 S. Ct. at 1742-43; *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) (Fourteenth Amendment and Title VII); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (Title VII); *Smith v. City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004) (same); *Schwenk v. Hartford*, 204 F.3d 1187, 1200-02 (9th Cir. 2000) (Gender Motivated Violence Act); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000) (Equal Credit Opportunity Act).

[15] The adoption of these "values" has been consistent across federal agencies throughout

sense.  Repealing a rule consistent with controlling precedent does not serve the value of consistency with civil rights statutes.

Third, Defendants posit that the Supreme Court's grant of certiorari in *Bostock* provided sufficient "good reason" for the 2020 Rule.  *See* Defs.' Mem. Opp. Summ. J. 64.  But this acknowledgement cannot possibly excuse Defendants' failure to consider the Supreme Court's ultimate decision in that case, particularly where the legal principles underlying *Bostock* were well-established.  Defendants claim that the agency decision here was "made before" the Supreme Court's decision in *Bostock* and that the administrative record was purportedly closed prior to *Bostock*.  Defs.' Mem. Opp. Summ. J. 53 (citing August 13, 2019 comment period closure).  But the record contains a multitude of documents that postdate the closure of the comment period, including briefs by the federal government in other litigation and federal court opinions from several months preceding the publication of the Final Rule.  *See* ECF No. 103-2 (listing index of administrative record).  The court should not credit Defendants' horse-out-of-the-barn argument, particularly where the agency specifically acknowledged the impact that a decision from the Supreme Court in *Bostock* and its related cases would have on the interpretation of Section 1557's prohibition of discrimination "on the basis of sex."  *See* 84 Fed. Reg. at 27,855 ("a holding by the U.S. Supreme Court on the definition of 'sex' under Title VII will likely have ramifications for the definition of 'sex' under Title IX, and for the cases raising sexual orientation or gender identity claims under Section 1557"); *see also Walker*, 2020 WL

---

President Trump's administration.  On January 8, 2021, for example, the Department of Education issued a memorandum stating that "*Bostock* does not affect the meaning of 'sex' as that term is used in Title IX."  Memorandum from Reed Rubinstein, Principal Deputy General Counsel, U.S. Dep't of Educ. to Kimberly Richey, Acting Assistant Secretary for the Office of Civil Rights, U.S. Dep't of Educ. at p. 2 (Jan. 8, 2021), available at https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf.

4749859, at *9 (holding that Defendants acted arbitrarily and capriciously in publishing the 2020 Rule where the record shows that "whether by design or bureaucratic inertia, the fact remains that HHS finalized the 2020 Rule[] without addressing the impact of the Supreme Court's decision in *Bostock*").

Defendants' reliance on *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978), is similarly misplaced. In *Vermont Yankee*, the Court recognized that an agency could not have considered factual developments that arose *years* after the agency's decision, and where there was "nothing" before the agency suggesting the possibility of those developments. *Id*. In contrast, the Supreme Court decided *Bostock before* the final agency action here. This was not an unanticipated development. Rather than await the Supreme Court's authoritative ruling, Defendants willingly charged ahead with their regulation. *See Walker*, 2020 WL 4749859, *9.

Fourth, the Court should not credit Defendants' assertion that "[r]esolving complaints of discrimination on a case-by-case basis" to minimize litigation risk, was a "good reason" for repealing the 2016 Rule. Defs.' Mem. Opp. Summ. J. 51-52. In fact, the 2020 Rule exposes Defendants to more litigation risk, because now it is clear that anti-transgender discrimination is sex discrimination, and it has long been clear that discrimination based on sex stereotypes and pregnancy status is sex discrimination. *Bostock,* 140 S.Ct. at 1741; *Price Waterhouse*, 490 U.S. at 251; *UAW*, 499 U.S. at 198-99 (Title VII); *see also Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1078 (N.D. Fla. 2015) (Title IX). Defendants' claim that they will resolve the contours of prohibited discrimination on a case-by-case basis is belied by numerous statements throughout the preamble, which makes clear that they intend to follow their preferred definition of discrimination "on the basis of sex." *See Walker*, 2020 WL 4749859, at *9 ("As the preamble makes perfectly clear, [HHS's] reasoning was based upon its pre-*Bostock* understanding and

20

contention that 'reasonable distinctions on the basis of sex, as the biological binary of male and female, may, and often must, play a part in the decision-making process—especially in the field of health services.'") (citing 85 Fed. Reg. at 37,185); *Whitman-Walker,* 2020 WL 5232076, at *24 ("the 2020 Rule's preamble brings into stark relief HHS's position that discrimination based on transgender status does not qualify as sex discrimination under Section 1557").  Thus, it is the 2020 Rule's interpretation that will invite litigation and will merit swift reversal in each instance. Defendants' professed desire to reduce litigation risk cannot explain their decision to push forward with repealing the 2016 Rule, especially post-*Bostock*.

For these reasons, Defendants' repeal of the 2016 Rule's definition of discrimination "on the basis of sex" is arbitrary and capricious.  The 2020 Rule's changes in this regard should be vacated.

> b.  *The 2020 Rule's elimination of the express prohibition on categorical coverage exclusions on gender-affirming health care is arbitrary and capricious.*

Defendants' remaining arguments for repealing the 2016 Rule's express protections against discrimination targeting transgender individuals lack merit.  Defendants proffer the post hoc rationalization that "[e]ven assuming that sex discrimination encompasses gender identity discrimination, 'reasonable distinctions on the basis of sex, as the biological binary of male and female" may play a part in decision making "especially in the field of health services.'"  Defs.' Mem. Opp. Summ. J. 56 (quoting 85 Fed. Reg. 37,185).  But substantial record evidence undermines these arguments, which profoundly misunderstand the medical needs of transgender people and the robust consensus among medical experts and organizations.[16]

---

[16] *See, e.g.*, AR-00144884-885 (Nat'l All. of State & Territorial AIDS Dirs. cmt.); AR-00154186 (Nat'l Ass'n of Pediatric Nurse Practitioners cmt.); AR-00167466-67 & nn.13-18 (Jim Collins Found. cmt.); AR-00159802 (Yale New Haven Pediatric Gender Clinic cmt.); AR-00098435

The record makes clear that Defendants' actions run counter to the substantial evidence that medical decision making based on "distinctions on the basis of sex, as the biological binary of male and female" often produces poor treatment outcomes for transgender patients. *See, e.g.*, AR-00140062-063 (Endocrine Soc'y cmt.) ("Removing these nondiscrimination protections will make it easier for providers to deny care to transgender individuals for any health care service, not just those related to their gender transition, and will discourage transgender individuals from seeking care or reporting when they have been a victim of discrimination."). The 2016 Rule, consistent with this medical consensus, therefore sensibly prevented insurers from denying or limiting coverage for services "ordinarily or exclusively available to individuals of one sex" to transgender people who need them. *See* 81 Fed. Reg. 31,471-72, (former § 92.207(b)(3)-(5)). Contrary to Defendants' assertion, this regulatory requirement did not "interfere with the ethical and medical judgment of health professionals," 85 Fed. Reg. at 37,187, but instead simply required insurance companies to provide comparable coverage for like services, regardless of whether they were to treat gender transition or another condition, 81 Fed. Reg. at 31,471-72 (former § 92.207(3), (5)), and barred insurers from maintaining categorical exclusions for transition-related care that would deny coverage to transgender people for medically necessary care, *id*. at 37,472 (former § 92.207(4)). This now-repealed requirement respected health professionals' clinical judgment by preventing insurance companies from categorically disregarding the medical necessity determinations reached by these providers. It is therefore

---

(Mount Sinai Health Sys. cmt.); AR-00140033 & nn.31-32 (Am. Coll. of Obstetricians & Gynecologists cmt.); AR-00154061 & nn.19-20 (Nat'l Latina Inst. for Reprod. Health cmt.); AR-00129346-347 (Nat'l Health Law Program cmt.); AR-00140062-063 (Endocrine Soc'y cmt.).

Defendants' revisions in the 2020 Rule that sideline expert medical judgement, rendering them arbitrary and capricious.

> c. *Franciscan Alliance does not excuse HHS's failure to consider individual and public health harms caused by the 2020 Rule.*

The Court should not credit Defendants' argument that they may disregard the myriad individual and public health harms that the record makes clear will be attributable to the 2020 Rule simply because a district court enjoined and later vacated some (but not all) relevant portions of the 2016 Rule.  *See* Defs.' Mem. Opp. Summ. J. 80; *see also* Pls.' Mem. Supp. Summ. J. 54-59 (describing harm).  In *Franciscan Alliance v. Burwell*, the court held the meaning of "sex" in Title IX and therefore Section 1557 "unambiguously refers to 'the biological and anatomical differences between male and female students as determined at their birth.'"  227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) (internal citations omitted).  But *Bostock*, for the reasons discussed above, makes it unmistakably clear that *Franciscan Alliance* was wrongly decided. *Accord Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 593, 619 (4th Cir. 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020) (applying *Bostock* to Title IX); *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1304-05 (11th Cir. 2020) (applying *Bostock* to Title IX); *see also Whitman-Walker*, 2020 WL 5232076, at *25-26 (discussing *Franciscan Alliance*).  Defendants' decision to rush forward with a faulty analysis of the 2020 Rule's costs was therefore arbitrary and capricious.

## 2.    HHS has not adequately justified its removal of language access protections.

While Defendants are correct that HHS was "free to change" its language access policies under its regulatory interpretation of Section 1557, in order to do so, they were required to "show that there are good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), that are "based on non-arbitrary, relevant factors" and "tied to the purposes"

23

of Section 1557 or the "appropriate operation" of federal anti-discrimination laws in the health care industry. *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (internal citations omitted). The record makes clear that HHS has failed this test.

The Rule eliminates notice and tagline requirements and weakens language access requirements in contravention of the agency's prior factual findings that such actions will undermine "meaningful access" required by Section 1557; as such, it fails to adequately consider the harms of 2020 Rule, *see, e.g.*, 81 Fed. Reg. 31,378, 31,419, 31,459, 31,461-62, and is without adequate justification. Tellingly, Defendants now jettison most of the cost-based justifications that buttressed the 2020 Rule. Regardless, whatever cost and administrability benefits may inure to the regulated community and HHS as a result of the 2020 Rule, Defendants failed to appropriately consider the impact that this policy change would have on individual LEP patients—the very people Section 1557's comprehensive nondiscrimination provision protects. *See, e.g.*, *State Farm.*, 463 U.S. at 47-51 (finding agency's rescission of rule requiring airbags arbitrary and capricious where the agency failed to take account of the benefits of airbags).

Defendants' opposition devotes paragraphs to faulting Plaintiffs for not identifying contradictory factual findings in the record. *See* Defs.' Mem. Opp. Summ. J. 75, 77. But this argument misapprehends Plaintiffs' central point: Defendants overlooked, or altogether ignored, HHS's earlier factual findings and the myriad comments submitted in connection with the 2019 NPRM. The record is clear that the removal of the 2016 Rule's language access provisions would adversely impact many LEP individuals in a number of ways: denying them the ability to access important health care services and programs; impeding their ability to communicate effectively with providers and insurers; and reducing their ability to understand the information critical to informed medical decision-making and consent. *See, e.g.*, 85 Fed. Reg. 37,233-34.

For example, HHS received myriad comments in connection with the 2019 NPRM that described precisely how and why the 2016 Rule improved access to health care for LEP individuals, including, for example, by increasing the use of translation services, *see, e.g.*, 85 Fed. Reg. 37,233, and improving access to health care for other particularly vulnerable groups, *see* 85 Fed. Reg. 37,234.  Likewise, HHS received myriad comments explaining precisely how and why the 2020 Rule would reduce access to health care by LEP individuals, generate confusion among patients, invite discrimination on the basis of race and national origin, adversely impact provider-patient communications, cause LEP individuals to avoid or delay seeking care, and otherwise unnecessarily erect barriers to accessing critically important health care services.  *See, e.g.*, *id.* at 37,165; 37,204; 37,211; 37,212.

Rather than meaningfully address any of these patient-centered concerns, HHS flatly asserted that it "agrees with those who reported a different experience"[17] and that it "lacks the data enabling it to . . . calculate the value of such benefits lost as the result of this final rule."  85 Fed. Reg. 37,233.  The failure of HHS to grapple with the impact of the 2020 Rule on LEP patients and the harm that it "might do to human health" violates the APA.  *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015); *see also FCC v. Fox Television Stations, Inc.*, 566 U.S. 502, 515-16 (2009) (requiring a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy"); *Henley v. FDA*, 77 F.3d 616, 620 (2d Cir. 1996) ("A reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a 'satisfactory explanation for its action, including a rational

---

[17] As to translation services, HHS appears to have agreed with a single insurance company who reported no appreciable increase in the use of translation services over comments from several health care providers that reported increases in the use of translation services as a result of the 2016 Rule.  *See, e.g.*, 85 Fed. Reg. 37,232-33.

connection between the facts found and the choice made." (citations omitted)); *Delaware Dep't of Nat. Res. & Env. Control v. EPA*, 785 F.3d 1, 13-14 (D.C. Cir. 2015) (failing to adequately address comments identifying an important aspect of the problem is arbitrary and capricious).

Nor have Defendants adequately justified their decision to jettison the prior factual findings and framework. Defendants' attempt to recast Plaintiffs' claims related to the importation of the four-factor HHS and DOJ LEP Guidance as "inappropriate[] complain[ts] about the wisdom of HHS's new standards" falls flat. Defs.' Mem. Opp. Summ. J. 76. Section 1557 expressly protects *individual* patients from discrimination, while Defendants' new test reflects a *categorical* approach to compliance that offers no guarantee that individuals will be free from discrimination as provided by Section 1557, but instead permits covered entities to determine for themselves whether they have any language access obligations at all, and if so, the extent of those obligations based, in part, on the total number or proportion of LEP individuals served. *See* Pls.' Mem. Supp. Summ. J. 60-61. But the record shows—and Defendants acknowledge—that moving from an individual approach to a categorical approach will *reduce* the number of LEP individuals that covered entities are required to serve. *See* Defs.' Mem. Opp. Summ. J. 73; 85 Fed. Reg. 37,211 (noting that the four-factor guidance is necessary because the 2016 Rule "could be potentially interpreted to require a covered entity to provide language assistance services to every LEP individual it comes into contact with."). This approach simply cannot be squared with the text and purpose of Section 1557.

      **3.**      **The Rule arbitrarily and capriciously incorporated Title IX's religious exemption.**

Defendants have not presented any meaningful support in the record for why the 2020 Rule's incorporation of Title IX's broad religious exemption and "abortion neutrality" provision is not arbitrary and capricious. The record is clear that Defendants failed to consider two

important aspects of the problem. *See* Pls.' Mem. Supp. Summ. J. 67-70; *State Farm*, 463 U.S. at 43. Furthermore, Defendants' incorporation of these provisions is at odds with its reasoned explanation in the 2016 Rule for why the incorporation of those provisions was dangerous, including that "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results," *see* 81 Fed. Reg. at 31,380,[18] Defendants' failure to provide a substantial justification for their policy reversal is arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2125-26. While the 2016 Rule offered text- and evidence-based reasons for HHS's decision to appropriately decline to incorporate these exemptions, 81 Fed. Reg. at 31,380, Defendants here fail to plausibly explain why their earlier reasoning was wrong.

First, as HHS has previously acknowledged, unlike parents or students voluntarily choosing religious schools, patients seeking health care often have no choice but to obtain such care from religiously affiliated entities. 81 Fed. Reg. at 31,380. Under the revisions imposed through the 2020 Rule, however, patients now face the life-threatening consequences of health care discrimination by providers that may be the patients' only option to obtain health care services. Defendants claim that Plaintiffs have waived this argument because it is being raised for the first time on judicial review and was not raised in the comments to HHS by either Plaintiffs or any other commenter. Defs.' Mem. Opp. Summ. J. 80, n. 16. However, comments

---

[18] *See, e.g.*, AR-00154252-253 (Nat'l Asian Pac. Women's Forum cmt.); AR-00141595-596 (NARAL Pro-Choice Am. cmt.); AR-00153954-957 (Nat'l Hispanic Leadership Agenda cmt.); AR-00144889-890 (Nat'l All. of State & Territorial AIDS Dirs. cmt.); AR-00142062-068 (law and religion scholars cmt.); AR-00129685-687 (Am. Med. Student Ass'n cmt.); AR-00117576-577 (Ass'n of Am. Med. Colls. cmt.); AR-00143086-087 (Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Med. cmt.); AR-00162009-011 (Gender Justice cmt.); AR-00152654-655 (HIV Health Care Access Working Grp. cmt.); AR-00154064-067 (Nat'l Latina Inst. for Reprod. Health); AR-00164147-149 (Planned Parenthood cmt.).

to the agency in the rulemaking process did address *both* that patients seeking care often have no choice but to obtain care from a religiously affiliated entity *and* the life-threatening consequences of health care discrimination.  *See, e.g.*, AR-00164228-251 (Lambda Legal cmt.) ("while students or parents select schools as a matter of choice, individuals needing health care often have limited or no choice, . . . where religious institutions have taken over hospitals that serve people of diverse faith and no faith."); *see also* AR-00129291-378 (Nat'l Health Law Program cmt.); AR-00142058-070 (Law and Religion Scholars cmt.); AR-00146049-071 (cmt. of 22 States).  And the 2016 Rule—which the agency considered in issuing the new Rule—itself made clear that the difference in contexts between education and health care was among the reasons that HHS at that time did not include Title IX's religious exemptions in the 2016 Rule.

Defendants incorrectly contend that incorporating Title IX's religious exemption was "more consistent with statutory language," and that Title IX specifically contemplated its application in the health care context.  Defs.' Mem. Opp. Summ. J. 80 (citations omitted).  But Defendants' position has no basis in law.  Defendants rely on *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 558 (3d Cir. 2017).  However, *Doe*, despite involving a hospital, was decided in the educational context, as the teaching hospital "was affiliated with a university and administered the program at least in part for the purpose of teaching residents."  *Id*.  But unlike medical residents who may choose their programs or choose not to pursue a residency, patients seeking care may have only religiously affiliated providers available, and choosing not to seek care could be life-threatening.  That Defendants conflate these two scenarios highlights that HHS did not seriously consider how the statutory exemptions are inappropriate in the health care context.

Second, HHS failed to consider the harms to individuals who will be denied health treatments, services, and insurance coverage because of these exemptions, particularly those for whom religiously affiliated medical providers are the only available options, and attendant public health costs.  Defendants claim that HHS did consider these costs and harms but then decided that those costs and harms could not exist because "the 2020 Rule does not create any new religious or abortion exemption."  Defs.' Mem. Opp. Summ. J. 83.  However, the religious exemptions and the "abortion neutrality" provision were not included in the 2016 Rule.  The Rule empowers and authorizes health care providers to change their practices in light of the 2020 Rule, and that would lead to harms to individuals and attendant public health costs.  For these reasons, HHS's failure to consider the harms from exempting religiously affiliated health programs from Section 1557 is arbitrary and capricious.

Third, HHS also failed to account for its prior determination that these exemptions would delay or deny medically necessary care—including in emergency circumstances—because of discrimination.  *See* 81 Fed. Reg. at 31,380.  At "no point did the agency even assert that a religious exemption would preserve meaningful access to health care for vulnerable populations—let alone provide evidence supporting any such conclusion."  *Whitman-Walker*, 2020 WL 5232076 at *28.  HHS's new assertion that the "religious exemption will ensure 'high-quality and conscientious care,'" 85 Fed. Reg. at 37,206, is "a 'conclusory statement' . . . delivered entirely without elaboration or support."  *Whitman-Walker*, 2020 WL 5232076 at *28 (quoting Getty v. Fed. Sav. & Loan Corp., 805 F.2d 1050, 1057 (D.C. Cir. 1987)).

## III.   The Court should reject Defendants' request to narrow the scope of relief.

Defendants have requested that the Court remand the 2020 Rule without vacatur, citing speculative "disruption" and "confusion" from the vacatur of the 2020 Rule.  Def. Mem. Opp. Summ. J. 83-84.  But it would be far from disruptive to vacate the 2020 Rule, which eliminated

many specific regulatory requirements of the 2016 Rule that provided clarity to the regulated community.  The *Franciscan Alliance* decision's deletion of five words from the 2016 Rule's definition of discrimination "on the basis of sex" does not lend any more weight to Defendants' arguments here.  Rather than engender confusion, complete vacatur of the 2020 Rule will prevent ongoing harm to Plaintiffs and their residents.  For the same reasons, the Court should reject Defendants' request that the court sever and vacate the 2020 Rule only in part.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment on their Administrative Procedure Act claims.

DATED:  January 20, 2021                        Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Travis England*
Travis W. England, *Assistant Attorney General*
Fiona J. Kaye, *Assistant Attorney General*
Marissa Lieberman-Klein
   *Special Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6233
Travis.England@ag.ny.gov

XAVIER BECERRA                          MAURA HEALEY
*Attorney General of California*          *Attorney General of Massachusetts*

Renu R. George                          By:  */s/ Amanda Hainsworth*
   *Senior Assistant Attorney General*     Amanda Hainsworth
                                           *Assistant Attorney General*
Kathleen Boergers                        Kimberly A. Parr, *Assistant Attorney General*
   *Supervising Deputy Attorney General*   Office of the Massachusetts Attorney General
                                         One Ashburton Place, 18th Floor
By: */s/ Neli Palma*                      Boston, Massachusetts 02108
Neli Palma,                              (617) 963-2618
   *Supervising Deputy Attorney General*   amanda.hainsworth@state.ma.us
Lily Weaver,

30

*Deputy Attorney General*
Martine D'Agostino,
 *Deputy Attorney General*
Office of the California Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7522
Neli.Palma@doj.ca.gov